**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------X

**UNITED STATES OF AMERICA**

       **04 Cr. 356  (KBF)**

      **V.**

**HAROON RASHID ASWAT,**

       **Defendant.**
------------------------------------------------------X


**SENTENCING MEMORANDUM**
**ON BEHALF OF HAROON RASHID ASWAT**


                             Peter Enrique Quijano
                             Anna N. Sideris
                             Attorneys for the Defendant
                             QUIJANO & ENNIS, P.C.
                             40 Fulton Street, Floor 23
                             New York, New York 10038

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X

**UNITED STATES OF AMERICA**

                                                    **04 Cr. 356  (KBF)**

          **V.**

**HAROON RASHID ASWAT,**                       **October 2, 2015**

                           **Defendant.**
-----------------------------------------------------X

## SENTENCING MEMORANDUM
## ON BEHALF OF HAROON RASHID ASWAT

We respectfully submit this memorandum on behalf of Haroon Rashid Aswat, in order to advise your Honor of several matters that the defense will raise at the time of his sentencing to aid in the determination of the appropriate sentence. Mr. Aswat entered a plea of guilty on March 30, 2015, before your Honor, to Counts Five and Six of the indictment, which charged him with Conspiracy to Provide Material Support to a Foreign Terrorist Organization and a substantive count of Providing Material Support to a Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1) and 2. Mr. Aswat's sentencing is scheduled to take place before your Honor on October 16, 2015 at 11:00 a.m. The parties have stipulated that the applicable Sentencing Guideline (hereinafter, "Guidelines") range is two hundred forty (240) months. The following discussion will demonstrate that a sentence of one hundred fifty (150) months would be sufficient, but not greater than necessary, to fulfill the goals of sentencing.

As detailed for the Court below, there are several 18 USC § 3553(a) factors that favor a sentence of one hundred fifty (150) months for Mr. Aswat. His

personal history and character reveal a very gentle, kind, and good intentioned man. The particular historical and religious context of this case certainly does not justify or defend his actions but it does offer a better understanding of Mr. Aswat's motivations and contextualizes conduct. Mr. Aswat's personal participation in the offense was extremely limited and minimal by any standard, and it certainly did not involve an act of terrorism. The terrorism enhancement applied via § 3A1.4 significantly overstates Mr. Aswat's conduct and his Criminal History. And finally, a sentence of more than one hundred fifty (150) months imprisonment would create unwarranted sentencing disparities between Mr. Aswat and others who have been sentenced for similar or far worse conduct.

## I.  Applicable Legal Standard

Pursuant to the United States Supreme Court's decision in *United States v. Booker,* 543 U.S. 220 (2005), and the Second Circuit's interpretation of *Booker* in *United States v. Crosby,* 397 F. 3d 103 (2d Cir. 2005), this Court's sentencing decision must be based upon the factors set forth in 18 U.S.C. § 3553(a). Section 3553(a) requires the Court to impose a sentence "sufficient, but not greater than necessary" to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to criminal conduct, to protect the public, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. 18 U.S.C. § 3553(a).

Factors that the Court must consider in determining how to satisfy the enumerated goals of sentencing include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a). The Second Circuit has reaffirmed these principles while emphasizing that "[a] sentencing judge has very

wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera,* 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*). "A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors; aided by the arguments of the prosecution and defense. *Id.* The Supreme Court has reiterated in *Nelson v. United States*, 555 U.S. 350, 352 (2009) that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed reasonable*" (emphasis in original).

In this case, given Mr. Aswat's personal characteristics and lack of criminal history, the circumstances surrounding his involvement in the offense, his minimal role in the offense, and sentences imposed on similarly situated defendants, a reasonable sentence is one hundred fifty (150) months.

## II.    Personal History and Characteristics

### A.  Childhood, Education and Family

Mr. Aswat was born in 1974 in Dewsbury, West Yorkshire, England to Rashid Aswat and Sara Kara. Pre-Sentence Report (hereinafter "PSR" ¶63).  His parents were originally from India and immigrated to England, where they are still living, happily married and not far from the rest of his family.  Mr. Aswat has five brothers and four sisters and he has remained close with all of them.  In their birth order, his siblings' names are: Mohammed, Ismail, Hawabibi, Kadija, Ilyas, Ibrahim, Zuleka, Fatima, and Bashir.  Mr. Aswat fondly remembers his childhood spent with his close-knit family and surrounded by extended family that all shared a common Gujarati background.  His parents were religious and Mr. Aswat credits them for instilling in their children, through their Islamic faith, the importance of compassion and respect for others, regardless of any cultural, religious or racial differences.  Mr. Aswat's brother Mohamed also feels a great deal of gratitude

towards their parents.  "Discipline, good moral characters, appreciation for society and above all, love and respect for humanity at large were they key fundamental teachings.  To this day we thank our parents that these qualities play a pivotal role within our family lives." Exhibit A.  A common theme in the letters submitted on behalf of Mr. Aswat describe him as holding on to these core values and exhibiting them daily.

For grade school, Mr. Aswat attended public school during the day and religious instruction in the evenings.  When he was 14, he enrolled in Markaz, an Islamic boarding school in Dewsbury from where he received his high school degree. PSR ¶73.  It was also where he learned to memorize the Quran, proudly following in his father and brothers' footsteps, in becoming *hafeez*.  Wanting to pursue his interest in mechanics, Mr. Aswat attended Dewsbury College for two years, where he studied electronic engineering. PSR ¶73.

As the letters attached confirm, Mr. Aswat has always been extremely generous, caring, and patient.  Two of his younger sisters wrote to the Court recalling precious time spent with Mr. Aswat when he helped them with their studies for countless hours, took them on memorable adventures, and taught them by example how to be kind and good to all people.  Zulekha Aswat, his younger sister, shared a story that accurately captures what kind of man Mr. Aswat is.  She remembers being extremely frightened one evening when she was a young girl and discovered a spider in her room.  Zulekha requested that her brother kill the spider. "He gently explained to [Zulekha] that all creatures big and small had been created by God and should be treated with kindness.  He gently captured the spider and let it out the window."  Moosa Bulbulia, Mr. Aswat's cousin, is another family member who describes for the Court his acts kindness and generosity that have touched her deeply and inspired her entire family.  One story in particular was

5

when Mr. Aswat rescued and cared for a stray cat he found in the park.  As a result, her children no longer feared cats.  These same sentiments were also confirmed by the Imam at Broadmoor Hospital where Mr. Aswat spent his incarceration for six years prior to his extradition to the U.S.  Faiz Qureshy writes:

> During our time together I found him to be very patient, that he displayed a lot of consideration for all patients, those from all faiths and those with no faith.  As well as someone who was very helpful if the opportunity ever arose to help someone.  An example of this includes when I would give out religious artefacts, or the like to the patients, if I was ever short he would always waive his right to it to ensure that another patient could benefit from the item… I can honestly say that in my 6 years of working with Mr. Aswat I cannot say anything negative about him, nor did I ever hear anything negative about him from staff, nor other patients.  I believe this to be praise in and of itself.

