UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | : |
| - v. - | S2 04 Cr. 356 (KBF) |
| HAROON RASHID ASWAT,<br> a/k/a "Haroon,"<br> a/k/a "Haroon Aswat," | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

John P. Cronan
Ian McGinley
Shane T. Stansbury
Assistant United States Attorneys
     -Of Counsel-

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................1

II.     BACKGROUND.........................................................................................2

        A.      The Offense Conduct........................................................................2

                1.      The Origins of the Bly Training Camp Plot ........................3

                2.      Aswat and Kassir's Travel to the United States .................4

                3.      Aswat's Post-Bly Training with al Qaeda .........................7

        B.      Aswat's Indictment, Arrest, and Extradition............................8

        C.      Aswat's Guilty Plea........................................................................10

        D.      The Presentence Investigation Report ......................................11

III.    ARGUMENT:  THE COURT SHOULD IMPOSE A SENTENCE OF TWENTY YEARS'
        IMPRISONMENT .......................................................................................12

        A.      The Governing Legal Framework .................................................12

        B.      The Nature and Seriousness of Aswat's Crimes and the Need for Just Punishment
                Necessitate a Sentence of Twenty Years' Imprisonment ......................................14

        C.      A Sentence of Twenty Years' Imprisonment Will Serve the Purpose of
                Deterrence and Will Promote Respect for the Law.................................17

        D.      A Sentence of Twenty Years' Imprisonment is Appropriate to Protect the Public
                from Further Crimes of Aswat .................................................19

        E.      Imposing a Guidelines Sentence, With Application of the Terrorism Enhancement,
                Would Advance the Goals of Section 3553(a) .......................................19

        F.      Aswat's Medical Condition Does Not Warrant Any Reduction of His Sentence...23

        G.      A Sentence of Twenty Years' Imprisonment Would Not Create Unwarranted
                Sentencing Disparities .................................................26

IV.     CONCLUSION.............................................................................................31

# TABLE OF AUTHORITIES

**Cases**

*Gall* v. *United States*, 552 U.S. 38 (2007) .........................................................................12, 13, 21

*Rita* v. *United States*, 551 U.S. 338 (2007)...............................................................................13

*United States* v. *Ahmed*, No. 10 Cr. 131 (PKC) (S.D.N.Y.) ........................................................30

*United States* v. *al-Bakri, et al.*, No. 02 Cr. 214 (WMS) (W.D.N.Y.)...........................................30

*United States* v. *Alishtari*, No. 07 Cr. 115 (AKH) (S.D.N.Y.) ...............................................28, 29

*United States* v. *al-Moayad, et al.*, No. 03 Cr. 1322 (DLI) (E.D.N.Y.)........................................29

*United States* v. *Aref*, No. 04 Cr. 402 (TJM) (N.D.N.Y.) ......................................................28, 29

*United States* v. *Babafemi*, No. 13 Cr. 109 (JG) (E.D.N.Y.) ......................................................31

*United States* v. *Booker*, 543 U.S. 220 (2005)..........................................................................12

*United States* v. *Bout*, No. 08 Cr. 365 (SAS) (S.D.N.Y.) ..........................................................28

*United States* v. *Brudi*, No. 12-4723-cr, 2013 WL 5681647 (2d Cir. Oct. 21, 2013)...................25

*United States* v. *Carty*, 264 F.3d 191 (2d Cir. 2001) ...................................................................26

*United States* v. *Carty*, 95 Cr. 973 (S.D.N.Y. Nov. 9, 2001).........................................................26

*United States* v. *Cordoba-Ramirez*, No. 08 Cr. 1290 (DC) (S.D.N.Y.) .................................28, 30

*United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005)..........................................................12, 13

*United States* v. *Defreitas, et al.*, No. 07 Cr. 543 (DLI) (E.D.N.Y.) ......................................29, 30

*United States* v. *Dorvee*, 616 F.3d 174 (2d Cir. 2010) ................................................................23

*United States* v. *Fernandez*, 443 F.3d 19 (2d Cir. 2006) .............................................................20

*United States* v. *Fishman*, 631 F. Supp. 2d 399 (S.D.N.Y. 2009) ................................................25

*United States* v. *Green*, No. 04 Cr. 424 (RWS), 2006 WL 3478340 (S.D.N.Y. Dec. 1, 2006).....26

*United States* v. *Hashmi*, No. 06 Cr. 442 (LAP) (S.D.N.Y.) ........................................................30

*United States* v. *Ibarguen-Palacio*, No. 09 Cr. 498 (WHP) (S.D.N.Y.)..........................................28

*United States* v. *Iqba, et al.*, No. 06 Cr. 1054 (RMB) (S.D.N.Y.).....................................28, 29, 30

*United States* v. *Issa*, No. 09 Cr. 1244 (BSJ) (S.D.N.Y.) ...............................................................28

*United States* v. *Lelonde*, 509 F.3d 750 (6th Cir. 2007) ................................................................24

*United States* v. *Mateo*, 299 F. Supp. 2d 201 (S.D.N.Y. 2004).....................................................26

*United States* v. *Meskini*, 319 F.3d 88 (2d Cir. 2003) ......................................................17, 21, 23

*United States* v. *Morales*, No. 11–1803–cr, 2012 WL 5275363 (2d Cir. Oct. 26, 2012)..............25

*United States* v. *Naranjo-Ramirez*, No. 09-4343-cr, 2010 WL 4723301
(2d Cir. Nov. 23, 2010).........................................................................................................26

*United States* v. *Nayyar*, No. 09 Cr. 1037 (RWS) (S.D.N.Y.)........................................................28

*United States* v. *Rattoballi*, 452 F.3d 127 (2d Cir. 2006) ..............................................................20

*United States* v. *Rubenstein*, 403 F.3d 93 (2d Cir. 2005) .........................................................20, 21

*United States* v. *Sarachandran, et al.*, No. 06 Cr. 615 (RJD) (E.D.N.Y.)...............................28, 29

*United States* v. *Shah, et al*., No. 05 Cr. 673 (LAP) (S.D.N.Y.) ...............................................29, 30

*United States* v. *Stewart*, 590 F.3d 93 (2d Cir. 2009).................................................17, 18, 21, 23

*United States* v. *Thavaraja, et al.*, No. 06 Cr. 616 (RJD) (E.D.N.Y.) ...............................28, 29, 30

*United States* v. *Torres-Teyer*, 322 F. Supp. 2d 359 (S.D.N.Y. 2004) ..........................................26

*United States* v. *Viglakis*, No. 12 Cr. 585 (KBF) (S.D.N.Y.) ........................................................28

*United States* v. *Yousef*, No. 08 Cr. 1213 (JFK) (S.D.N.Y.)..........................................................28

## Statutes

8 U.S.C. § 1228..............................................................................................................................11

18 U.S.C. § 2339A........................................................................................................................8, 9

18 U.S.C. § 2339B ...........................................................................................................................9

18 U.S.C. § 3553 ............................................................................................ *passim*

18 U.S.C. § 3585 ............................................................................................10

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1796 .....21

**Sentencing Guidelines**

U.S.S.G. § 2M5.3 ............................................................................................10, 20

U.S.S.G. § 3B1.2 ............................................................................................15

U.S.S.G. § 3A1.4 ............................................................................................10, 20, 21, 23

U.S.S.G. § 3D1.2 ............................................................................................10, 20

U.S.S.G. § 3E1.1 ............................................................................................10, 20

U.S.S.G. § 5A ............................................................................................20

U.S.S.G. § 5E1.2 ............................................................................................20

## I. PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of Haroon Rashid Aswat, a/k/a "Haroon," a/k/a "Haroon Aswat" ("Aswat" or the "defendant"), which is scheduled for October 16, 2015, at 11:00 a.m., and in response to the Sentencing Memorandum on Behalf of Haroon Rashid Aswat, which was filed on October 2, 2015 ("Aswat Br."). On March 30, 2015, Aswat pled guilty, pursuant to a plea agreement, to one count of providing material support and resources to a designated foreign terrorist organization ("FTO"), *i.e.*, al Qaeda, and to one count of conspiring to provide material support and resources to an FTO, *i.e.*, al Qaeda.