## B.  Mental Health History

Mr. Aswat's was first diagnosed as having an acute psychotic episode in March of 2008, while he was imprisoned in England's HMP Long Lartin Prison. The staff became concerned due to Mr. Aswat behaving erratically over a two-week period.  He was disruptive and hostile towards prison staff, shouting loudly at others and to himself[1].  Mr. Aswat refused to eat during this time and drank very little.  He experienced auditory and visual hallucinations as well as paranoia and grandiose delusions.  Two government doctors at Long Lartin (Dr. Kenney-Herbert and Dr. Payne) examined Mr. Aswat – on their own, without any request from defense counsel.  Dr. Payne diagnosed him as having an acute psychotic episode, declared him incompetent to decide to not to eat or drink, and ordered a transfer to

---

[1] Attached, as Exhibit B, is the report of Dr. Claire Dillon (hereinafter "Dillon Rpt"), Consultant Forensic Psychiatrist at Broadmoor Hospital, West London Mental Health Trust.

Broadmoor Hospital on March 27, 2008, for involuntary admission to receive proper and necessary treatment. Exhibit B, p.4.

Mr. Aswat continued to experience psychotic symptoms at Broadmoor for several months, "including being suspicious, guarded and perplexed, thought disorder, grandiose delusions, delusions of reference, persecutory ideas and probably visual and auditory hallucinations." He was diagnosed as having paranoid schizophrenia and treated accordingly. Exhibit C, p.6. His medication and treatment at Broadmoor proved effective as Mr. Aswat's condition improved over the course of a year until eventually, he no longer exhibited psychotic symptoms[2].

Mr. Aswat recalls that he first experienced symptoms of schizophrenia when he was approximately twenty years old and living in London. At the time, he was behaving somewhat "rebellious" – smoking cannabis and going out to nightclubs; both were inconsistent with his religious teachings. He became extremely paranoid and sincerely believed that people were following him in order to harm him. He was also convinced that certain people walking around among us were actually aliens and capable of reading his thoughts. Unsure of what it was he was experiencing and how to deal with it, he resumed praying five times a day. Soon after, he started to feel better and his paranoia subsided. He believed that focusing on praying brought him relief and comfort. It was then that he started attending Finsbury Park Mosque. He felt welcomed there and enjoyed the people, who offered him a job as a caretaker and cook. This was also when he first met his codefendant, Mustafa Kamel Mustafa ("Mustafa"), who was in charge of the mosque. Mr. Aswat spent a great deal of time with Mustafa and enjoyed learning

---

[2] Dr. Dillon was responsible for Mr. Aswat from June 2011 until his extradition and she has detailed his condition – symptoms and treatment – in her report.

all about religion and politics from him.  Mustafa, having lost both of his hands, must have enjoyed having Mr. Aswat around because in him, he gained a devoted errand boy.  Mr. Aswat availed himself to Mustafa for day-to-day chores as well as organizing events or media.  He felt as though this new routine helped him to clear his head and feel healthy again.

His "full recovery" did not last very long as Mr. Aswat eventually began to suffer from deep depression and could no longer even bring himself to work at the mosque, which he had once very much enjoyed.  His energy plummeted and he no longer had the desire to do much of anything.  This depression coincided with the time period when Mustafa encouraged him to go to Bly, Oregon for training and a change of scene.

Upon his extradition to the U.S., Mr. Aswat was transferred to Columbia Regional Care Center (CRCC) in Columbia, South Carolina where he was monitored and assessed.  He was given a diagnosis of Schizophrenic disorder, bipolar type, history of paranoid schizophrenia[3].

18 U.S.C. § 3553(a)(2)(D) requires that the sentence imposed provide the defendant with the needed medical care in the most effective manner.  While Mr. Aswat has received medication since his incarceration in the Bureau of Prisons, he is not receiving the same type of treatment responsible for his recovery while he was in Broadmoor.  For example, despite assurances during the extradition process that he would receive proper medical care, there were several days while Mr. Aswat was housed at both the MCC New York and MDC Brooklyn when he was kept in the Special Housing Unit.  This entailed 23 hour lock down in solitary confinement.  In addition, he was not receiving his medication during those times.  Mr. Aswat's need for continued medical care favors a sentence of 150 months.

---

[3] Attached as Exhibit C is the report from CRCC.

## III.   The Nature and Circumstances of the Offense

### A.  Historical and Religious Context

Mr. Aswat fully accepts responsibility for his actions and does not question his guilt.  He announced his decision to plead guilty very early on in our representation of him, understanding that he had, without question, committed a crime.  In asking the Court to consider the historical context in which he committed this offense and his personal motivations, Mr. Aswat is not backing away from his acceptance of responsibility.  Rather, he is providing the Court with the full narrative and relevant facts that will assist in imposing a sentence that is individualized to him and "sufficient but not greater than necessary".

To understand why Mr. Aswat – a man who had never believed or engaged in violence - would agree to attend and assist at a training camp in the United States for whom he believed was an Arab Muslim group, we must remember what the world was like in 1999 for European Muslims in general and particularly for Mr. Aswat.  This was before 9/11; before most of the world, including Mr. Aswat, knew what Al-Qaeda was or that it even existed.  Mr. Aswat motivated by a religious and humanitarian belief that it was his duty to train if one day he would need to defend fellow Muslims under attack, as they had been in Bosnia and other parts of Europe.  He was not interested and never intended to join a war against Westerners and was adamantly against bringing harm to innocent people anywhere in the world.