This Court should sentence Aswat to the statutory maximum sentence of 20 years' imprisonment, which is the stipulated Guidelines range in this case as well as the sentence recommended by the Probation Office. Aswat was a loyal and devoted follower of co-defendant Mustafa Kamel Mustafa, a/k/a "Abu Hamza al-Masri" ("Abu Hamza"), an inspirational and radical cleric based in London. Operating out of the Finsbury Park Mosque, Abu Hamza orchestrated global acts of terror, sending his followers—including Aswat—across the world to support terrorism.

Acting at Abu Hamza's direction, in late 1999, Aswat and co-defendant Ouassama Kassir ("Kassir") traveled from London to the United States, tasked with establishing a jihad training camp in Oregon. That training camp—whose purpose was to support al Qaeda—had a terrifying objective: to train young men on U.S. soil to engage in acts of violence and murder in Afghanistan. Aswat's intended role at this terrorist training camp was a vital one: to provide religious training to the men at the Bly training camp, while they also received physical training to kill in the name of jihad.

Even after the Bly training camp venture failed, Aswat continued to support terrorism, joining up with terrorists in Pakistan and Afghanistan and in fact receiving training from al Qaeda in Afghanistan.  In May 2001, Aswat traveled to Pakistan and was soon transported to Afghanistan where he received training at the al Faruq training camp, al Qaeda's primary training camp at the time.  Aswat then remained in Afghanistan for approximately four months after the attacks of September 11, 2001.

To be sure, the Government agrees with the defense that Aswat was not a leader of terrorism.  *See* Aswat Br. at 18-19.  He was a loyal lieutenant to Abu Hamza.  But he was most certainly dangerous.  In terrorist organizations, it is the lieutenants who carry out the violent orders of their superiors and, as evidenced by his actions in this case, Aswat stood ready to implement Abu Hamza's murderous agenda.  In light of the seriousness of this conduct, as well as the need for individual and general deterrence, to protect the public from future crimes of this defendant, and to promote respect for the law, a sentence of 20 years' imprisonment is the appropriate sentence in this case.

## II. BACKGROUND

### A.    The Offense Conduct

As the leader of the Finsbury Park Mosque in London, Abu Hamza worked tirelessly to drive his young, impressionable followers to participate in acts of violence and murder across the globe.  From the safe confines of his mosque, Abu Hamza openly and unapologetically used the power of his hateful words to distort religion by giving purported religious justification for acts of terrorism.  In Abu Hamza's eyes, engaging in violent jihad was not just recommended, it was mandatory.  In the fall of 1999, Abu Hamza sent two of his devoted followers—Aswat and Kassir—from London to the United States with orders to establish a terrorist training camp on a

remote ranch in Oregon.  The purpose of this camp was to train young, impressionable men in America to fight and kill, so they could travel to Afghanistan to join forces with al Qaeda.

### 1.      The Origins of the Bly Training Camp Plot

In around the fall of 1999, co-defendant Earnest James Ujaama ("Ujaama"), one of Abu Hamza's U.S.-based followers, reached out to Abu Hamza and discussed plans to create a jihad training camp at a ranch in Bly, Oregon.  Tr. at 2038.[1]  Ujaama—who had been a student of Abu Hamza's and had spent time with Abu Hamza at the Finsbury Park Mosque—was aware of Abu Hamza's view that physical jihad training was mandatory for all Muslims.  *Id*. at 2039.  Abu Hamza was interested in Ujaama's training camp proposal, and agreed to send two men—who ultimately would be Aswat and Kassir—to the United States to help Ujaama establish the training camp.  *Id*. at 2039-40.

Abu Hamza received two faxes from Ujaama discussing the plans for the training camp. Tr. at 1940-42.  The first fax, which was sent from Ujaama to Abu Hamza on October 25, 1999, contained language for a flyer to advertise the training facility and a message from Ujaama to Abu Hamza.  *Id.* at 2058-59; GX 315.  In the message, Ujaama referenced "[t]he land that we spoke of," and emphasized that the land would simulate conditions in Afghanistan:  the property "looks just like Afghanistan with mountains and small trees, dry, hot and cold extreme temperatures," and "[i]t barely rains, but snows heavily during the winter."  Tr. at 2061; GX 315. Ujaama drew this comparison because the purpose of the Bly, Oregon camp was to train men to fight in Afghanistan.  Tr. at 2055, 2061.  Ujaama also explained in the October 26, 1999 fax that the property "is in a state that is pro-militia and fire-arms state," and assured Abu Hamza that

---

[1] Citations to "Tr." are to the transcript from the trial in *United States* v. *Mustafa*, 04 Cr. 356 (KBF), which took place in April and May 2014, and citations to "GX" are to exhibits that were admitted at that trial.

"[o]ur ju'mat," referring to the group of young men from Ujaama's Seattle mosque, "is young, strong and desirous."  GX 315.  Ujaama told Abu Hamza that they were "expecting the two brothers that we discussed to come in November," *id.*; those "two brothers" would in fact arrive in Seattle in November 1999, and were Aswat and Kassir.  Ujaama also informed Abu Hamza in this October 1999 fax that they were planning to bring Abu Hamza to the United States permanently, explaining that "[i]t is already understood that you will lead us here in America." *Id.*

A little under two weeks later, on November 6, 1999, Ujaama sent Abu Hamza a second fax.  GX 316.  In this fax, Ujaama, among other things, informed Abu Hamza that the "juma't" had split, "[t]he second juma't will operate underground," and "[t]he two brothers coming will not have contact with the first juma't."  *Id.* Twenty days later, those "two brothers"—*i.e.*, Aswat and Kassir—arrived in the United States.

### 2.      Aswat and Kassir's Travel to the United States

In November 26, 1999, Aswat, Kassir, and Kassir's wife and children flew from London to New York City, where they boarded a Greyhound bus for Seattle.  Tr. at 2081-82; GX 2, 335, 336, 337, 338, 339; Presentence Investigative Report ("PSR") ¶ 28.  Upon arriving in Seattle, Aswat, Kassir, and Kassir's family were picked up by Ujaama, stayed at Ujaama's residence for two or three days, and soon were brought to the ranch in Bly, Oregon.  Tr. at 2081-84.

Upon arriving at Bly, Kassir announced that he had been sent by Abu Hamza to train men to fight in Afghanistan.  Tr. at 152-53, 927, 939; PSR ¶ 29.  Kassir, who behaved as the leader between himself and Aswat, Tr. at 2085, boasted that he had received training at camps in Afghanistan associated with Bin Laden and that he himself had run training camps for Bin Laden, *id.* at 153, 939.  Aswat similarly told people at Bly that he was there to train the brothers

in jihad and that he too had received training at camps in Afghanistan.  *Id.* at 154.[2]  Aswat's specific role at Bly was to provide the men at the Bly training camp religious training that would inspire and justify their interest in justice.  PSR ¶ 29; Aswat Br. at 13.

Kassir brought with him various tools to conduct this training, including manuals on manufacturing poisons, nerve gas, and explosives.  GX 312-B, 312-C, 312-D, 330-C-T, 330-D; PSR ¶ 30.  Kassir also possessed letters addressed to both Usama Bin Laden and Abu Hamza, reflecting his support for those individuals.  GX 330-E, 330-E-T, 330-F, 330-F-T; PSR ¶ 30.  In his letter to Abu Hamza, Kassir thanked Abu Hamza for "the hospitality" that Abu Hamza extended Kassir at Abu Hamza's "residence" and for "correction of [Kassir's] knowledge," and further wrote, "I love you and I felt so comfortable with you."  GX 330-E, 330-E-T.  Kassir also had a copy of Bin Laden's 1996 declaration of war against America and a December 1998/January 1999 issue of the newsletter for Abu Hamza's organization, the Supporters of Shariah.  The newsletter contained articles about the Islamic Army of Aden taking responsibility for a December 1998 kidnapping of tourists in Yemen and accused "the United Snakes of America" of trying to kill Bin Laden.  GX 330-B, 330-G; PSR ¶ 30.