### 1.  Political Atmosphere

What happened in Bosnia in the 1990's had a profound effect on Muslims around the world, including Mr. Aswat.  Shortly after Bosnia-Herzegovina

declared it's independence from Yugoslavia in 1992, Bosnian Serb forces engaged in an ethnic cleansing program and genocide that targeted Bosnian Muslims and included mass executions, rape, and torture at Muslim detention camps. One of the worst among many atrocities that occurred during the roughly three-year war took place in Srebrenica. The United Nations had declared Srebrenica among the "safe havens" in 1993 to be disarmed and protected by international peacekeeping forces. In July of 1995 however, Serbian forces advanced on Srebrenica and ultimately took control. Muslim women, children, and elderly were deported to detention camps and males over the age of sixteen were all murdered. At least 7,000 of Srebrenica's men and boys were murdered[4] – because they were Muslim.

Many Muslims watched in horror from their homes in the U.K. as this – the largest massacre in Europe since the Holocaust of World War II - played out on their television screens. Mr. Aswat did not understand the extent of this tragedy as it took place but he learned more about it after he started attending and working at the Finsbury Park Mosque, around 1997. He watched graphic videos showing images of the genocide caught on tape and became extremely distressed. He remembers getting very emotional when he saw women and children crying over dead bodies. Like many others, he was angry that the rest of the world did not adequately react to this massacre and come to the aid of so many innocents. It was in reaction to the Bosnian genocide that he first felt compelled to train in order to prepare to defend himself, his family and Muslims around the world from the same fate. It was a turning point in his life when he felt that he and his family could be next; this happened to his own people, to his brothers, in Europe. He feared his family being massacred like what happened in Bosnia.

Going forward, Mr. Aswat followed current events and took more of an

---

[4] http://thomas.loc.gov/cgi-bin/query/D?r109:1:./temp/~r109GDho5z::

interest in learning about history from Mustafa and others at the mosque.  It was the first time he was around political conversation like that because his family was not interested or vocal about such matters.  He heard from men at the mosque about Afghanistan and what it was like after the Taliban captured Kabul, as well as the jihad against the Soviets long before that.  He envied the young men he encountered who went to Kosovo in an effort to provide aid missions during the crisis there.  Mr. Aswat spent most of his time around Mustafa, who was very opinionated and vocal on politics.  He watched as Mustafa preached and spoke passionately about issues that affected the Muslim community and couldn't help but feel protective of his mentor when so many seemed to mock him and distort his important message. It was all new and fascinating to Mr. Aswat.

The idea of hurting innocent people – Muslims or non-Muslims – was never something he condoned or signed up for.  When Mr. Aswat went to Bly in 2000, it is understandable and possible that he could attend a training camp for the "Arab Group" and still hold his belief system of not wanting to harm, let alone kill innocent people.  He was going there to teach religion in exchange for military training. The military training was not to wage a war but it was necessary, as a Muslim man, in order to be ready to defend fellow Muslims who fell under attack.

### 2.  The Teachings of the Quran

As previously explained herein, Mr. Aswat grew up in a religious household and attended an Islamic boarding school where he learned to memorize the Quran. The Quran teaches that Muslims must defend each other.  "As for the believers, men and women, they are protectors of one another." (Quran 9:41).  Muslim young men throughout the world believed that it was obligatory to obtain military training, not with the goal of engaging in jihad.

During Mustafa's trial, government witness Saajid Badat explained this.

11

Mustafa Trial Transcript (MTT) pp 1698-1699:

8 Q. And then in January of '99, you decided you were going to
9 go to Afghanistan?
10 A. Yeah.
11 Q. And you were in Afghanistan off and on from January of '99
12 up and through December of 2001, right?
13 A. Yes.
14 Q. And when you first went, when you first decided to go to
15 Afghanistan, you did not intend to join al-Qaeda, did you?
16 A. That's correct.
17 Q. And when you went to Afghanistan, when you first went
18 there, you were going there to fulfill a religious obligation,
19 right?
20 A. Yes.
21 Q. And you wanted to go train, isn't that right?
22 A. Yes.
23 Q. You wanted to train in case you wanted to get involved in
24 jihad, right?
25 A. Yes.

1699

1 Q. Because training was, in fact, one step of jihad, a
2 separate obligation, wasn't it?
3 A. Yes.
4 Q. So it's an obligation to train and then a separate and
5 distinct obligation to get involved in the actual fighting,
6 isn't that right?
7 A. Yes.
8 Q. Now, when you first went to Afghanistan, you did not go
9 with the intent to fight anybody in Afghanistan, did you?
10 A. No.
11 Q. And when you first went to Afghanistan, you never had to go
12 with the intent to fight anybody in the United States, did you?
13 A. No.
…

20 Q. You just went so you could train as one portion of your

12

21 obligation under the Quran, right?

22 A. Yes.

23 Q. And, in fact, when you went there, it was your intent when

24 you left to come back to university, right?

25 A. Yeah.

### B.  Haroon Aswat's Role in the Offense

It is now known, from the trials of Mr. Aswat's codefendants, Mustafa and Oussama Kassir, that in 1999 Ernest James Ujaama traveled from Oregon to London to see Mustafa at the Finsbury Park Mosque.  Ujaama urged Mustafa to come to Bly, Oregon where Ujaama claimed there was a cadre of American Muslims seeking Mustafa's religious guidance and military training.  Mustafa sent Kassir to provide physical weapons training and Mr. Aswat was sent to provide religious training in Bly. (PSR ¶29).  Mr. Aswat was interested in learning to train having never had any previous experience or exposure to such training.  The idea of leaving London for the U.S. was enticing for him as well.  He was experiencing depression and lethargy at home, focusing on his lack of prospects for a future wife and feeling disconnected to the city around him.  Mustafa, aware of Mr. Aswat's low spirits and frustrations, encouraged him to go and get married there.

It was in this landscape that Mr. Aswat eventually came to find himself in Bly, Oregon.  He arrived at a broken down ranch with a couple of rifles, in what could not, even in the loosest of terms, be descried as a "training camp."  While Kassir may have brought manuals on weapons training, Mr. Aswat did not witness or receive any such training at Bly.  Nor did Mr. Aswat see or hear anything about Usama Bin Laden's 1996 "Declaration of War."  There was nothing organized about the property in Bly, and Mr. Aswat didn't have the opportunity to provide religious training as he understood he was sent there to do.  The most activity that Mr. Aswat experienced in Bly was when he accompanied a couple of the men on

an armed night patrol of the property.  There were not even enough weapons for everyone – a handful of men at most - to be armed.