After arriving at Bly and viewing the property, Kassir was furious at Ujaama because the property at Bly did not resemble what Ujaama had represented to Abu Hamza.  Tr. at 121, 928.  In particular, Kassir aggressively confronted Ujaama because Ujaama had promised Abu Hamza that there would be brothers to train and guns on the property, and because there was no place for Abu Hamza to stay.  *Id.* at 121-22, 928.  Aswat was similarly disappointed that the Bly training camp was not what had been promised to Abu Hamza and was unsuccessful.  As a witness at the

_____

[2] While Aswat reported to others at Bly that he had previously received training in Afghanistan, he denies that he in fact had received training prior to arriving at Bly.  PSR ¶ 31.  As noted below, however, Aswat admits that he subsequently received training in Afghanistan in 2001.  Aswat Br. at 20-21; PSR ¶¶ 31, 36 fn. 2.

Abu Hamza trial who spoke with Aswat at Bly testified, Aswat "compared his faith to that of a candle that is lit, and his faith being the fire, and the longer it burns, the less the candle becomes until it fizzles out." *Id*. at 425; PSR ¶ 34. According to that witness, Aswat was "very unhappy" about the failure of the Bly camp, because he came to the United States "to do something." *Id.*

Even so, Kassir and Aswat still attempted to institute military-style activities and conduct training, consistent with their direction from Abu Hamza. Both Kassir and Aswat armed themselves with firearms and organized armed patrols of the property at night. Tr. at 151. Kassir and Aswat conducted target practice and physical exercises, and instructed people at Bly on how to throw knives. *Id.* at 928-30. On one occasion, Kassir trained various Bly residents, including an 18-year old teenager, how to slit a person's throat. *Id.* at 144-46; PSR ¶ 31. During this demonstration, Kassir asked the teenager if he would kill a *kaffir* (*i.e.*, a non-Muslim). Tr. at 144-45. Aswat, for his part, served the role of the spiritual leader, teaching the Koran and Arabic to the men at Bly. PSR ¶ 31.

Abu Hamza supported and directed Kassir and Aswat from London. Abu Hamza provided Kassir and Aswat with money to fund the training at the Bly property, and called the men while they were at Bly. Tr. at 126, 150-51; PSR ¶ 32. During one phone conversation with Abu Hamza, Kassir complained that the property at Bly was not what had been anticipated and questioned whether he should continue there. Tr. at 127-28; PSR ¶ 32. Abu Hamza responded by exhorting Kassir to persevere in his mission at Bly. Tr. at 128; PSR ¶ 32.

Frustrated with the lack of men to train at Bly, Aswat and Kassir relocated to the Dar Us Salaam Mosque in Seattle. PSR ¶ 33. At the mosque, Kassir taught men how to make silencers, how to assemble and disassemble an AK-47 assault rifle, how to convert an AK-47 into a fully automatic firearm, and how to modify an AK-47 so it can launch grenades. Tr. at 409-18; PSR

6

¶ 33.  Kassir also met with men from the Dar Us Salaam Mosque at one of their homes, where Kassir said he was only concerned about his martyrdom and that he had come to the United States to destroy.  Tr. at 422; PSR ¶ 33.

Both Kassir and Aswat subsequently left the United States.  PSR ¶ 35.  Kassir eventually returned to his home country of Sweden.  In October 2003 and January 2006, Swedish authorities conducted searches of Kassir's residence.  GX 7, 8; PSR ¶ 35.  During those searches, Swedish authorities found a large volume of jihadi material, as well as numerous manuals related to weapons, poisons, and explosives.  *Id.*

### 3.     Aswat's Post-Bly Training with al Qaeda

Aswat subsequently linked up with al Qaeda and received training at an al Qaeda training camp.  PSR ¶ 36.  In September 2002, the Federal Bureau of Investigation ("FBI"), in conjunction with Pakistani authorities, conducted a search of a house connected to al Qaeda in Karachi, Pakistan.  GX 4; PSR ¶ 36.  During that search, the FBI seized a handwritten ledger, written in Arabic, which contained a list of names.  *Id.*  Among the names listed on that ledger was "Aswat Haroon," along with a notation indicating British nationality.  GX 1111-A-T. Numerous items recovered from this al Qaeda house contained the fingerprints of Khalid Sheikh Mohammed, who at the time served as al Qaeda's Chief Operational Planner.  GX 4; PSR ¶ 36.[3]

---

[3] The Government's terrorism expert, Evan Kohlmann, testified at Abu Hamza's trial as follows about Khalid Sheikh Mohammed:

Q.     Now, Mr. Kohlmann, what was Khalid Sheikh Mohammed's role in Al Qaeda?

A.     Khalid Sheikh Mohammed was appointed within Al Qaeda to oversee special projects, and by special projects this meant large overseas military operations that required a great amount of complexity and that would have targeted some of Al Qaeda's most high-profile adversaries.  The reason why KSM was chosen for this role is he had a history of coming up with very serious and high-profile terrorist plots that Al Qaeda admired.

Q.     And has Khalid Sheikh Mohammed planned terrorist attacks?

While Aswat denies recalling being at this particular guest house in Karachi or actually meeting Khalid Sheikh Mohammed, he does admit to receiving training at an al Qaeda training camp in mid-2001.  PSR ¶ 36 fn. 2; Aswat Br. at 20-22.  Aswat acknowledges that, in approximately May 2001, he traveled to Pakistan in order to attend a training camp in Afghanistan.  PSR ¶ 36 fn. 2.  According to Aswat, after traveling from Lahore, Pakistan, to Quetta, Pakistan, he was interviewed at "the Taliban Office" and then entered Afghanistan where he was vetted at a guest house in Kandahar.  *Id.*  Aswat reports that, at the Kandahar guest house, he was required to surrender his passport, money, and valuables, and he was then taken to the al Faruq training camp.  PSR ¶ 36 fn.2; Aswat Br. at 20-21.  Aswat claims that he did not realize the al Faruq camp was affiliated with al Qaeda, but rather believed that the training camp was a *mujahideen*, Arab, or Taliban camp.  *Id.*; *see* Aswat Br. at 21.  To be sure, the al Faruq training camp was al Qaeda's primary training camp and where recruits were trained in topics that included military tactics, weapons, and explosives.  Tr. at 1632, 1647-48.  Al Qaeda member Saajid Badat, a trained operative and intended shoe bomber, attended the al Faruq training camp, as did Feroz Abassi, whom Abu Hamza sent to Afghanistan for violent jihad training.  Tr. at 1602, 1647.

## B.    Aswat's Indictment, Arrest, and Extradition

In connection with his efforts to establish a jihad training camp in Bly, Oregon, Aswat was charged in an Indictment in four counts: (1) conspiring to provide material support and resources to terrorists, in violation of Title 18 United States Code, Section 2339A ("Count

---

A.    Yes, he has.

Q.    What are some of the attacks he's planned?

A.    The chief plot in which he is associated with is the September 11, 2001 terrorist attacks in the United States, of which he is conceded of being the mastermind.

Tr. at 1176-77.

Three"); (2) providing material support and resources to terrorists, also in violation of Section 2339A ("Count Four"); (3) conspiring to provide material support and resources to an FTO, in violation of Title 18, United States Code, Section 2339B ("Count Five"); and (4) providing material support and resources to an FTO, also in violation of Section 2339B ("Count Six").

Aswat was arrested by authorities in Zambia and extradited to the United Kingdom in June 2005.  At the time of Aswat's arrest, law enforcement seized a computer from him that was subsequently searched and found to contain extremely disturbing literature, similar to the materials Kassir brought to Bly and also seized from Kassir when he was arrested.  For instance, Aswat's computer contained, among other items, (1) a book on survival skills in the event of a nuclear, biological and chemical weapon detonation; (2) the "Anarchist Cookbook," which contains instructions on how to make bombs and hack into computers; (3) a hand-to-hand combat instruction manual, which notes that its purpose is to "teach you how you can kill another person with your own two hands;" (4) the "Close Combat Textbook;" and (5) the "Big Book of Mischief," which also contains detailed and extensive instructions on how to make explosives.

Perhaps even more troubling, at the time of Aswat's arrest, Aswat possessed batteries and wires.  Tr. at 825.  In addition, on Aswat's computers, law enforcement found what appear to be diagrams of electrical circuits.  The combination of these materials suggests that Aswat may have been actually attempting to construct explosive devices.