After it became clear that there was no training camp in Bly, Mr. Aswat and Kassir traveled to a mosque in Seattle, Washington. (PSR ¶33).  This led to further disappointment for Mr. Aswat who spent most of his time there praying alone.  He was constantly bored, and had no money or opportunity for income, resorting to petty larceny[5].  As for military training, he remembers someone demonstrated how to assemble and disassemble an AK-47 rifle a couple of times while at the mosque.  His hopes for learning to train in the U.S. and meeting a potential wife[6] were not recognized either.  While in Seattle, Mr. Aswat and Kassir had an argument and they eventually went their separate ways.

Mr. Aswat was in Bly and Seattle, Washington for about three months. Once he was able to purchase a plane ticket with help from his father, he returned to London.  He soon became disillusioned with Mustafa as a result of Mustafa's extreme views.  Mustafa was spending more time with Ujaama, whom Mr. Aswat did not want to be around because of his radical beliefs.  Shortly after his return from Seattle, Mr. Aswat disassociated from and severed all links with Mustafa, the Finsbury Park Mosque, Kassir, Ujaama, and all of the Bly and Seattle crew.

In understanding Mr. Aswat's role in the charged conspiracy, it is important to remember that this was two years before September 11th.  Mr. Aswat has readily admitted his guilt to the charged conspiracy, including that he intentionally provided material support to a terrorist organization – al-Qaeda.  He understood that Mustafa had ties with an "Arab Group," and he agreed to accompany Kassir to

---

[5] Hungry and cold, Mr. Aswat stole some food and a sleeping bag.
[6] While on the property in Bly, the couple living their offered for Mr. Aswat to marry their daughter.  When he discovered she was only 9 years old, he declined as he felt that was extremely inappropriate.

Bly in order to provide religious instruction in exchange for military style training. However, Haroon had never heard of al-Qaeda, and did not understand that the "Arab Group" was in fact al-Qaeda. This was common in 1999. Government witness Saajid Badat testified that in 1999 when he traveled to Afghanistan to go to a training camp, he didn't refer to the group as "al-Qaeda."

MTT p. 1578

3 Q. Later on in your time in Afghanistan, when you were working
4 with al-Qaeda, did you refer to al-Qaeda by that name?
5 A. No.
6 Q. By what name did you call it?
7 A. It was called the sheikh's group

Badat also explained how in 1999 unknown al-Qaeda was even to the young men who traveled to Afghanistan to train in 1999. MMT 1700:

10 Q. Now, when you first went to Afghanistan, you said it was
11 January of '99, right?
12 A. Yeah.
13 Q. You hadn't even heard of al-Qaeda at that point, had you?
14 A. That name, no.
15 Q. And you heard of maybe a group, but that name of al-Qaeda,
16 when you went to Afghanistan in '99, you did not know, did you?
17 A. No.
18 Q. But you had heard something about bin Laden, hadn't you?
19 A. That's correct, yeah.
20 Q. Now, when you went there to train, it was, like I said,
21 part of your obligation, just like praying and just like
22 charity, right?
23 A. Yeah.

It is now understood that in 1999 Abu Zubayda was al-Qaeda and ran the Khaldan al-Qaeda training camp. By March 2000, United States officials were reporting that Zubaydah was a "senior Bin Laden official," the "former head of Egypt-based

Islamic Jihad," a "trusted aide" to Bin Laden with "growing power," who had "played a key role in the East Africa embassy attacks." (David A. Vise and Loraine Adams "Bin Laden Weekend, Officials say" The Washington Post, March 11, 2000).   The Khalden training camp was one of the hundreds of al-Qaeda training camps in Afghanistan. They were established and run by members of al-Qaeda during the Taliban rule (1996–2001)(Son of Al Qaeda, *Frontline* (PBS)) .Yet, when Badat trained there he was unaware that the camp or Zubayda were al-Qaeda. MMT 1707, 1720.

P  1707

11 Q. It was also Arab training camps, right, that was not Al
12 Qaeda?
13 A. Yeah.
14 Q. K-H-A-L-D-E-N, right?
15 A. Yeah. D-U-N, yeah. That wasn't.
16 Q. That was an Arab camp. It was not Al Qaeda, right?
17 A. That's correct.
18 Q. Who ran the Khalden camp?
19 A. Ibn Sheikh.
20 Q. Ibn Sheikh ran the Khalden camp?
21 A. Yeah.
22 Q. The Khalden camp was not an Al Qaeda camp?
23 A. To my knowledge, no. With Abu Zubaydah.

P 1720

16 Q. Please tell me if I misheard you. Abu Zubaydah and Ibn
17 Sheikh al-Libi were both responsible for the Khaldan camp,
18 right?
19 A. Yeah.
20 Q. That was not an Al Qaeda camp?
21 A. It was not.

At Bly, Mr. Aswat's role was minimal; minor at worst. Mostly, it appears, he was simply there – tagging along in Kassir's wake, with Kassir clearly in charge.

Government witness Ayatr Hakimah described the following, at MTT p.928:

13 Q. Ms. Hakimah, as between Haroon and Abu Khadijah, did one or
14 the other appear to be in charge?
15 A. Yes, sir.
16 Q. Who was that?
17 A. Abu Khadijah.
18 Q. Why do you say that Abu Khadijah appeared to be in charge?
19 A. He was the one that did most of the talking.
20 Q. Did there ever come a time when Abu Khadijah gave
21 instructions or orders to Haroon?
22 A. Yes.
23 Q. How did Haroon respond?
24 A. He obeyed them.

Ernest Ujaama described Kassir and Mr. Aswat's roles as follows, at MMT p. 1946-7:

4 Q. What was Kassir's role supposed to be at the jihad training
5 camp in Bly?
6 A. Kassir's role was to be the physical jihad trainer, sir.