After many years of challenging his extradition on the instant charges in British courts and before the European Court of Human Rights, Aswat was extradited from the United Kingdom to the United States and first appeared before the Court on October 21, 2014.  PSR ¶ 38.  Accordingly, Aswat was detained for a little over nine years in British custody on the

charges in this case.  *See* 18 U.S.C. § 3585(b)(1) ("A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed . . . that has not been credited against another sentence.").[4]

## C.    Aswat's Guilty Plea

Aswat pled guilty on March 30, 2015, to Counts Five and Six of the Indictment, pursuant to a plea agreement with the Government.  The plea agreement contemplated a total offense level of 37, calculated as follows: (1) Counts Five and Six are grouped because they involve the same act or transaction, *see* U.S.S.G. § 3D1.2(a); (2) the base offense level is 26, *id.* § 2M5.3(a); (3) two points are added because the offenses involved firearms, *id.* § 2M5.3(b); (4) 12 points are added because the offenses were felonies that involved, or were intended to promote, federal crimes of terrorism, *id.* § 3A1.4(a); and (5) three points are reduced for acceptance of responsibility, *id.* § 3E1.1(a), (b).  The plea agreement further provided for a Criminal History Category of VI, in light of the terrorism enhancement under Section 3A1.4(a), resulting in a Guidelines range of 360 months' to life imprisonment.  However, because the combined statutory maximum for Counts Five and Six is twenty years' imprisonment, the Guidelines sentence stipulated by the parties is 20 years' imprisonment.  The applicable fine range under the plea agreement is, after determining the defendant's ability to pay, $20,000 to $200,000.

During his plea allocution, Aswat stated the following regarding his criminal conduct:

> [F]rom approximately October 1999 until early 2000, in Bly, Oregon, London, England, and elsewhere, I agreed with others to provide material training to others on behalf of a terrorist organization.

---

[4] Based on conversations with counsel for the Bureau of Prisons, the Government understands that Aswat will be eligible to receive good conduct time credit, pursuant to Title 18, United States Code, Section 3624(b), for his time in British custody pending extradition.

Specifically, in the fall of 1999, at the direction of Abu Hamza, I traveled to Bly, Oregon, to assist Oussama Kassir in the creation of a training camp and the training of others, who wanted to participate in jihad on behalf of a terrorist organization.

At the time, I understood that Abu Hamza and Kassir were associated with an Arab organization that was engaged in terrorist activity and was engaged [in] terrorism. I later came to know that this Arab organization was known as al Qaeda.

While doing these things, I understood it was illegal.

Transcript, *United States* v. *Aswat*, 04 Cr. 356 (KBF) (S.D.N.Y. Mar. 30, 2015), at 24.

As part of his guilty plea, the Government provided notice of its intent to request for a judicial order of removal, pursuant to Section 238(c) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1228(c). Aswat executed a statement that, *inter alia*, conceded that he is removable from the United States and waived any rights to relief or protection from removal, deportation, or exclusion under the INA or related federal regulations. The Government plans to request at sentencing that the Court enter the judicial order of removal for Aswat.

D.      **The Presentence Investigative Report**

On June 18, 2015, the Probation Office issued its PSR in connection with Aswat's sentencing. Consistent with the parties' plea agreement, the PSR calculated an offense level of 37 and a Criminal History Category of VI in light of the terrorism enhancement pursuant to U.S.S.G. § 3A1.4. PSR ¶¶ 43-59. The Probation Office's Guidelines calculation is not in dispute, and mirrors that contained in the plea agreement. Based on an offense level of 37, and a Criminal History Category of VI, the Probation Office calculated a Guidelines range of 360 months to life imprisonment; although, in light of the combined statutory maximum sentence for Counts Five and Six, the effective Guidelines range is 240 months. *Id.* ¶ 82.

The Probation Office has recommended a sentence of 240 months' imprisonment.  PSR p. 22.  This recommended term of incarceration reflects a 10-year sentence for both Counts 5 and 6, to run consecutively.  *Id.*  In support of this recommendation, the Probation Office emphasized the seriousness of the defendant's conduct, which "posed a serious threat to the public safety." *Id.* at p. 23.

## III.  ARGUMENT

### THE COURT SHOULD IMPOSE A SENTENCE OF TWENTY YEARS' IMPRISONMENT

### A.    The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a):  "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among

defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.*

§ 3553(a)(7).  *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence

sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to
>        provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical
>        care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the

applicable Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to

consider the Guidelines supports the premise that district courts must begin their analysis with

the Guidelines and remain cognizant of them throughout the sentencing process."  *Gall*, 552 U.S.

at 50 n.6.  Their relevance throughout the sentencing process stems in part from the fact that,

while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge

and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*,

551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on

extensive empirical evidence derived from the review of thousands of individual sentencing

decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.  To the extent a sentencing court

varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure

that the justification is sufficiently compelling to support the degree of the variance."  *Gall*, 552

U.S. at 50.

**B.    The Nature and Seriousness of Aswat's Crimes and the Need for Just Punishment Necessitate a Sentence of Twenty Years' Imprisonment**

For this defendant—who traveled from a foreign country to U.S. soil with the purpose of establishing a terrorist training camp—"the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), "the seriousness of the offense," *id.* § 3553(a)(2)(A), and the need "to provide just punishment for the offense," *id.*, are by far the most relevant sentencing considerations.  Not only did Aswat agree with Abu Hamza's extremist ideology, but he took affirmative steps to put Abu Hamza's murderous message of violence and hate into motion.  Aswat was committed to violent jihad and willing to take concrete steps in service of his terrorist goals.

Aswat, along with another one of Abu Hamza's followers, traveled from England to Oregon to establish a jihad training camp.  The purpose of that camp was as simple as it was terrifying:  to train men so that they could go to Afghanistan to fight with al Qaeda.  Kassir and Aswat were well-suited to the task.  Kassir carried with him deadly manuals containing guides for making poisons and bombs.  GX 312-B, 312-C, 312-D, 330 C-T, 330-D.  He not only spoke of violent jihad but he demonstrated it, most notably while teaching participants at Bly how to slice a man's throat and teaching men at the Dar Us Salaam Mosque in Seattle about how to use an AK-47 and how to construct silencers for firearms.  Tr. at 144-46, 409-18.  For his part, Aswat's assignment at Bly was to provide religious training to these men, and he followed through, serving as a spiritual advisor and teaching the Koran and Arabic to men at the ranch. PSR ¶¶ 29, 31; Aswat Br. at 13.  The clear purpose of this training was to give religious inspiration and justification for the violent training the men were supposed to receive.

The Government therefore disputes Aswat's characterization of his conduct as "minimal, or, at the very least, minor."  Aswat Br. at 19; *see id.* at 17 ("At Bly, Mr. Aswat's role was minimal; minor at worst."); *id.* at 3 (asserting that Aswat's participation in the offense was

"extremely limited and minimal by any standards").[5]  While the Government agrees that Aswat was not a terrorist leader, and that Kassir was the more assertive and violent of the two at Bly, Aswat's role was far from an insignificant one.  Aswat traveled halfway across the globe to serve an important role at the Bly training camp: to provide the Islamic training that would serve as the religious justification for the violent jihad training that the men were to receive, as well as the fighting in Afghanistan that they were expected to later participate in.  If Kassir was sent to provide physical training to these recruits, Aswat was their spiritual advisor.

While not a leader himself, Aswat was a devoted follower of a terrorist leader, whose reach spanned the globe.  To be sure, loyal followers like Aswat and Kassir are essential to the success of terrorist leaders like Abu Hamza in orchestrating global acts of murder.  Abu Hamza needed his followers like Ujaama, Kassir, and Aswat to establish the jihad training camp in Bly, just as he needed followers to conduct a hostage-taking in Yemen in 1998 and to support al Qaeda and the Taliban in 2000 to 2001.  Often, terrorist leaders like Abu Hamza do not do the dirty work of terrorism—they are not the ones on the front lines in Afghanistan, they are not taking hostages themselves, they are not blowing themselves up.  For that, they rely on followers, just as Abu Hamza relied on Aswat to follow his orders.  If Aswat was willing to drop everything and travel from London, England to Bly, Oregon to set up a terrorist training camp for Abu Hamza, it is frightening to consider the lengths that Aswat would have gone for Abu Hamza.  In this regard, a follower like Aswat is just as dangerous to society as his boss.