24 Q. What was his [HAROON ASWAT] role supposed to be at the training camp in
25 Bly, Oregon?

1 A. His role was to be more of a religious spiritual trainer
2 teaching Quran and assistance in learning Arabic.

and at MTT p. 2084-86

25 Q. During this trip to Bly of Kassir and Haroon Aswat, did
either of them appear to be the leader?

17

2 A. Yes, sir.

3 Q. Which one of them?

4 A. Abu Khadija, Abdullah Kassir.

5 Q. Why do you say that?

6 A. Because Haroon was very quiet. Said almost nothing.

7 Q. How did Kassir behave?

8 A. Very arrogant, assertive, and more like he was in control.

9 Q. At some point did Kassir tell you who had sent him to the
10 United States?

11 A. Yes, sir, he did.

12 Q. Who did Kassir say sent him to the United States?

13 A. He said that Sheikh Abu Hamza sent him to the United
14 States.

15 Q. Did Kassir mention any mosques that he attended in the
16 United Kingdom?

17 A. Yes, sir, he did.

18 Q. Which mosque was that?

19 A. Finsbury Park Masjid.

20 Q. What, if anything, did he tell you about his time at the
21 Finsbury Park Masjid?

22 A. He told me he had helped Sheikh Abu Hamza take over the
23 masjid.

24 Q. Did Kassir tell you why he had come to the United States?

25 A. Yes, sir, he did.

1 Q. What did he tell you?

2 A. He told me that he came expecting recruits and he came to
3 train.

4 Q. Did he say what type of training he came to conduct?

5 A. Yes, sir, he did say jihad training, physical jihad
6 training.

Over and over again, during the Mustafa trial, government witnesses described Mr. Aswat as someone who was following Kassir's orders and was at his side saying very little, with the occasional head nod or a chorus of "Alla Akbar." In evaluating the circumstances surrounding Mr. Aswat's involvement in this offense (*i.e.*, conspiracy to provide material support to a foreign terrorist organization), his

18

role, as well as his role in relationship to the other coconspirators is extremely relevant and instructive.  While this is not a guideline determination as to whether a role reduction is warranted, and if so, how much of a one is warranted, a consideration of Role jurisprudence is nonetheless helpful.

Application Note 3(A) of USSG §3B1.2 states that a mitigating role adjustment is warranted "for a defendant who plays a part in committing the offense that makes him **substantially less culpable than the average participant.**" (Emphasis supplied). Until 2001, there was a debate, and conflict among the Circuits as to whether the term "average participant" referred to an average participant  in the charged crime, or to  a hypothetical average participant in similar crimes.  The Commission eventually adopted the definition of average participant, as used in Application Note 1 of § 3B1.1 (Aggravating Role) to mean "a person who is criminally responsible for the commission of the offense, but need not have been convicted."

Application Note 4 states that a reduction for minimal role – the highest permitted under the Guideline - is intended for a participant who is **plainly** among the least culpable among those involved in the conduct of the group. And, Application Note 5 states that the reduction for minor role – the lowest permitted under the Guideline – is intended for a participant who is less culpable than most other participants, but whose role could not be described as minimal.

Under any analysis or standard, Mr. Aswat's conduct as described by several government cooperating witnesses can only be characterized as minimal, or, at the very least, minor.  There can be no credible dispute that compared to Mustafa, Ujaama and Kassir, Mr. Aswat was "substantially less culpable".  The only other known participants of the offense are those who were already in Bly and Seattle.  Even compared to this pathetic crew, Mr. Aswat is, at the very least, "plainly among the least culpable."

19

**IV.    The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of the similar conduct.**

In Sentencing a defendant, a court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  The Second Circuit quoted that statutory language in *United States v. Stewart,* and said judges have a "responsibility, …, 'to avoid unwarranted sentence disparities.'" 590 F.3d 93, 144 (2d Cir. 2009).  The Court in *Stewart* further explained that courts must undertake a rigorous review of similar sentences even in the context of applying the terrorism enhancement:

> Perhaps all who merit this enhancement are culpable and dangerous – but some among them are more culpable, more dangerous, with crimes more serious, than others.  It is the district court that is primarily charged with the responsibility for making such distinctions.

*Id.*


The United States Sentencing Commission reports that the average sentence imposed for providing material support to designated foreign terrorist organizations or for terrorist purposes is 111 months. (*See* United States Sentencing Commission, Quick Facts: Offenses Involving National Defense (2012)).[7]  The New York University Law School Center on Law and Security's most recently published "Terrorist Trial Report Card," a comprehensive analysis of terrorism-related prosecutions and their results, similarly reports that the average sentence for all "jihadist" terrorism-related offenses (i.e. including charges going

---

[7] *Available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_National_Defense.pdf

beyond providing material support) is 14 years.[8]

After a survey of such cases, it is clear that the twenty-year sentence  (the statutory maximum and stipulated guideline sentence) would be far in excess of the range of sentences regularly imposed on defendants similarly situated to Mr. Aswat, and higher than many defendants convicted of multiple, serious terrorism-related charges.

### CASES SURVEYED

The below 18 cases from the Second Circuit are roughly comparable to Mr. Aswat's charges but the conduct in many of them is far worse.  This briefing focuses on defendants who were charged with providing or attempting or conspiring to provide material support to a foreign terrorist organization (often in addition to other charges). In addition we have endeavored, based on the information available to us, to exclude defendants who received downward departures under USSG 5K1.1 for providing substantial assistance to the government.

- **United States v. Ioannis Viglakis, 12 Cr. 585 (KBF) (SDNY)**
Judge: Katherine B. Forrest
Nature of offense: The defendant offered to provide large quantities of lethal, military-grade weapons to a DEA confidential source, who purported to represent the Fuerzas Armadas Revolucionarias de Colombia (the "Revolutionary Armed Forces of Colombia" or "FARC"), a violent international terrorist group based in Colombia. He then arranged for the successful delivery of three rocket-propelled grenade launchers ("RPGs"), with six accompanying RPG grenades, to an undercover law enforcement agent in Athens, Greece, and later gave thousands of euros to the DEA confidential source as a partial payment to the FARC to transport a multi-kilogram shipment of cocaine to Spain on his behalf.

---

[8] *Available at* http://www.lawandsecurity.org/Publications/Terrorism-Trial-Report-Card.

Convicted of: 18 USC 2339B (Attempt to provide material support or resources to terrorists)

**Length of sentence imposed: 120 months (10 years) (statutory maximum was 180 months.**

- ***United States v. Mohamed Ibrahim Ahmed*, 10 Cr. 131 (PKC) (SDNY)**
Judge: P. Kevin Castel
Nature of offense: The defendant traveled to Somalia to receive "jihad" training in weapons and explosives at an al Shabaab camp, and provided a total of 3,000 Euros to al Shabaab, a designated foreign terrorist organization.