---

[5] While Aswat cites authority for a mitigating or minor role adjustment under the Guidelines pursuant to U.S.S.G. § 3B1.2, Aswat does not seek a role adjustment for his conduct. *See* Aswat Br. at 18-19 ("While this is not a guideline determination as to whether a role reduction is warranted, and if so, how much of one is warranted, a consideration of [r]ole jurisprudence is nonetheless helpful.").  Nor could Aswat seek a Guidelines reduction for his role under the terms of his plea agreement, in which he stipulated to the Guidelines calculation that applies to his criminal conduct.

The Government similarly would not agree with the defense that Aswat's conduct "certainly did not involve an act of terrorism." Aswat Br. at 3. While it is true that there is no evidence of Aswat conducting, participating in, or planning a specific terrorist attack, his conduct, by definition, entailed committing acts that supported terrorism. Aswat traveled to the United States, at the behest of a terrorist leader, with the tasking of helping to establish a camp that would train men to fight as *mujahideen* in Afghanistan. And he later received military-style training himself at an al Qaeda camp in Afghanistan. These were very real acts taken by Aswat to support terrorism.

Aswat further contends that, "[i]n understanding [his] role in the charged conspiracy, it is important to remember that this was two years before September 11th." Aswat Br. at 14; *see id.* at 9 (explaining that Aswat's conduct "was before 9/11; before most of the world, including Mr. Aswat, knew what Al-Qaeda was or that it even existed"). However, Aswat's commitment to violent jihad and terrorism did not end with his failed efforts to establish the jihad training camp in Bly, Oregon, in late 1999. A few years later, after the attacks of 9/11, Aswat's name was found on a ledger that was recovered from an al Qaeda safehouse in Pakistan, where Khalid Sheikh Mohammed had been present. As Aswat has acknowledged, in May 2001, he traveled to Pakistan and then onwards to Afghanistan, where he received training from the al Faruq training camp, which served as al Qaeda's primary training camp. PSR ¶ 36 fn. 2; Aswat Br. at 20-22. Young men at al Faruq were trained in topics that included military tactics, weapons, and explosives. Tr. at 1632, 1647-48. It appears that Aswat attended the al Faruq camp prior to September 11, 2001, but he remained in Afghanistan after receiving this terrorist training and after the attacks, when the United States invaded Afghanistan. While it is unclear what exactly Aswat was doing during this time, there is no question that he was well-trained to participate in

fighting.

Further, the disturbing materials found on Aswat's computer at the time of his arrest in 2005 suggest that Aswat remained committed to violent jihad even after September 11, 2001. Simply put, Aswat possessed killing manuals and survival guides, suggesting that Aswat expected to act on his radical beliefs at some point. Given these materials, it is simply not credible to claim, as the defense does, that Aswat no longer approved of Abu Hamza's violent ideology after returning from Bly in 2000. Aswat Br. at 20. In fact, the evidence shows just the opposite: since he traveled to Bly until the time of his arrest 2005, Aswat was committed to violent jihad, training at the most notorious al Qaeda training camp in Afghanistan, and preparing himself to fight.

The nature and seriousness of Aswat's conduct and corresponding need for just punishment thus stand as far and away the most compelling sentencing factors in this case, and warrant a sentence of 20 years' imprisonment.

## C.     A Sentence of Twenty Years' Imprisonment Will Serve the Purpose of Deterrence and Will Promote Respect for the Law

A sentence of 20 years' imprisonment in this case also will "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), and "promote respect for the law," *id.* § 3553(a)(2)(A). Indeed, the need for deterrence is especially important in the context of a terrorism offense. Terrorism is a crime with high recidivism rates and rehabilitation is notoriously difficult. *See United States* v. *Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time"). As Second Circuit Judge John M. Walker has stated, "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." *United*

*States* v. *Stewart*, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring).  In this case, there is

an overwhelming demand for both individual and general deterrence.

      As for individual deterrence, a sentence of 20 years' imprisonment is likely to deter

Aswat from returning to his criminal conduct.  Notably, Aswat's support for terrorism did not

cease with his failed efforts to establish the jihad training camp in Bly, Oregon.  Under two years

later in May 2001, Aswat reaffirmed his commitment to violent jihad, when he in fact joined up

with terrorists and received training at al Qaeda's al Faruq camp in Afghanistan.  *See* Aswat Br.

at 20-22; PSR p. 11 fn.2; GX 4, 1111-A-T.  Even after receiving this training, Aswat remained in

Afghanistan for months after the attacks of 9/11, not departing Afghanistan until January 2002.

PSR ¶ 36 fn. 2.  Aswat, who is still only 41 years old, remains a young man, capable of resuming

support for acts of physical violence.

      As for general deterrence, it is essential for our country's security that other young men

be deterred from engaging in similar conduct.  A substantial sentence of 20 years' imprisonment

is likely to deter others who are exposed to hateful extremist teaching from purported "spiritual

leaders"—the next generation of people like Aswat, Ujaama, and Kassir—from being persuaded

to engage in acts of terrorism at the urging of purported religious leaders like Abu Hamza, or on

their own initiative.  General deterrence is particularly important in today's environment, where

so many young men and women, including Americans, are gravitating toward these purported

"spiritual leaders" on the Internet and choosing to travel to Syria and other areas of conflict to

satisfy their interest in waging jihad.  Those who might turn to terrorism must realize that if they

conspire to train and fight with terrorists, or if they support al Qaeda's call to murder Americans,

they will be caught, prosecuted, and then imprisoned for many years.

For all these reasons, society's interest in effective deterrence also calls for a sentence of 20 years' imprisonment.

### D.    A Sentence of Twenty Years' Imprisonment is Appropriate to Protect the Public from Further Crimes of Aswat

For many of the same reasons, a sentence of 20 years' imprisonment in this case is necessary "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(2)(C).  As noted above, Aswat not only tried to help establish a terrorist training camp on U.S. soil—a camp whose purpose was to support al Qaeda and train young men to engage in acts of violence and murder in Afghanistan—but after those efforts, Aswat linked up with al Qaeda in Afghanistan.  Aswat, who is still only 41 years old, remains of an age where he could engage in similar acts upon his release.  Accordingly, a sentence of 20 years' imprisonment— which would entail a little under seven years of additional incarceration (assuming full good conduct time credit)—will protect the public from additional crimes by this defendant.

### E.    Imposing a Guidelines Sentence, With Application of the Terrorism Enhancement, Would Advance the Goals of Section 3553(a)

Pursuant to Section 3553(a), the Court is to consider "the kinds of sentence and the sentencing range established [in the Sentencing Guidelines]," as well as "any pertinent policy statement [issued by the Sentencing Commission]."  18 U.S.C. § 3553(a)(4), (5).  These statutory factors weigh especially heavy in favor of a Guidelines sentence of 20 years' imprisonment.

The Government agrees with the Probation Office's calculation of the advisory Guidelines range in this case, which the parties also agreed to in the plea agreement.  That calculation is as follows.  Because the two counts of conviction (Counts Five and Six) involved substantially the same act or transaction (*i.e.*, Aswat's efforts to provide material support to al Qaeda by working to establish a jihad training camp in Bly, Oregon), those two counts are

treated as one Group pursuant to U.S.S.G. § 3D1.2(a).  The operative Guideline for these two

Counts is U.S.S.G. § 2M5.3, which provides for a base offense level of 26.  Pursuant to U.S.S.G.

§ 2M5.3(b), that base offense level is increased by two levels because the offense involved

firearms.  Because this offense was a felony that involved, or was intended to promote, a federal

crime of terrorism, the offense level is increased by 12, pursuant to U.S.S.G. § 3A1.4.  Finally,

because Aswat accepted responsibility through his plea allocution and by giving timely notice of

his intent to enter a guilty plea, thereby permitting the Government to avoid preparing for trial

and permitting the Court to allocate its resources efficiently, three levels are reduced, pursuant to

U.S.S.G. § 3E1.1(a), (b).  According, the final offense level is 37.

       In addition, the applicable Criminal History Category becomes VI, in light of the

terrorism enhancement, because the offense involved, or was intended to promote, a federal

crime of terrorism.  *See* U.S.S.G. § 3A1.4(b).  Accordingly, at offense level 37 and Criminal

History Category VI, the Guidelines range would be life imprisonment, *id.* § 5A, with a

recommended fine of $20,000 to $200,000, *id.* § 5E1.2(c)(3).  However, in light of the combined

statutory maximum sentence for Counts Five and Six, the applicable Guidelines sentence for

Aswat is 20 years' imprisonment.