Convicted of: 18 USC 371 (conspiracy to provide material support to a foreign terrorist organization), 18 USC 371 (conspiracy to receive military-type training from a foreign terrorist organization)

**Length of sentence imposed: 111 months (9 years)**

- ***United States v. Jorge Abel Ibarguen-Palacio*, 09 Cr. 498 (WHP)(SDNY)**
Judge: William H. Pauley III
Nature of offense: Ibarguen-Palacio was arrested armed with a machine gun, at sea in a boat full of military supplies, including explosives, after a shootout with the Panamanian National Police ("PNP"). The firefight occurred after the PNP attempted to render aid to this boat, which had become stranded traveling to a narcotics transaction involving the sale by the FARC of approximately one ton of cocaine.

Convicted of: 18 USC 2339B (material support to terrorists)

**Length of sentence imposed: 130 months (10.8 years)**

- ***United States v. Patrick Nayyar*, 09 Cr 1037 (RWS) (SDNY)**
Judge: Robert W. Sweet
Nature of offense: Nayyar made plans with a confidential informant to acquire

various weapons and other military materials, including sniper rifles, missiles, vehicles, bullet proof vests, and night vision goggles, which Nayyar agreed to sell to Hezballah through the CI.  On one occasion Nayyar gave the CI a handgun and a box of ammunition in exchange for $1,000.

Convicted of: providing material support or resources to terrorists (2 counts), conspiracy to defraud the United States

**Length of sentence imposed: 180 months (15 years) (statutory maximum was 900 months)**

- ***United States v. Issa et al*, 09 Cr 1244 (LAP) (SDNY)**

Judge: Loretta A. Preska
Nature of offense: Issa, Harouna Touré and Idriss Abdelrahman were charged in connection with their agreement to transport cocaine through West and North Africa with the intent to support the drug trafficking activities of Al Qaeda, Al Qaeda in the Islamic Magreb ("AQIM"), and the Fuerzas Armadas Revolucionarias de Colombia ("FARC").

Convicted of: 18 USC 2339B (Harboring or concealing terrorists)

**Length of sentence imposed:**
- **Oumar Issa: 57 months**
- **Harouna Toure: 63 months**
- **Idriss Abdelrahman: 46 months**

- ***United States v. Cordoba-Bermudez*, 08 Cr. 1290 (DC) (SDNY)**
Judge: Denny Chin
Nature of offense: Cordoba pleaded guilty to conspiring to provide material support to the FARC.

Convicted of: 18 USC 2339B (Material support for terrorists)
**Length of sentence imposed: 180 months (15 years)**.

- ***United States v. Jamal Yousef*, 08 Cr. 1213 (JFK) (SDNY**)
23

Judge: John F. Keenan
Nature of offense: The defendant, who had a history of trafficking in drugs, weapons, and fake travel documents, conspired to provide an arsenal of military-grade weapons to the designated foreign terrorist organization FARC in exchange for a large shipment of cocaine.

Convicted of: 18 USC 2339B (conspiracy to provide material support to a foreign terrorist organization)


**Length of sentence imposed: 144 months (12 years)**


- ***United States v. Abdul Tawala Ibn Ali Alishtari*, 07 Cr. 115 (AKH) (SDNY)**

Judge: Alvin K. Hellerstein
Nature of offense: The defendant facilitated the transfer of $152,500, believing that the funds would be used in Afghanistan and Pakistan to help train terrorists and provide them military equipment.

Convicted of: 18 USC 2339 (terrorist activity- attempt to finance terrorism)


**Length of sentence imposed: 121 months (10 years)**


- ***United States v. Iqbal et al*, 06 Cr 1054 (RMB) (SDNY)**

Judge: Richard M. Berman
Nature of offense: Iqbal and Elahwal provided satellite television services to al-Manar, a TV channel operated by Hezbollah, a designated foreign terrorist organization.

Convicted of: 18 USC 2339B (Material support for terrorists)

**Length of sentence imposed:**
- **Javed Iqbal: 69 months (5.75 years)**
- **Saleh Elahwal: 17 months**

- ***United States v. Syed Hashmi*, 06 Cr. 442 (LAP) (SDNY)**

Judge: Loretta A. Preska

Nature of offense: Hashmi helped deliver protective clothing and night-vision goggles to an Al Qaeda military commander and helped a friend buy a plane ticket to Pakistan to engage in jihad.

Convicted of: 18 USC 2339 (harboring or concealing terrorists)

**Length of sentence imposed: 180 months (15 years)**

- ***United States v. Shah et al*, 05 Cr. 673 (LAP) (SDNY)**

Judge: Loretta A. Preska

Nature of offense: Defendants conspired to provide material support to Al Qaeda. Shah was a martial arts instructors who urged many of his students to prepare for violent jihad against the infidels and expressed his willingness to recruit others start a homegrown cell. Brent trained with Shah and attended a Lashkar-e-Taiba training camp in Pakistan. Sabir agreed to provide medical support to wounded jihadists.

Convicted of:
- Tarik Ibn Osman Shah: 18 USC 2339A (Terrorist activity)
- Rafiq Sabir: 18 USC 2339A (Terrorist activity) (2 counts)
- Abdulrahman Farhane: 18 USC 371 (Conspiracy to defraud the United States), 18 USC 1001 (Making a false statement to a government official)

- Mahmud Farouq Brent: 18 USC 2339A (Terrorist activity)

**Length of sentence imposed:**
- **Tarik Ibn Osman Shah: 180 months (15 years)**
- **Rafiq Sabir: 300 months (25 years)**
- **Abdulrahman Farhane: 96 months (8 years)**
- **Mahmud Farouq Brent: 180 months (15 years)**

- ***United States v. Viktor Bout**, 08 Cr. 365 (SAS) (SDNY)*
Judge: Shira A. Scheindlin
Nature of offense: The defendant was convicted after trial of conspiracy to kill
U.S. nationals, conspiracy to kill officers and employees of the U.S., conspiracy to
acquire and use anti-aircraft missiles, and harboring or concealing terrorists
(material support conspiracy).