       This Guidelines sentence of 20 years' imprisonment should be imposed in this case.  As

the Second Circuit has explained, "the guidelines cannot be called just another factor in the

statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors."

*United States* v. *Rattoballi*, 452 F.3d 127, 131 (2d Cir. 2006) (citations and internal quotation

marks omitted); *cf. United States* v. *Fernandez*, 443 F.3d 19, 28 (2d Cir. 2006) (stating that "the

Guidelines range should serve as 'a benchmark or a point of reference or departure' for the

review of sentences") (citations omitted) (quoting *United States* v. *Rubenstein*, 403 F.3d 93, 98-

99 (2d Cir. 2005)).  As the Supreme Court put it in *Gall*, "to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  552 U.S. at 50.  Indeed, it is precisely because the Guidelines function as a national "benchmark" that a Guidelines sentence here will advance another Section 3553(a) goal:  "the need to avoid unwarranted sentence disparities."  18 U.S.C. § 3553(a)(6).

Aswat argues that the terrorism enhancement at U.S.S.G. § 3A1.4 "exaggerates his conduct and criminal history," and the Court therefore should impose a significantly below-Guidelines sentence of 150 months.  Aswat Br. at 33.[6]  The application of U.S.S.G. § 3A1.4(a) does not overstate the seriousness of Aswat's criminal conduct.  In 1994, Congress mandated that the Sentencing Commission provide for a Guidelines enhancement for terrorism offenses to ensure that those convicted of such crimes receive punishment commensurate with the extraordinary nature of their conduct.  *See Stewart*, 590 F.3d at 172 (citing Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 120004, 108 Stat. 1796, 2022).  The resulting "terrorism enhancement" at U.S.S.G. § 3A1.4 reflects Congress's intent that defendants convicted of terrorism offenses serve sentences appropriate to their uniquely dangerous crimes.  As Judge Walker explained in his concurrence in *Stewart*:

> The import of this enhancement 'could not be clearer': It reflects Congress' and the Commission's policy judgment 'that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time.'

*Id.* at 172-73 (quoting *Meskini,* 319 F.3d at 91-92).  The enhancement appropriately assesses the seriousness of the offense in this case.  Aswat was a loyal follower of a terrorist leader who

---

[6] Here too, Aswat does not dispute that the terrorism enhancement at U.S.S.G. § 3A1.4 applies to his conduct, *see* Aswat Br. at 33—nor can he under the terms of his plea agreement with the Government.

21

engaged in acts of terror that spanned the globe, including in the United States where Aswat attempted to establish a jihad training camp. Aswat followed up on that conduct by traveling to Afghanistan, where he trained at al Qaeda's main terrorist training camp. Aswat thus did more than exhibit a philosophical commitment to the cause: he worked to provide real support in the form of religious training to individuals were expected to later fight in support of jihad in Afghanistan and by himself receiving training from al Qaeda. This conduct falls squarely within the kind of dangerous activity that Congress has deemed worthy of significant punishment through the application of the terrorism enhancement. To vary downward to the extent requested by the defense would thwart Congress's intent to ensure that acts of terrorism are severely punished and additionally would disregard the nature of the defendant's conduct.

Application of the terrorism enhancement to Aswat also would not "over-represent" the "likelihood of recidivism" in this case. Aswat Br. at 35. Aswat's criminal conduct was varied and spanned over six years, during which time his committed numerous terrorist acts that spanned the globe, from Bly, Oregon, where he tried to help start a jihad training camp, to Afghanistan, where he trained at an al Qaeda training camp. Aswat even remained in Afghanistan after receiving this terrorist training and after the attacks of September 11, 2001. In addition, Aswat is still relatively young. Even assuming *arguendo* he receives a 20-year sentence, he will likely be released by the time he is approximately 47 years old (assuming full good conduct time credit). Indeed, given the great credibility Aswat has on the topic—having studied under Abu Hamza and trained with al Qaeda in Afghanistan—Aswat could wield a great deal of influence over others considering to engage in violent jihad, were he so inclined.

Nor would the enhancement's impact on Aswat's applicable Criminal History Category provide "a gross overstatement of his criminal history" that calls for a non-Guidelines sentence.

22

Aswat Br. at 35.  Rather, the effect of the enhancement on the applicable Criminal History

Category reflects the Commission's assessment of the need for deterrence and likelihood of

recidivism in terrorist offenses.  As the Second Circuit has previously recognized, "the

Sentencing Commission had a rational basis for creating a uniform criminal history category for

all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior

are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and

the need for incapacitation."  *Stewart*, 590 F.3d at 143 (citing *Meskini*, 319 F.3d at 92).

      Furthermore, despite the defense's contrary assertion, a Guidelines sentence here would

not run afoul of the concerns articulated by the Second Circuit in *United States* v. *Dorvee*, 616

F.3d 174 (2d Cir. 2010).  *See* Aswat Br. at 33-35.  The Second Circuit's decision in *Dorvee* was

based in part on its assessment that the relevant Guideline was "irrational[]" and, "unless

carefully applied, [could] easily generate unreasonable results." 616 F.3d at 187-88.  By contrast,

the Second Circuit has expressly *endorsed* the "rational[ity]" of the terrorism enhancement.  *See*

*Meskini*, 319 F.3d at 92.  The rationality of that enhancement is plain in this case.  Aswat

traveled to the United States for purposes of helping to establish a terrorist training camp and

providing religious guidance to the trainees.  He then traveled to Afghanistan, where he received

training himself at al Qaeda's al Faruq training camp.

      Accordingly, a Guidelines sentence of 20 years' imprisonment is the appropriate sentence

in this case.

**F.**    **Aswat's Medical Condition Does Not Warrant Any Reduction of His Sentence**

      The defense claims that Aswat's condition of paranoid schizophrenia and need for

continued medical care warrants a significantly below-Guidelines sentence of 150 months'

imprisonment, under Section 3553(a)(2)(D).  *See* Aswat Br. at 8.  While Aswat acknowledges

that he "has received medication since his incarceration in the Bureau of Prisons," he claims that "he is not receiving the same type of treatment responsible for his recovery while he was in Broadmoor" Hospital, the West London medical facility where Aswat was housed prior to his extradition. *Id.*[7]

Section 3553(a)(2)(D) provides that a sentencing court should consider "the need for the sentence imposed . . . to provide the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Here, the Bureau of Prisons is fully capable of handling this medical treatment going forward, which negates any basis for a health-based reduction. *See United States* v. *Lelonde*, 509 F.3d 750, 770 (6th Cir. 2007) (approving the district court's "ask[ing] the federal marshal as well as the probation officer about [the defendant's] ability to receive adequate medical care while in custody" in upholding the imposition of the maximum sentence recommended by the Guidelines). The Bureau of Prisons provides inmates with a stratified approach to the delivery of mental health services, which range from inpatient psychiatric treatment, to residential treatment programs, to outpatient psychological and psychiatric services. The vast majority of this mental health care is provided on an outpatient basis at local institutions by the Psychology Services Department, working in collaboration with either a full-time or consultant physician. The mental health services provided by the Bureau of Prisons are delivered by well-qualified psychiatrists and doctoral level psychologists, all of whom meet or exceed the community standards for mental health providers

---

[7] It is noteworthy that, during the course of this case, Aswat has not previously claimed that the Bureau of Prisons has not provided him with adequate medical treatment. To be sure, the Government certainly is not aware of any instances when Aswat was denied proper medical care while in U.S. custody.

in the United States.  In addition, all Bureau of Prisons facilities are equipped to handle mentally

ill inmates, and all facilities have a psychologist on-call 24 hours a day, seven days a week.[8]

But most importantly, Aswat's medical condition and his need for future treatment while

in Bureau of Prisons custody in no way detract from the exceedingly seriousness of his offense

of providing material support to al Qaeda—which is far and away the most compelling and

significant factor in this case under Section 3553(a), and calls for a 20-year sentence.  *See, e.g.*,

*United States* v. *Fishman*, 631 F. Supp. 2d 399, 405 (S.D.N.Y. 2009) (declining to take into

account the defendant's bipolar disorder under Section 3553(a), because the defendant made "no

claim of a causal relationship between his proffered illness and his crime," and therefore the

illness "will have no effect on the Court's ultimate sentence"); *see also United States* v. *Morales*,

No. 11–1803–cr, 2012 WL 5275363, at *1 (2d Cir. Oct. 26, 2012) (emphasizing that it was

proper to consider the defendant's health issues in the context of the serious nature of the

defendant's crime); *United States* v. *Brudi*, No. 12-4723-cr, 2013 WL 5681647, at *1 (2d Cir.