Convicted of: 18 USC 2332A (conspiracy to kill U.S. nationals), 18 USC 1114
(conspiracy to kill officers and employees of the U.S.), 18 USC 2332AA
(conspiracy to acquire and use anti-aircraft missiles), 18 USC 2339 (harboring or
concealing terrorists)

**Length of sentence imposed: 300 months (25 years)**


- ***United States v. Sarachandran et al**, 06 Cr. 615 (RJD) (EDNY)*
Judge: Raymond J. Dearie
Nature of offense: Defendants conspired to buy weapons for the Tamil Tigers from
an FBI agent posing as an arms dealer. Sarachandran contacted the arms dealer
about buying shoulder-fired missiles and AK-47s. Sabaratnam was the finance
guy. Thanigasalam met with Sri Lankan rebels to get their approval for the deal.

Convicted of:
o  Sathajhan Sarachandran: providing material support to terrorists, conspiracy to
provide material support to terrorists, attempt to provide material support to
terrorists, use of certain weapons of mass destruction, attempt to acquire anti-
aircraft missiles
o  Sahilal Sabaratnam: conspiracy to provide material support to terrorists, attempt
to provide material support to terrorists, use of certain weapons of mass
destruction, attempt to acquire anti-aircraft missiles
o  Thiruthanikan Thanigasalam: conspiracy to provide material support to
terrorists, attempt to provide material support to terrorists, use of certain weapons
of mass destruction, attempt to acquire anti-aircraft missiles
o  Nadarasa Yograrasa: conspiracy to provide material support to terrorists,
attempt to provide material support to terrorists

**Length of sentence imposed:**
**o  Sathajhan Sarachandran: 312 months (26 years)**

- **Sahilal Sabaratnam: 300 months (25 years)**
- **Thiruthanikan Thanigasalam: 300 months (25 years)**
- **Nadarasa Yograrasa: 168 months (14 years)**


- ***United States v. Thavaraja et al***, 06 Cr. 616 (EDNY)

Judge: Raymond J. Dearie
Nature of offense: Defendants allegedly raised millions of dollars to support the Liberation Tigers of Tamil Eelam (LTTE), a designated terrorist organization. Thavarajah was a principal arms and explosives agent for the LTTE. The group allegedly bribed informants posing as a State Department officials in an attempt to get the United States to take the Tamil Tigers off its terrorism list.

Convicted of:
o Pratheepan Thavaraja: providing material support or resources to terrorists, conspiracy to defraud the United States
o Murugesu Vinayagamoorthy: providing material support or resources to terrorists
o Vijayshanthar Patpanathan: providing material support or resources to terrorists
o Nachimuthu Socrates: conspiracy to defraud the United States
o Karunakaran Kandasamy: providing material support to terrorists, money laundering
o Suresh Sriskandarajah: providing material support or resources to terrorists
o Ramanan Mylvaganam: providing material support or resources to terrorists

**Length of sentence imposed:**
o **Pratheepan Thavaraja: 108 months (9 years)**
o **Murugesu Vinayagamoorthy: time served (63 months)**
o **Vijayshanthar Patpanathan: time served (67 months)**
o **Nachimuthu Socrates: 12 months and one day**
o **Karunakaran Kandasamy: time served (72 months)**
o **Suresh Sriskandarajah: 24 months**
o **Ramanan Mylvaganam: time served (72 months)**


- ***United States v. Defreitas et al***, 07 Cr. 543 (EDNY)

Judge: Dora L. Irizarry
Nature of offense: Defendants plotted to blow up fuel tanks at JFK Airport.
Convicted of:
o  Russell Defreitas: terrorism, explosives used in commission of a felony, destruction of aircraft or facility, violence at international airports, train wrecking
o  Kareem Ibrahim: terrorism, explosives used in commission of a felony, destruction of aircraft or facility, violence at international airports, train wrecking
o  Abdul Kadir: terrorism, explosives used in commission of a felony, destruction of aircraft or facility, violence at international airports, train wrecking
o  Abdul Hameed Nur: Providing material support to terrorists

**Length of sentence imposed:**
o  **Russell Defreitas: Life**
o  **Kareem Ibrahim: Life**
o  **Abdul Kadir: Life**
o  **Abdul Hameed Nur: 180 months (15 years)**


***United States v. Al-Moayad et al*, 03 Cr. 1322 (EDNY)**
Judge: Dora Irizarry
Nature of offense: Defendants were accused of supplying money, recruits, weapons and communication equipment to al-Qaeda and Hamas. Mr al-Moayad was alleged to have given al-Qaeda $20 million before the September 11 attacks.

Convicted of:
o Mohammed Ali Al-Moayad: Providing material support or resources to terrorists
o Mohammed Mohsen Zayed: Providing material support to terrorists (3 counts)

**Length of sentence imposed:**
o **Mohammed Ali Al-Moayad: time served (80 months) ordered deported**
o **Mohammed Mohsen Zayed: time served (80 months), ordered deported**


• ***United States v. Mukhtar al-Bakri*, 02 Cr 214 (WDNY)**
Judge: William M. Skretny
Nature of offense: Al-Bakri, along with Sahim Alwan, Faysal Galab, Yahya Goba, Shafal Mosed, and Yasein Taher, was part of the Lackawanna Six, a group of men charged with providing material support to Al Qaeda. He received training at an Al

Qaeda camp in Afghanistan. He admitted to staying for extra training, but said that he never felt allegiance to Al Qaeda.

Convicted of: 18 USC 2339A (providing material support to terrorists)

**Length of sentence imposed: 120 months (10 years)**

- ***United States v. Yahya Goba*, 02 Cr 214 (WDNY)**
Judge: William M. Skretny
Nature of offense: Goba, along with Mukhtar al-Bakri, Sahim Alwan, Faysal Galab, Shafal Mosed, and Yasein Taher, was part of the Lackawanna Six, a group of men charged with providing material support to Al Qaeda. Goba received training at an Al Qaeda camp in Afghanistan and met Osama bin Laden.

Convicted of: 18 USC 2339A (providing material support to terrorists)

**Length of sentence imposed: 120 months (10 years)**

- ***United States v. Aref*, 04 Cr. 402 (TJM) (NDNY)**
Judge: Thomas J. McAvoy,
Nature of offense: Defendants conspired to aid a terrorist group and provide support for a weapon of mass destruction, as well as money-laundering and supporting a foreign terrorist organization. They were found guilty at trial.