---

[8] Additional details regarding the mental health services provided by the Bureau of Prisons to inmates is set forth in a letter, dated May 8, 2012, from the United States Department of Justice, Office of International Affairs, to the Home Office of the United Kingdom, which was submitted in connection with Aswat's extradition proceedings.  The May 8, 2012 letter is attached hereto as Exhibit A.  The Government has confirmed with counsel for the Bureau of Prisons that the representations contained in that letter regarding mental health services provided by the Bureau of Prisons for inmates remain in place today, with one exception.  The Bureau of Prisons has, since the date of that letter, implemented a policy designed to avoid placing inmates deemed "seriously mentally ill" in restrictive settings such as Special Housing Units (SHU) and the Special Management Unit (SMU).  Accordingly, inmates with what are deemed "serious mental illnesses" are now excluded from the Administrative Maximum Facility (ADX) in Florence, Colorado, unless the inmates are unable to function in a less restrictive setting due to special safety and security needs.  The determination as to whether an inmate has a "serious mental illness" (and, if so, whether there are extraordinary security concerns to justify this exception) cannot be made until a thorough mental health evaluation is made by the Bureau of Prisons.

Oct. 21, 2013) (same).  The gravity of Aswat's crime utterly dwarfs any sentencing consideration that he should receive based on his medical condition.[9]

## G.  A Sentence of Twenty Years' Imprisonment Would Not Create Unwarranted Sentencing Disparities

Aswat further contends that a sentence of twenty years would create an unwarranted disparity as compared to sentences handed down to similarly situated defendants.  *See* Aswat Br. at 23-33; *see also* 18 U.S.C. § 3553(a)(6) (identifying "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").  For all the reasons set forth above, a 20-year sentence is commensurate with Aswat's criminal conduct as it would properly reflect the seriousness of the conduct at issue, and therefore such a term of incarceration would not create unwarranted sentencing disparities.  In contrast, the 150-month sentence advocated by the defense—which would equate to time-served

---

[9] In the somewhat analogous context of evaluating requests for downward departures based on conditions of confinement, courts have generally determined that the more serious the crime, the less compelling is any argument for a reduction in sentence based on conditions of confinement.  For instance, in *United States* v. *Torres-Teyer*, 322 F. Supp. 2d 359 (S.D.N.Y. 2004), Judge Lynch considered a defendant's application for a downward departure where the defendant had spent ten months in a foreign prison, which the defendant characterized as "an extraordinarily harsh environment filled with fear, danger, violence, rape and corruption."  *Id.* at 377.  Given the defendant's Guidelines range of approximately 20 years' imprisonment, Judge Lynch concluded that, "[a]bsent evidence of truly horrific conditions, subjection to substandard detention conditions for ten months does not warrant a meaningful departure from a twenty-year sentence."  *Id.*  Similarly, in *United States* v. *Carty*, 264 F.3d 191 (2d Cir. 2001), the Second Circuit held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures" under the Sentencing Guidelines.  *Id.* at 208 (emphasis added).  On remand in *Carty*, Judge Schwartz declined to depart downward, citing, among other things, the severity of the defendant's crimes.  *United States* v. *Carty*, 95 Cr. 973 (S.D.N.Y. Nov. 9, 2001); *see also, e.g.*, *United States* v. *Naranjo-Ramirez*, No. 09-4343-cr, 2010 WL 4723301, at **2, 4 (2d Cir. Nov. 23, 2010) ("noting that sentencing judges are "under no obligation to depart from the Guidelines on the basis of [a defendant's] allegedly harsh pre-sentence confinement conditions," so long as they are "consider[ed]") (emphasis in original).  Since *Carty*, "the courts have granted relief generally where the conditions in question are extreme to an exception degree and their severity falls upon the defendant in some highly unique or disproportionate manner." *United States* v. *Mateo*, 299 F. Supp. 2d 201, 211 (S.D.N.Y. 2004); *accord, e.g.*, *United States* v. *Green*, No. 04 Cr. 424 (RWS), 2006 WL 3478340, at *4 (S.D.N.Y. Dec. 1, 2006).

assuming the Bureau of Prisons affords Aswat credit, including good conduct time, for his time in British custody—would fall well short of reflecting the seriousness of the criminal conduct here.

In support of a 150-month sentence, Aswat cites an extensive list of sentences imposed in prior terrorism cases in this Circuit. *See* Aswat Br. at 23-33. Of course, the most analogous conduct was committed by Aswat's co-defendants, Abu Hamza (life sentence), Kassir (life sentence), and Ujaama (sentence pending). However, those defendants are each readily distinguishable from Aswat for a number of reasons. Abu Hamza, Kassir, and (to a lesser extent) Ujaama engaged in vastly more serious criminal conduct than Aswat. Furthermore, unlike Aswat, Abu Hamza and Kassir proceeded to trial and failed to accept responsibility for their crimes. Finally, Ujaama has cooperated with the Government and, at sentencing, likely will receive the benefit of a motion pursuant to U.S.S.G. § 5K1.1 from the Government.

With respect to the cases cited by Aswat, he fails to demonstrate that his conduct— providing material support and resources to al Qaeda, including by working to establish a terrorist training camp on U.S. soil—is in any significant way similar to the conduct of the defendants in the panoply of cases he cites. Indeed, many of the cited cases are readily distinguishable.[10]

First, most of the cases Aswat relies upon entailed the provision of material support to organizations other than al Qaeda. Although these groups espouse anti-U.S. doctrines and are undoubtedly worthy of their designations as terrorist organizations, as recent history has shown, they are not principally dedicated to attack the United States and its interests in the same way as al Qaeda. For example, the defense cites numerous cases in which the defendants provided

---

[10] Exhibit B, attached hereto, sets out additional details regarding the facts and sentences in these cases.

support to the *Fuerzas Armadas Revolucionarias de Colombia* (the "FARC"), and where the

offense conduct primarily involved narcotics trafficking or weapons transactions relating to the

FARC's narcotics trafficking activities in South America.  *See United States* v. *Viglakis*, No. 12

Cr. 585 (KBF) (S.D.N.Y.); *United States* v. *Bout*, No. 08 Cr. 365 (SAS) (S.D.N.Y.); *United*

*States* v. *Ibarguen-Palacio*, No. 09 Cr. 498 (WHP) (S.D.N.Y.); *United States* v. *Issa*, No. 09 Cr.

1244 (BSJ) (S.D.N.Y.); *United States* v. *Cordoba-Ramirez*, No. 08 Cr. 1290 (DC) (S.D.N.Y.);

*United States* v. *Yousef*, No. 08 Cr. 1213 (JFK) (S.D.N.Y.).  Similarly, several cases cited by the

defense involved support to terrorist organizations that, while certainly dangerous and a threat to

American interests, have not engaged in the same level of violence and murder against the

United States as al Qaeda.  *See United States* v. *Nayyar*, No. 09 Cr. 1037 (RWS) (S.D.N.Y.)

(support to Hezbollah); *United States* v. *Iqbal, et al.*, No. 06 Cr. 1054 (RMB) (S.D.N.Y.)

(support to Hezbollah); *United States* v. *Sarachandran, et al.*, No. 06 Cr. 615 (RJD) (E.D.N.Y.)

(support to Liberation Tigers of Tamil Eelam ("LTTE")); *United States* v. *Thavaraja*, *et al.*, No.

06 Cr. 616 (RJD) (E.D.N.Y.) (same); *United States* v. *Aref*, No. 04 Cr. 402 (TJM) (N.D.N.Y.)

(support to Jaish-e-Mohammed ("JEM")).

　　　　Second, many of these same cases—as well as numerous other cases cited by the

defendant—involved undercover "sting" operations by law enforcement agents, as opposed to

the consummated, historical conduct by this defendant.  *See, e.g., Viglakis*, No. 12 Cr. 585 (KBF)

(S.D.N.Y.) (Drug Enforcement Administration sting operation involving the FARC); *Bout*, No.