Convicted of: Several counts of money laundering for enemies of the U.S., several counts of providing material support for terrorism

**Length of sentence imposed:**
- **Yassin Muhiddin Aref: 180 months (Guidelines range 360 – life)**
- **Mohammed Mosharref Hossain: 180 months (Guidelines range 360 – life)**

## V.     The Automatic Application of the Terrorism Enhancement

Pursuant to USSG §3A1.4, the terrorism enhancement, every offender's sentencing offense level is increased by 12, and their criminal history category

becomes a level VI.  The enhancement is applied regardless of whether any acts of terrorism are committed; regardless of whether any violence is involved; and regardless of whether the individual has ever been convicted of a crime.  In Mr. Aswat's case, the enhancement exaggerates his conduct and criminal history.  The Court should remedy this by imposing a below guideline sentence to avoid an unjust sentence.

### A.   The Terrorism Enhancement should be remedied in light of § 3553(a) Sentencing Factors

Mr. Aswat is not objecting to his Guideline calculation in the PSR, including the application of the §3A1.4.  However, he is requesting that the Court use its broad discretion and consider the drastic impact of §3A1.4 against all other § 3553(a) sentencing factors and the parsimony clause.  Child pornography cases, like terrorism cases, invoke serious public policy concerns and both charges carry severe Guideline enhancements without allowing for varying degrees of culpability among individual defendants.  The Second Circuit has addressed the automatic enhancements (§2G2.2) that apply in child pornography cases in *United States v. Dorvee,* 616 F.3d 174 (2d Cir. 2010).

Neither §2G2.2 nor §3A1.4 are based on empirical data.  They are not based on data compiled by the Sentencing Commission from a statistically significant number of cases.  In *Dorvee*, the Court discussed this aspect of  §2G2.2 and the level of deference that a sentencing court owes to the Guidelines when an enhancement is not the product of empirical evidence.

> Deference to the Guidelines is not absolute or even controlling; rather, like our review of many agency determinations, "the weight of such a judgment in a particular case will depend upon the thoroughness evident in the [the agency's] consideration, the validity of its reasoning, its

> consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 [] (1944); *see Kimbrough,* 552 U.S. at 109 [] (citing the crack cocaine Guidelines as an example of Guidelines that "do not exemplify the Commission's exercise of its characteristic institutional role").

616 F.3d at 188

    The Court also noted a problematic effect of §2G2.2 is that it results in defendants (even first time offenders) having Guideline ranges close to or above the statutory maximums based solely on sentencing enhancements that are all but inherent to the crime of conviction.  616 F.3d at 186.  The enhancement allows for no distinction between first time and repeat offenders or levels of culpability.  The Court concluded that "[t]his result is fundamentally incompatible with §3553(a)[,]" because "[b]y concentrating all offenders at or near the statutory maximum, §2G2.2 eviscerates the fundamental statutory requirement in §3553(a) that district courts consider 'the nature and circumstances of the offense and the history and characteristics of the defendant[.]'" 616 F.3d at 187.  The Court warned:

> [d]istrict judges are encouraged to take seriously the broad discretion they possess in fashioning sentences under §2G2.2 – ones that can range from non-custodial sentences to the statutory maximum – bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results.

616 F.3d at 188.

    Here, the application of §3A1.4 puts Mr. Aswat in the same Guideline range as someone who was severely more culpable and has an extensive criminal history; compared to his minimal role and non-criminal history.  Sentencing Mr. Aswat

31

within the Guidelines range would result in a sentence that is "fundamentally incompatible with §3553(a)." *Id.*

### B.  Mr. Aswat's Criminal History is Grossly Overstated

The application of §3A1.4 results in Mr. Aswat's Criminal History Category increasing from a level I to a level VI and a gross overstatement of his criminal history.  This distortion provides further compelling justification for a non-Guidelines sentence based on the §3553(a) factors.

Acknowledging the potential problems and impact of §3A1.4 on a defendant's Criminal History, the Second Circuit has instructed that "[a] judge determining that §3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under §4A1.3 to depart downward in sentencing." *United States v. Meskini,* 319 F.3d 88, 92 (2d Cir. 2003).  While Mr. Aswat is not requesting a downward departure, his criminal history and likelihood of recidivism is over-represented due to §3A1.4.  He would otherwise have no criminal history points, and, other than petty larceny while he was homeless for a brief time, he has never committed another crime.

His placement in Criminal History Category VI strongly implies that Mr. Aswat is an incorrigible criminal.  However, his lack of criminal history and his personal history, including the time that he has been incarcerated, strongly indicate otherwise.

### VI.        Conclusion

In 1999, Mr. Aswat was a young man who believed that military training was part of his religious duties.  He was also motivated by the political atmosphere at the time and believed that he would be needed and wanted to be able to defend his family and fellow Muslims under attack.  He was never motivated to wage a

war, impose religion on non-believers or to hurt innocent civilians.  He played a very limited and minimal role in Bly but still understands, accepts responsibility, and is remorseful for his criminal conduct.  Mr. Aswat was also a young man who was living and battling with schizophrenia.  Until his incarceration, he was undiagnosed and un-medicated.  For over 10 years, Mr. Aswat has been severely punished for his actions.  While they are in regular and frequent email and telephone contact, he has been separated from his family and has missed many major milestones in his siblings' and parents' lives.  His mother is not in good health and this is something that weighs heavily on him every day.  Still, he holds no ill feelings or resentment about his incarceration.  Mr. Aswat is an extremely kind and thoughtful man.  He looks forward to his release so that he can spend time with his family and finish his education.

Accordingly, for all the foregoing reasons, it is respectfully submitted that a sentence of 150 months imprisonment (with credit since June, 2005, when he was arrested in the United Kingdom on a provisional warrant issued pursuant to a request by the United States) would be sufficient, but not greater than necessary, to accomplish the goals of sentencing.

Your Honor's attention to and consideration of this submission are, as always, greatly appreciated.

Dated:      New York, New York
            October 2, 2015

                                    Respectfully submitted,

                    *Peter Enrique Quijano*        *Anna N. Sideris*

                    Peter Enrique Quijano        Anna N. Sideris

33

cc:    A.U.S.A. Ian McGinley (by email)
       A.U.S.A.  John Cronan (by email)
       A.U.S.A. Shane Stansbury (by email)
       U.S.P.O.  Tandis Bruno (by email)