08 Cr. 365 (SAS) (S.D.N.Y.) (same); *Issa*, No. 09 Cr. 1244 (LAP) (S.D.N.Y.) (same); *Yousef*,

No. 08 Cr. 1213 (JFK) (S.D.N.Y.) (same); *Nayyar*, No. 09 Cr. 1037 (RWS) (S.D.N.Y.) (sting

operation involving purported assistance to Hezbollah in obtaining military equipment); *United*

*States* v. *Alishtari*, No. 07 Cr. 115 (AKH) (S.D.N.Y.) (sting operation involving transfer of funds

to undercover agent for purpose of providing night vision goggles and other equipment for a training camp in Afghanistan); *United States* v. *Shah, et al.*, No. 05 Cr. 673 (LAP) (S.D.N.Y.) (sting involving, *inter alia*, agreement to aid al Qaeda by training terrorists in martial arts); *United States* v. *Defreitas*, *et al.*, No. 07 Cr. 543 (DLI) (E.D.N.Y.) (sting operation involving plot to conduct attack at John F. Kennedy International Airport); *United States* v. *al-Moayad*, *et al.*, No. 03 Cr. 1322 (DLI) (E.D.N.Y.) (sting involving agreement to provide millions of dollars in donations to fund violent jihad); *Sarachandran*, No. 06 Cr. 615 (RJD) (E.D.N.Y.) (sting involving plot to buy weapons for LTTE); *Thavaraja*, No. 06 Cr. 616 (RJD) (E.D.N.Y.) (case involving, in part, sting whereby U.S. officials would purportedly be bribed to take LTTE off designation list); *Aref*, No. 04 Cr. 402 (TJM) (N.D.N.Y.) (sting involving, *inter alia*, financing for missile to be used by JEM).

Finally, Aswat's generalization that the 18 cases he cites are "roughly comparable" to his own, Aswat Br. at 24, fails to take into account numerous other case-specific (and defendant-specific) factors that caution against such a conclusion. For example, a number of the cases—whether arising out of sting operations or otherwise—involved material support of a type that is qualitatively different than the type of support Aswat provided to al Qaeda. Some of the cases involved the provision of support over a relatively short period of time, or involved support in the form of money or financing—as distinguished from Aswat's longstanding dedication to al Qaeda and his concrete efforts to establish a jihadist training camp in the United States meant to service al Qaeda's objectives. *See, e.g., Alishtari*, No. 07 Cr. 115 (AKH) (S.D.N.Y.) (provision of financial support); *Iqbal*, No. 06 Cr. 1054 (RMB) (S.D.N.Y.) (provision of satellite broadcasting services); *Thavaraja*, No. 06 Cr. 616 (E.D.N.Y.) (provision of financial support and payment of bribes). Similarly, Aswat fails to take into account the fact that, in many of the cases

he relies upon, the defendants received sentences either at or close to the applicable statutory maximum.  *See, e.g., United States* v. *Ahmed*, No. 10 Cr. 131 (PKC) (S.D.N.Y.) (111-month sentence where statutory maximum was 120 months);[11] *United States* v. *Hashmi*, No. 06 Cr. 442 (LAP) (S.D.N.Y.) (statutory-maximum 15-year sentence); *Shah*, No. 05 Cr. 673 (LAP) (S.D.N.Y.) (Shah: statutory-maximum 15-year sentence; Sabir: 25-year sentence where statutory maximum was 30 years; Brent: statutory-maximum 15-year sentence); *Cordoba-Ramirez*, No. 08 Cr. 1290 (DC) (S.D.N.Y.) (statutory-maximum 15-year sentence); *United States* v. *al-Bakri, et al.*, No. 02 Cr. 214 (WMS) (W.D.N.Y.) (al-Bakri: statutory-maximum 10-year sentence; Goba: statutory-maximum 120-month sentence);[12] *Defreitas,* 07 Cr. 543 (DLI) (E.D.N.Y.) (Defreitas: life imprisonment; Kadir: life imprisonment; Ibrahim: life imprisonment; Nur: statutory-maximum 15-year sentence).

Each of the above cases undoubtedly involved serious criminal conduct, worthy of harsh punishment.  Nevertheless, those cases are, on the whole, not easily compared to this one, which involved a uniquely alarming form of material support to a uniquely dangerous organization. Aswat, over a significant period of time, demonstrated a dedication to al Qaeda, whose primary objective is killing Americans, and to Abu Hamza, a leading orchestrator of global acts of terror. And Aswat manifested his support by going so far as to assist in the preparation of a terrorist training camp on U.S. territory.  The litany of cases cited by the defense may share one common theme, in that they all involved some form of material support to a foreign terrorist organization, but they shed limited light on the appropriate sentence to be imposed here.

---

[11] In *Ahmed*, Judge Castel's sentence took into account the time Ahmed spent in Nigerian custody prior to his arrival in the United States, for which Judge Castel believed Ahmed would not receive credit from the Bureau of Prisons.

[12] In the cases of al-Bakri and Goba, press releases issued by the Department of Justice also revealed that both defendants were cooperating with the Government.

A recent, and perhaps more helpful, point of comparison is the sentence imposed by Judge Gleeson in *United States* v. *Babafemi*, No. 13 Cr. 109 (JG) (E.D.N.Y.).  The defendant, who (like Aswat) pled guilty to conspiring to provide and providing material support to an FTO—in that case, al Qaeda in the Arabian Peninsula ("AQAP")—was sentenced on August 12, 2015 to 22 years' imprisonment.  In a show of support to AQAP analogous to Aswat's demonstration of support to al Qaeda, Babafemi traveled on two occasions, in 2010 and again in 2011, from Nigeria to Yemen to obtain training in the use of weapons from the leaders AQAP. Babafemi also used his English skills to assist AQAP in the publication of its English-language propagandist publication, *Inspire* magazine, and received approximately $8,600 in cash to recruit other English-speakers from Nigeria to join the terrorist organization—a task that Babafemi failed to carry out.  Given that the level of support Babafemi provided to AQAP is in many ways similar to that provided by Aswat, Babafemi's 22-year sentence helps demonstrate that a 20-year sentence in this case would not create unwarranted disparities.  Indeed, in some respects, Babafemi's conduct was even less egregious than Aswat's—particularly given that Babafemi's actions did not take place on U.S. soil.

## IV. Conclusion

For the foregoing reasons, a Guidelines sentence of 20 years' imprisonment is the appropriate sentence in this case.  Aswat traveled to the United States, at the direction of a global terrorist leader, for the purpose of establishing a terrorist training camp whose purpose was to teach and inspire men on American soil to learn how to fight and kill in support of a war of jihad against those that he considered infidels.  A sentence of 20 years' imprisonment would reflect the seriousness of that offense, promote respect for the law, provide just punishment, afford adequate deterrence, and would be sufficient, but not greater than necessary to serve the purposes of

sentencing.[13]  In addition, the Government respectfully requests that the Court enter the order of

judicial removal, on consent, with respect to Aswat.

Dated:  New York, New York
         October 9, 2015

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York


                          By:  _____/s/ John P. Cronan_____
                                        John P. Cronan
                                        Ian McGinley
                                        Shane T. Stansbury
                                        Assistant United States Attorneys
                                        Tels.: (212) 637-2779/-2257/-2641

---

[13] In light of the nature of the crimes here and the sentence that should be imposed,
educational and vocational training of the defendant does not pose a particular concern in this
case.

**AFFIRMATION OF SERVICE**

SHANE T. STANSBURY, pursuant to 28 U.S.C. § 1746, hereby declares under the

penalty of perjury:

I am an Assistant United States Attorney in the Office of the United States Attorney for

the Southern District of New York. On October 9, 2015, I caused copies of the Government's

Sentencing Memorandum to be delivered by ECF and electronic mail to the following counsel

for defendant Haroon Aswat:

> Peter Enrique Quijano, Esq.
> 381 Park Avenue South
> Suite 701
> New York, New York 10016
> Email: peter@qandelaw.com

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Dated:  New York, New York
        October 9, 2015

                                        _____/s/ Shane T. Stansbury_____
                                        Shane T. Stansbury
                                        Assistant United States Attorney