FAGAASWS                        Sentence

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                              04 CR 356 (KBF)

5   HAROON RASHID ASWAT,

6               Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           October 16, 2015
9                                          11:00 a.m.

10

11  Before:

12                  HON. KATHERINE B. FORREST,

                                           District Judge
13

14                        APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    SHANE T. STANSBURY
17  JOHN P. CRONAN
    IAN P. MCGINLEY
18       Assistant United States Attorney

19  PETER E. QUIJANO
         Attorney for Defendant Aswat
20
    ANNA N. SIDERIS
21       Attorney for Defendant Aswat

22

23

24

25
```

FAGAASWS                          Sentence

1          (Case called)

2          MR. STANSBURY:  Shane Stansbury, John Cronan and Ian

3    McGinley, for the government.  And we've also got several

4    agents and a paralegal at the table.

5          THE COURT:  All right.  Welcome.  Good morning.

6          MR. QUIJANO:  Good morning, Judge Forrest.

7          For defendant Haroon Aswat, Peter Quijano and Anna

8    Sideris.  Also present in the front row is Jacob Bineman, a

9    barrister from the United Kingdom, who was one of Mr. Aswat's

10   attorneys.

11         THE COURT:  Is he with the same firm --

12         MR. QUIJANO:  Yes, he is, your Honor, or rather he was

13   at the time of the representation.

14         THE COURT:  All right.  Thank you.

15         MR. QUIJANO:  Mr. Aswat is present and ready to

16   proceed.

17         THE COURT:  All right.  Thank you and welcome all of

18   you.

19         We're here for the sentencing of Mr. Aswat and I want

20   to start by setting forth for the record the materials that

21   I've received in connection with this proceeding and make sure

22   I have those materials which you folks think I should have.  If

23   I'm missing anything please let me know.

24         I've received from the defense two submissions,

25   actually, three submissions.  I've received another one this

FAGAASWS                    Sentence

morning.  One of October 3, 2015, that's the corrected version

of the sentencing submission.  The second of October 13, 2015.

And then I received a reply to the government's sentencing

memorandum and it's dated 10/15/15.  So that was just yesterday

and I read it this morning.  So, it's actually dated the 14th.

It was filed on the 15th and I read it on the 16th.

Now those submissions are accompanied by a number of

letters and I want to mention those as well because a couple of

them play a particularly important role here.  Not only the

letters from Mr. Aswat's family, there are letters from his

aunts, his uncle, a cousin, several siblings, several friends,

two friends from South Africa, a chaplain from one of the

hospitals in which he was residing in for a period of time.

And then also -- and these are the two that I wanted to mention

in particular -- a letter from Ms. Garret Pierce that's dated

October 5, 2015, and it's a very extensive letter, quite

detailed and also the detailed report of Dr. Wadman,

W-A-D-M-A-N, from the West London Mental Health Center and

that's dated March 26, 2014.  Both of those letters I want to

have you folks understand that I've read those.  I've read all

the letters quite carefully.  Those were so detailed they

really took a couple of readings to take them in but they're

very detailed.

I've also received a PSR -- that's a presentencing

investigation report -- that's dated June 18, 2015.  The PSR

sets forth an offense level of 37 and a criminal history

category of six.  We'll talk about that in a moment.  The PSR

will be made part of the record in this matter and filed under

sealed.  If an appeal is taken, then counsel on any appeal can

have access to the PSR without any need for further application

to the Court.

I've also received a submission from the government

that's dated October 9, 2015.  That submission also has

attachments.  It has two attachments.  In particular, a

statement from the Department of Justice relating to the

extradition proceeding and also one relating to various

terrorism cases.  Both sides spent time in their submissions

talk about sentencing proceedings and other terrorism cases and

there was an appendix that did that in the government's

submission.

Now, is there anything that you folks think I should

have that I've not mentioned?

MR. STANSBURY:  No, your Honor.  That covers it.

MR. QUIJANO:  Not from the defendant, your Honor.

Thank you.

THE COURT:  All right.  I then will move on to the

next piece which is let me just ask you, Mr. Quijano, have you

had an opportunity to review the PSR with Mr. Aswat?

MR. QUIJANO:  We have, your Honor.

THE COURT:  Do you or Mr. Aswat have any modifications

FAGAASWS                        Sentence

```
 1    to the PSR?

 2             MR. QUIJANO:  No, your Honor.

 3             THE COURT:  Does the government have any objections or

 4    modifications to the PSR?

 5             MR. STANSBURY:  Your Honor, we just noticed a couple

 6    of typos.  It appears that paragraph 31 at the very end of the

 7    paragraph states that he was subsequently received training in

 8    Afghanistan in 2011.  I believe that should read "2001".

 9             THE COURT:  Yes.  I agree with that change.

10             MR. QUIJANO:  I agree.

11             THE COURT:  All right.  Well, that change shall be

12    made and I think that's an important change.

13             MR. STANSBURY:  And then at paragraph 82 where it says

14    "guideline provisions" I think this is just an extra word in

15    the second line it says the guideline imprisonment range is 360

16    months to zero life.

17             THE COURT:  Right.  The word "zero" should be struck.

18             Mr. Quijano, do you agree?

19             MR. QUIJANO:  Of course, your Honor.

20             THE COURT:  Then that word shall be struck from

21    paragraph 82.

22             All right.  The Court then does adopt the factual

23    findings of the PSR.  It's not my practice nor would it be

24    appropriate to adopt the recommendation necessarily.  The Court

25    can take that into consideration but that's not one of the
```

1    findings that's adopted and upon which the Court specifically

2    relies in terms of its ultimate sentence.

3            Let me just make a couple of comments about the

4    guidelines calculation so that we can have a discussion about

5    it.  It actually in some ways impacts with a little bit of an

6    odd situation here.  The guidelines are grouped.  They are the

7    result of a grouping because there are two counts of conviction

8    here, both of which relate to the same conduct which is the

9    conspiracy to provide material resources and support to a

10   foreign terrorist organization and then a substantive crime for

11   the same thing.

12           That in turn relates to the Glide, Oregon training

13   camp, if you will, and the conduct associated with that.  So

14   they are grouped together under guidelines provision Section

15   3D1.2 because they essentially are the same criminal conduct

16   and the same harm.  And then there's a necessary series of

17   steps hat one goes through to come up with the guidelines which

18   is to turn immediately for that particular crime which is the

19   statutory crime to guidelines provision 2M as in "man" 5.3

20   which is a guidelines provision that doesn't require any by

21   analogy consideration by the court actually on its face

22   directly applicable to this crime.

23           That starts the business base offense level off at 26.

24   And I think there's also no doubt, nor could there be under the

25   Lynn Stewart case and other cases that the terrorism

1    enhancement here does apply.  And that automatically would

2    under 3A1.4A add 12 levels and that's appropriately added here

3    for the crime for the acts that underlay the crime and for the

4    and the provision itself.

5            Then there's a specific offense characteristic related

6    to firearms and that adds two.  But the 2M5.3 plus 12 which are

7    Congressional requirements through the guidelines, if you will,

8    it's not a minimum, but through the guidelines which Congress

9    has authorized there to be the guidelines and Congress

10   authorizes amendments to the guidelines, you start off under

11   any scenario really 38.  That is odd because 38 is above what

12   would be the statutory maximum for the crime which is ten

13   years.  So each count carries an independent ten years maximum.

14   Now they are separate crimes, Count Five and Count Six are

15   separate.  But there is the oddity here which I simply note so

16   that some day maybe somebody can fix the oddity which is we've

17   got two congressional pronouncements which are intentioned with

18   one another.  One is that the crime of providing material

19   resources and support to terrorists carries a statutory maximum

20   of ten years by statute but that the sentencing guidelines

21   which are ultimately approved by Congress in terms of amendment

22   thereto and the initial authorization therefore, would put the

23   minimum guidelines higher than anything close to the statutory

24   maximum.

25           Here, when you take the enhancements into account when

FAGAASWS                    Sentence

you also adjust for acceptance of responsibility you end up

here in our case with an on offense level of 37.  That would be

true for one count or for two counts because of the grouping.

And so whether it was one count or two counts for the guideline

is irrelevant under the guidelines calculation, insofar as

that's concerned it would be still 37.  The criminal history

category under the 3A1.4 is increased to six for all terrorism

related crimes and so we end up at 37 and six which is 360

months to life.

          Now for a single count that is what the guidelines

would be.  But there's a ten-year statutory maximum for a

single count of ten years.  Under the guidelines 5G1.2 the

Court in this kind of situation where there are maximums which

are together less than the guidelines, one then runs the

sentences consecutively.  And that would mean that the

guidelines which are guidelines are 240 months which is 20

years which is Counts Five and Count Six.  So the guidelines

are 20 years.  So there's no minimum here.  I just wanted to

point out the oddity in the statute.  I do find that the

guidelines are appropriately calculated at 37 and six but then

reduced down to 240 months due to the maximum statutory penalty

which can be imposed for the crimes of conviction.  So there's

sort of an analytical disconnect, if you will that I wanted to

mention.

          Would anybody like to comment on that or does anybody

1    disagree with the calculation?

2            MR. QUIJANO:  I do not disagree.  I will be commenting

3    on it in a few moments.  I can wait until then.

4            THE COURT:  All right.  Anything from the government?

5            MR. STANSBURY:  No, your Honor.  We agree with the

6    calculation.

7            THE COURT:  All right.  Then let's then go on and the

8    way that I would like to handle things is it to have the

9    government speak and then Mr. Quijano.  And then certainly give

10   Mr. Aswat an opportunity to address the Court if he would like

11   to do so before sentence is imposed.

12           Let me preview this by telling you what I'm struggling

13   with and I'll go into this more now but let me give you sort of

14   an overview.  I don't think it will surprising.  I think that

15   in effect it's the two pictures that I'm getting of the

16   defendant.

17           There is one picture -- and this is the place where

18   the two letters come into play in which the Court has really --

19   I thought were very, very thoughtfully done and read very

20   closely and tell me a fair amount about people who spent a lot

21   of time with the defendant over time, over a period of years.

22   And the two pictures are on the one hand there's a very young

23   man who is 21-years-old.  He gets involved with Abu Hanza, is

24   very close to Abu Hanza.  He is not just a listener.  He is

25   accompanying Abu Hanza here and there for several years.  And

FAGAASWS                    Sentence

in that connection he ends up in Glide, Oregon.  We'll go into
more of that in detail little bit later.

        He then comes back from Glide -- actually, from
Seattle.  He withdraws from hanging out with Abu Hanza.  I
could combine that then with skip to the life in South Africa
arrested and his family has said that he's a very gently
person.  He was struggling clearly with some mental health
issues at one point in time.  That comes through not so much
from the family at all but from the submissions from the two
letters that I mentioned and some other material.  So I've got
one picture of a fellow who was involved on the, what you call
religious inspirational aspects of Glide and of that aspect of
the preparing for jihad.

        And then I have another picture which is he didn't
just withdraw and leave the conduct with Abu Hanza.  He in fact
followed that by subsequently -- and this was I think
critical -- going to Afghanistan participating, being trained
at the Al Farouq training camp and then going off to South
Africa.  And so the question is is the fact that he was not
involved in any other terrorist events after he was arrested,
after the events of conviction a matter of timing of when he
was arrested and was he -- I mean, this is in terms of
character now, right?  The crimes of conviction are what we're
focused on as the crimes conviction.  But as the Court tries to
make an assessment of character I think is this guy a guy who

FAGAASWS                    Sentence

was really dangerous?  Or was this guy a guy who is a young kid
who was sorely misled and has cleaned himself up and gotten the
kind of treatment and support services that he needs to really
change things?  And so it's two different make pictures.

       And that picture is what I'm struggling with in terms
of whether or not I would go below 20 years.  And I will tell
you so that, Mr. Quijano, you can address this very clearly,
I'm concerned that in this kind of case the lack of clarity
works against a lower sentence rather than in favor of it
because of the inability to know.  I mean, I don't want this
guy to be released into -- so I wanted to just give you sort of
the picture of what I'm struggling with based upon the
submissions.  I know we're starting with a premise where this
defendant has already spent over a decade in jail for this
crime and other facilities associated therewith.  So that's
where we're starting.  We're starting where he served 120
months plus I believe.  And so it's really sort of what in
excess, if anything, of that amount.

       All right.  So why don't we start with the government
here.

       MR. STANSBURY:  Your Honor.  Thank you for that
preview, your Honor, and I want to get to that tension in just
a moment.  But just to sort of, to start out I think I'll start
out with the same place your Honor did which is there is a
tension between what the guidelines call for and what the

1    guidelines actually are.  So we end up with a 20-year sentence

2    being called for the guidelines which otherwise would be 360 to

3    life.  So I would submit that we should keep in mind what the

4    baseline is, this 360 to life, were it not for the statutory

5    maximum.

6            We think a 20-year sentence is perfectly appropriate

7    here.  And it captures all of those issues that your Honor

8    started to get into.  It's a complicated individual and I think

9    the government is not going to come up here and say that he was

10   as culpable as his co-defendants but we do believe that the

11   severity of the offense, the nature and circumstances of the

12   offense, along with the need for specific deterrence and

13   general deterrence and the need to protect the public call for

14   that 20 year sentence.

15           I'll start with the Glide, Oregon camp.  That's really

16   the heart of the conduct.  And as I go through this I just want

17   to sort of preview a theme.  There are multiple sort of

18   junctures in the defendant's life when he could have made

19   different choices.  But one of the first most significant

20   choices that he chose to make was to align himself with Abu

21   Hanza, who your Honor knows intimately.  This is a man whose

22   agenda and whose message was as dangerous and as murderous as

23   they come.  Your Honor went through some of the speeches that

24   Abu Hanza gave at his own sentencing.  There was no secret, no

25   ambiguity as to what that man stood for and this man chose to

FAGAASWS                    Sentence

align himself with that message and he chose to do that for a

long period of time.  And the general agenda of Abu Hanza was

simple, to encourage and insight global acts of terror and to

send his followers to support those acts of terrorism.

And there was one man in particular a few men in

particular who took it to the next step.  This defendant, he

was a loyal and a proud follower who was ready to put that

general message into motion and he was handpicked by Abu Hanza

with one other individual, Kasir.  And they were supposed to go

to Glide, Oregon and set up this camp and there was no secret

as to what the camp was about.  The purpose was to train young

men to fight on the front lines in Afghanistan right alongside

al-Qaeda.

So he made a choice when he aligned himself with Abu

Hanza, when he stuck around and then when he decided to go to

Oregon.  And I don't think any sort mitigating circumstances

about his conditions change that fact.

THE COURT:  Hold on for one moment and just remind me

if you could what the evidence at trial was and the record or

anywhere else that you know that the Glide Oregon camp was

specifically known to be for al-Qaeda.  Now I know it was known

to be for Abu Hanza.  I know that Abu Hanza was himself -- I

know how to get and link Abu Hanza to al-Qaeda and I know how

that was done at trial, but was there anything for instance, I

can't recall, from the letter the facts that were sent to Abu

FAGAASWS                    Sentence

1    Hanza whether anything references al-Qaeda that's connected to

2    Glide in writing?

3            MR. STANSBURY:  Nothing in writing in facts and this

4    defendant allocuted to the fact that he didn't know it was

5    specifically al-Qaeda until after the fact.  He knew he was

6    going to support a jihadist camp.  He didn't know that

7    organization's name.  He didn't know the name of that

8    organization until later.

9            Now there is a host of other evidence from the trial

10   and elsewhere that suggests that he should have known or would

11   have known.  Kasir was found with manuals and letters in his

12   computer and he had letters addressed to Bin Laden as well as

13   jihad.  He had a copy of bingled's 1996 declaration of war.

14   There was testimony in Ujaama and people present at the camp

15   about the fact that this both this defendant and Kasir spoke

16   about their prior training in Afghanistan.

17           Now I know the defense states in their submission that

18   he didn't actually train prior to Glide and Afghanistan but he

19   actually just boasted about it.  Kasir went the extra step of

20   saying that he actually was aligned with Bin Land and al-Qaeda

21   at the time.  So there is nothing in or out of this defendant's

22   mouth at the time but all of the circumstances of Kasir's

23   statements suggests that it was well-known that al-Qaeda's

24   agenda was a being served by that camp.

25           THE COURT:  All right.  Thank you.

1            MR. STANSBURY:  And just to sort of expand on that

2    point, I just want to touch on a point that's made in the reply

3    brief.  There's sort of this fine line that the defense seems

4    to be trying to walk.  He's allocuted to the offense.  He's

5    admitted that he was at the camp to serve a jihadist agenda.

6    But then at the same time he's sort of back-peddling in his

7    submission and saying, well, he was there really to support

8    his, to serve his faith, to carry out what he viewed as an

9    obligation to receive military training as part of his faith in

10   Islam.

11           Now, I think that's a very hard distinction to make

12   for the defendant.  First of all start with his guilty plea and

13   I think that's unambiguous and then we'll get into some of the

14   facts.  And I'm referring to page 24 and 25 of his guilty plea.

15   He said, I traveled to Glide, Oregon to assist Kasir in

16   creating a training camp and training others we wanted to

17   participate in jihad on behalf of a terrorist organization.  At

18   the time I understood that Abu Hanza and on Kasir were

19   associated with an Arab organization engaged in terrorist

20   activity and was engaged in terrorism.  I later came to know

21   that this Arab organization was known as "al-Qaeda".

22           Now the Court pressed him on this point.  And you

23   asked:

24           I just want to make sure that it's correct that at the

25   time you were engaged in this conduct you knew that you were

FAGAASWS                    Sentence

1    assisting a terrorist conversation.

2              The defendant said:  Yes, your Honor.

3              And you said again:

4              And did you understand that organization was involved

5    in terrorist activity?

6              He said:  I did, your Honor.

7              And you said again:  And you know that at the time you

8    were in engaged in these acts?

9              And he said:  Yes, your Honor.

10             Now, there's no question that he knew sort of what

11   this camp was about.  Those are his words and the circumstance

12   of the camp -- as I mentioned just to make it clear, and

13   there's also no question about what Abu Hanza's agenda was.  So

14   as far as the defendant's obligations to his religion, there

15   are many ways in which he could have fulfilled what he believed

16   were his obligations.  There are many people he could have

17   aligned himself with.  There are many places he could have

18   gone.  But the person he chose to associate himself with was

19   Abu Hanza, the man who spewed a message of hate and violence

20   towards innocent people, a man who spoke vocally and widely for

21   many years seeking recruits just like this man to serve

22   terrorist objectives.  So that's who he chose to associate

23   himself with.  And it's clear that he took those messages to

24   heart.

25             And then when you look at the conduct at Glide what

1    does he do?  Now, we're in the disputing that his role was

2    different from some of the others.  Kasir, as we mentioned in

3    our submission, was more, carried more of an operational role.

4    He was more involved in the actual military training.  This

5    defendant served a different kind of role.  It was more of a

6    spiritual role.  He was an adviser who was served there to

7    serve the purpose of inspiring these men to go fight on the

8    front lines in Afghanistan right alongside al-Qaeda.  And so

9    that role is no less important and that doesn't make his

10   conduct any less serious.  So as your Honor well knows, the

11   camp didn't work out.

12          And so what does he do at that point?  Well, he

13   doesn't leave.  This is again a juncture on which he could have

14   made a choice.  He doesn't leave and go home.  And it's quite

15   clear again what the agenda is at this point.  What does he do?

16   He stays with Kasir and goes to Seattle.  And at that point

17   they join a mosque and it's there at the Dar Salam mosque in

18   Seattle with he admits he is right alongside Kasir when Kasir

19   is there teaching men how to make silencers, how to assemble

20   and disassemble AK-47s, how to convert an AK-47 into a fully

21   automatic firearm, how to modify an AK-47 so it can launch

22   grenades.  What ever issues were going on in this defendant's

23   life at that time or later, there's no question what's going on

24   around him and what he's chosen to participate in and to help

25   effect.

FAGAASWS                    Sentence

1          Now, what happens after Glide?  So we know based on

2     the investigations that followed 9/11 and after Aswat's arrest

3     that he remained committed to violent jihad in the years after

4     he left the United States.  Again, we submit, this is another

5     critical juncture, another point of reference for your Honor to

6     consider whether or not 20 years is appropriate.

7          As you mentioned he is no longer associated with Abu

8     Hanza at some point.  But what does he do?  He doesn't go into

9     meditation mode.  He doesn't find a new sort of more main

10    stream scholar to follow.  No.  He goes right to the front

11    rounds in Afghanistan.  He goes to al-Qaeda's primary training

12    camp, Al Farouq.  This was not just any ordinary camp and there

13    was testimony at the trial.  This was al-Qaeda's primary

14    training ground where the troupes were trained in military

15    tactics, weapons, explosives and all of the things that they

16    needed to do to carry out al-Qaeda's agenda.

17         We know in this part because a few year after 9/11 the

18    defendant's name was found on the ledger that your Honor is

19    also aware of.  This is the ledger that was recovered from an

20    al-Qaeda safe house in Pakistan where -- Sheikh Muhammad who

21    was at the time al-Qaeda's chief operational planner had been

22    present.  And as the Court will recall there were a number

23    items recovered from that house that contained KSM's

24    fingerprints.

25         Now, this defendant denies being present at that

1    particular house in Karachi and he denies actually meeting KSM.

2    But this is a powerful fact and I think it goes to the

3    defendant commitment and his mindset and what kind of harm he

4    is capable of and agenda that he was committed to and that's a

5    frightening agenda.

6            We know that the defendant never denied that he

7    received training at Al Farouq even if he denied directly

8    meeting KFM.  He admits in mid 2001 he traveled to Pakistan.

9    And I'm referring now to Paragraph 36 Note Two of the PSR he

10   stated himself that he traveled to Pakistan to attend the

11   training camp in Afghanistan.  He mentions going to the Taliban

12   office to be interviewed, going to Afghanistan, being vetted at

13   this guest house in Kandahar where he was told to surrender his

14   passport and then he went on to Al Farouq.

15           So that's sort of another decision point as I

16   mentioned.  And I think that goes a long way to showing what

17   kind of individual he is.  At each point in his life when he

18   had a decision to make he made the decision to continue to

19   carry out the agenda of violent jihad.

20           Now when he was arrested in 2005 in Zambia -- and this

21   was six years after he traveled to Glide.  Four years after he

22   had attended al-Qaeda's camps and he was arrested -- and I mean

23   if the defendant's conduct up to that point was not disturbing

24   enough and this decision was not clear enough, he had within

25   his computer which as we submit in our brief, had a host of

FAGAASWS                    Sentence

1    disturbing literature that suggested that he had not given up

2    his commitment to the agenda I mentioned.

3              THE COURT:  Let me just ask you, does anybody have any

4    information as to the modeled of that computer and whether

5    since such a lengthy period of time had passed whether that

6    computer was a laptop, I assume, had been acquired subsequent

7    to or contemporaneous with the Al Farouq training and or Glide

8    or is it something --

9              MR. STANSBURY:  I don't believe we have that

10   information, your Honor.

11             THE COURT:  All right.  Only because four years is a

12   long time for a computer to continue to be sort of in existence

13   but I don't want to go there if people don't know.

14             MR. STANSBURY:  Yes.  And I know the defense sort of

15   tries, they make a point in the reply brief.  They talk about

16   some of the thing things that we mentioned in the computer, the

17   book on survival skills, the -- cookbook, etc., and they try to

18   downplay the significance of these.  And I will submit that the

19   significance of these is not in each individual manual or

20   instruction booklet.  It's the combination of these things and

21   it's the presence of these things in 2005 after the defendant

22   has shown himself to be committed to a particular agenda.  This

23   is I believe Mr. Quijano joked in his brief that had he fell

24   threw the -- cookbook in the 70s.

25             THE COURT:  I don't think it was a joke.

FAGAASWS                    Sentence

1          MR. STANSBURY:  But this is not Mr. Quijano we're

2      talking about.  This is someone who tried to setup a terrorist

3      training camp on U.S. soil.  This is a person who was on the

4      front lines in Afghanistan and trained with al-Qaeda.  So the

5      presence of these things on my computer or your computer I

6      would hope they would never be found but they carry a different

7      context for this defendant.  And what we mentioned in our brief

8      there's only a subset of what we found and I'll just go through

9      a few of them.

10          A nuclear biological chemical survival E-book, the

11      Anarchist Cookbook, the Antiterrorism Survival Bible E-book,

12      the Art of War, the Big Book of Mischief, the CIA Book of Dirty

13      Tricks, CIA Remote Viewing Mail, DMV Military Pentagon Secrets,

14      Hand Combat E-books, Marine Corp:  Advanced Military Skills, a

15      publication called Marine Sniper, the Textbook of Close Combat,

16      what appear to be chapters from a U.S. Army booklet, one

17      Chapter Three Top Secret Defense Biological Weapons Technology,

18      Chapter Six Nuclear Weapons Effects Technology, U.S. Navy Seal

19      Physical Fitness Guide, then there are photos of diagrams of

20      certain words and other -- components that we mentioned in our

21      brief.

22          THE COURT:  In terms of the way that those documents

23      were maintained on the computer, were they maintained in

24      separate files or downloaded in a single file?

25          MR. STANSBURY:  Yes.  Let me just confer --

FAGAASWS                    Sentence

1          THE COURT:  And is there any dispute as to whatever

2     the answer --

3          MR. STANSBURY:  I don't think there's any dispute.

4          (Pause)

5          MR. STANSBURY:  I don't think there's any dispute as

6     to how they were organized.  They were all separate files.

7     There wasn't sort of in an overarching folder.

8          THE COURT:  All right.  So, it wasn't -- at this point

9     if time you don't have any information as it being downloaded

10    only as a single file?

11         MR. STANSBURY:  That's correct.

12         THE COURT:  All right.

13         MR. STANSBURY:  So you put all of this in context and

14    you take a step back, your Honor.  I think going back to your

15    key question today I think we do have a clear picture of who

16    this defendant is.  Certainly in the context of the conduct for

17    I which he is going to be punished today.  He is a defendant

18    who at the least three different junctions mentioned today over

19    approximately a six-year period made his agenda clear.  He is

20    man who was at the right hand of Abu Hanza.  One of only a few

21    who took the extra step of traveling halfway across the world

22    to carry out that agenda.  So I think we have that very clear

23    picture of who that defendant is.

24         THE COURT:  Have you addressed the government's view

25    on the mental health issue?  And I'll put it in a very specific

1   way that the Court -- and the Court does take into

2   consideration very carefully the need for monitored consistent

3   mental health treatment.  And a concern, I'll tell you the

4   Court's concern is I don't want the defendant to enter a

5   situation that the BOP may put him in because he's doing well

6   now which causes a deterioration, potentially, a dramatic

7   deterioration in his mental health condition which could result

8   in him coming out more dangerous than he's going in to whatever

9   facility he's housed at because we only have him at maximum,

10  right, for another six years.  That's what we're talking about,

11  somewhere in that.  The BOP will calculate it but he serves all

12  but the maximum of six years of his possible sentence.  So, if

13  he were to go to the BOP and his mental condition were to

14  deteriorate dramatically you could end up having created more

15  of a problem than we have now.  I don't know.  That's something

16  I have been thinking about.

17           MR. STANSBURY:  And I completely understand that

18  concern.  And you're going to hear no dispute from us that this

19  is a defendant who needs mental health treatment.  And I hope

20  that the submission that we made to your Honor with the

21  assurance from the BOP assuaged some of those concerns.  I

22  think the BOP has shown itself very capable of handling a host

23  of very complicated mental health issues.

24           We, as you know went back and forth in the process of

25  extradition to assure the British authorities that the BOP was

capable of that.  I think they've shown themselves capable of

that.  We've heard no issues with the defendant in terms of the

care he's receiving or the treatment he's receiving.  And this

is just here locally.  So he's obviously going to get better

treatment if he's put in an institution that has more

specialized services.

        We have had conversations with the BOP as well in

advance of sentencing.  I recall from the Abu Hanza sentencing

your Honor spent quite a bit of time on medical issues at that

sentencing.  And you had a conversation with Dominique Ray in

the general counsel's office.  We spoke to Ms. Ray as well as

about this defendant and we're quite confident that the BOP is

able to handle it.  She also noted as we noted in our brief

that if anything the services have gotten better and their

benchmarks for determining where people should be housed have

gotten better.  So if someone is diagnosed with a -- I believe

the, I forget the language but it's a severe mental illness and

has to be evaluated by a team of doctors at the BOP, they won't

be housed at certain facilities or under certain conditions.

So I think all of that should give us comfort that he's not

going to be put in that position.

        Does that answer your question?

        THE COURT:  It does.  I'll tell you what causes me

concern is that short of an order from the Court as to housing

in a particular place which I frankly I've never done.  I've

FAGAASWS                  Sentence

let BOP -- it's very important to let the BOP assess things

based upon their protocols.  My concern is that I think if this

defendant went into solitary I think it would be potentially

quite damaging.  I hear your argument and I'll let you

continue.  It's just that I think that we need to put the

person that you're describing in the context of someone who

also has these mental conditions -- understand we only have him

for another six years -- and try to figure out how to protect

society best from any further behavior.  And we know that the

number one factor that we've got to worry about is mental

health stability, right?

          MR. STANSBURY:  Right.

          THE COURT:  Because that determines I think in large

part some of the outcomes for the future potentially.

          MR. STANSBURY:  And as I mentioned, I -- particularly

since 2012 since that letter that is attached to our brief was

submitted, as I mentioned there is a new BOP policy that

addresses this specific issue that it would be a very unusual

circumstance for this defendant if he's considered to have a

severe mental illness to be placed in solitary.  And the BOP is

going to make that determination.  I certainly am not in a

position to make it.  And I don't know that anybody in this

court is in a position to make it.  But I will say that the

procedures are in place to avoid precisely the situation your

Honor is describing.

FAGAASWS                    Sentence

1          THE COURT:  My concern is the BOP's concerned with

2     their situation at the time.  My concern is about when he gets

3     out.  My concern is that we don't have a situation where the

4     defendant gets out, is mentally unstable, has deteriorated

5     significantly, is released because we no longer have any

6     ability to hold on to him.  He is sent off to England, ends up

7     in London and we're in a worse place then we are now.  My worry

8     about the BOP is that their interests are different from my

9     responsibility.

10          MR. STANSBURY:  Understood, your Honor, but

11     respectfully I believe that it can only get better because I

12     think the services that are going to be available to him are

13     only going to get better.  He is not going to be at the MCC and

14     so the BOP is going to poor all of its resource as it has in

15     any number of cases where people are diagnosed with

16     schizophrenia and other illnesses to insure that that doesn't

17     happen.  I think we all have particularly have great comfort in

18     that.

19          If I can just touch on two more points which is the

20     need for deterrence in this case and the need to protect the

21     public.  And as your Honor mentions, the thought of this

22     defendant getting out in a worse place than he is now is a

23     frightening thought.  But I also think that also goes to the

24     need for a substantial sentence.  This is a young man who is 41

25     years old.  He's still a man who can engage in dangerous acts

FAGAASWS                    Sentence

even when he gets out.  He's shown him self to be amenable and

to be persuadable.  And he's shown him somebody to align

himself with very persuasive people, particularly, in today's

context where a lot of young men are making that jump and are

going to Syria and elsewhere.  That's certainly not a situation

that we want to be in.  And we believe that not only is it a

heavy sentence necessary both to as a matter of punishment and

to protect the public but also to prevent this defendant from

getting any worse, from getting himself into a position where

he could be persuaded to do the kinds of violent things that's

he been encouraged do in the past.

         And the final point is deterrence, both the need for

specific deterrence for the reasons I mentioned, he's shown

himself as I mentioned on repeated occasions to align himself

with dangerous agendas.  He's a very persuadable young man and

I think that that goes to the deterrence issue as well.

There's also a need for general deterrence.  Twenty years is

not, I'll respectfully submit, a long time for a sentence of

this magnitude, particularly, when you're starting with as I

mentioned a benchmark of 360 to life.

         His role as I mentioned was not as serious as some of

the other defendants in this case but it was significant.  So

the nature and circumstance of the offense, the need for

deterrence, the need to protect the public and the other

3553(A) factors we submit all warrant a guidelines sentence of

1  20 years.

2          The defendant traveled to this country which is hard

3  to imagine in today's, in this day and age.  But he traveled to

4  this country at the direction of one of the world's most

5  dangerous terrorist leaders for the purpose of training men who

6  were going to support a war in jihad.  He continued to support

7  that agenda years by going to Afghanistan and joining the fight

8  there.

9          So we submit that for all of those reasons, 20 years

10  is perfectly appropriate.  It would be in line with and I think

11  fair in right of other sentences that have been handed down in

12  this and other cases and we submit it is necessary to take into

13  account the seriousness of this conduct.  Thank you.

14          THE COURT:  Thank you.

15          Mr. Quijano.

16          MR. QUIJANO:  Thank you, your Honor.

17          Your Honor, I too wish to thank the Court for its

18  guidance this morning in terms of various questions it clearly

19  has.  With regard to the tension that the Court referenced this

20  morning, the tension between the guideline sentence as it is

21  now of 20 years and other statutory considerations in

22  sentencing that have come from the statutory maximum for these

23  crimes, I would suggest to the Court that this tension is

24  created initially, greatly by the mandatory terrorism

25  enhancement guideline.  We've described it as discriminatory.

FAGAASWS                    Sentence

1    It applies in any case that charges a terrorism type of crime.

2    There's no question -- the Court cannot reject it.  It has to

3    be there regardless of the facts and circumstance of the

4    individual case.  I suggest, your Honor, that what that does is

5    and it really is the result or creates the tension that the

6    Court has referred to.  What that does, it in essence is in

7    complete tension with the entire concept of sentencing after

8    Booker in 3553.

9         Where we are now with sentencing with 3553, certainly

10   one of the ideas, one of the goals is individualized sentencing

11   based on the circumstances of the offense, who this individual

12   is.  The actual conduct and all these things fly completely

13   into the face of a terrorism enhancement which automatically

14   creates a criminal history category six, which as I've

15   suggested it almost inherently will result in an overstatement

16   of one's true criminal history.  It certainly does in this

17   situation in this case with this young man and obviously jumps

18   a guideline from something that would perhaps reflect more of

19   the actual conduct involved in the case that the Court is

20   considering for sentencing to something that is three, four

21   times that.

22        In terms of the Court's questions regarding his mental

23   health and the Bureau of Prisons, I certainly understand the

24   concern.  I also share a deep concern of what would happen if

25   Haroon was not afforded his medication or put in a situation

FAGAASWS                    Sentence

1   such as a Special Housing Unit and what solitary confinement

2   really is in the Bureau of Prisons.  I submit to the Court that

3   Haroon today has a very good understanding and appreciation for

4   what his mental issues are.  And the road he's traveled and how

5   that's affected him throughout so much of his life well before

6   he was diagnosed and, certainly, during the time period in

7   question.  He has extensive recognition of that and appreciates

8   the effect it could have on him and talks candidly of the

9   difference and how he is now and how he views so many things.

10          I would note the following however, in terms of this

11  issue with the BOP and frankly, I'm not sure how this would cut

12  in terms of sentencing but as your Honor knows great assurances

13  were made to the United Kingdom during the extradition process.

14  It took years.  The entire reason for him not being extradited

15  was because of a concern that the United Kingdom had of how he

16  would be housed and the kind of medical treatment he would get

17  if he was allowed to be extradited today to the United States.

18  Specifically, they constantly refer to how the BOP would treat

19  him.  Would he be in solitary confinement?  Would he receive

20  the same kind of medication that he clearly needed and

21  benefited so much over the ten years that he was being detained

22  in the United Kingdom?

23          The government assured the United Kingdom repeatedly

24  that BOP would comply.  They outlined in fact and entire

25  scenario what would happen the moment he came here.  He would

FAGAASWS                    Sentence

1    not go into a BOP facility.  He would be sent to a medical

2    facility where he would receive comparable counseling

3    medication and treatment as he had been receiving in the United

4    Kingdom.  And they would make an assessment, not the BOP, an

5    independent doctor fully briefed on exactly his condition, his

6    medication, his entire psychological and emotional history and

7    what was needed.  This facility, this doctor would make an

8    evaluation and until they were satisfied that he could return

9    to a BOP facility and receive exactly what he needed to receive

10   to the point that it would not affect his condition, they would

11   never allow him to return.

12          I could tell the Court that his attorneys in the

13   United Kingdom when they were reviewing him and I have been

14   told that they certainly believe that the Court in the United

15   Kingdom when they reviewed these assurances all assumed he

16   would be in this evaluation position, if you will, for

17   certainly a necessary period of time to conduct an actual

18   evaluation.  Two weeks later he returned to the BOP.  The

19   assurances as far as the independent doctor had been made.

20   Regrettably, he was initially put in the SHU and there were two

21   other instances since then where for no disciplinary reason,

22   whatsoever, his record at the BOP, at the MCC, at the MDC is

23   exemplary -- and I'll get to that in a moment -- but because of

24   various either housing situations there were at least two

25   occasions, I think five days once at MDC recently where he was

FAGAASWS                    Sentence

1    placed in segregation in the SHU received medication and

2    certainly we noticed the difference immediately.  It is of

3    concern.

4             THE COURT:  Let me just probe on that for a moment.

5    This is the first I've heard about him being at the MDC without

6    medication.

7             MR. QUIJANO:  It was for a limited period of time.

8             THE COURT:  Was it for a five-day period?

9             MR. QUIJANO:  One moment.

10            (Pause)

11            MR. QUIJANO:  I believe it was a five-day period, your

12   Honor.

13            THE COURT:  What was the reason given for that

14   isolation?

15            MR. QUIJANO:  I don't know if -- I don't know for sure

16   where we ended up.  The government certainly assisted us in

17   trying to get an answer from the BOP.  We obviously talked to

18   them.  We do know it was not disciplinary.  Apparently, I don't

19   know.  I'm assuming it was a housing situation internally in

20   finding a place for him but the point is it did happen.  And

21   again, I'm not sure exactly how this cuts in terms of

22   determining the sentence.  But given the Court's questions in

23   this area, I thought it was important to note.

24            He -- let me continue.  The government obviously is

25   submitting to this Court that a guideline sentence of 20 years

1    is appropriate.  It's appropriate pursuant to 3553 and all of

2    those factors.  They've outline for the past half hour or so

3    the conduct, his actions.  As we noted in our submissions, your

4    Honor, we believe that for the Court to exercise its review of

5    these 3553(A) factors it is necessary to view this conduct in

6    terms of the context of the time and his motivation.  By the

7    context of the time, obviously, I'm referring to a pre-9/11

8    world.  It's kind of hard I think for any of us to really

9    remember what that was like but that it is extremely relevant

10   here.

11           In terms of his actual conduct at Glide, I would

12   submit that there's been some mischaracterizations of the

13   conduct, what leads up to it, these associations and what his

14   motivation was.  At no time, your Honor, did he align himself

15   with the radical violent views of Abu Hanza.  When he traveled

16   to London in his early 20s he was somewhat -- clearly no

17   direction, no job, no involvement with anyone.  He started to

18   go to the Finsbury mosque.  He wanted, he'd been raised in a

19   religious family, devout, certainly, not radical, not political

20   at all and he felt a home there.  He actually felt wanted

21   there.  He described to me how he felt sorry for Abu Hanza

22   because of the handicaps and he really started to become almost

23   an assistant for him.  In terms of day-to-day chores just

24   living, accomplishing tasks, things like that.

25           At the time -- again, this would have been 1999, well

FAGAASWS                    Sentence

1    before 911.

2           THE COURT:  But it is after Bin Laden had declared war

3    on United States.

4           MR. QUIJANO:  It is.  But, your Honor, at that time

5    most Americans were still not fully ware of Bin Laden or what

6    al-Qaeda was.  At that time I believe al-Qaeda had struck only

7    once outside of the Middle East and that was the embassy

8    bombings.  At the time which is after the Bosnia genocide of

9    Muslims were severely affected so much of the Muslim world

10   especially young Muslim men, there is a tenant in Islam, there

11   is a tenant in the Quran which requires that young men, that

12   men obtain the ability to defend other Muslims.  It's called

13   training.  That is a tenant.  That is not being committed to

14   jihad As jihad is used today.  That is not being committed to

15   terrorism as terrorism is used today.  It is part of the Quran.

16   It is part of what they believe.

17          And Haroon as a teenager like so many young Muslim men

18   in the mid 90s would see these videos, these news clips of what

19   turned out to be thousands of Muslims being murdered in Bosnia.

20   And he, like so many at the time and it still continues granted

21   it has taken on a completely different context, if you will,

22   but at the time it was very common for young Muslim men

23   throughout the world to try and seek training, military

24   training to be in a position to prevent a Bosnia happening to

25   them.

FAGAASWS                    Sentence

So Hamza, of course the Court is familiar with the circumstance of Glide, James Ujamma sends this invitation describing what he has there in these American converts to Islam who want to join the jihad and go to Afghanistan and fight and we need you, Abu Hanza, to send us the proper training and inspiration and we invite you to come overall, of this.  And Hamza sends Kasir and he sens Haroon.

This Court heard testimony from the government's own cooperating witnesses including Ujaama and other people who were not cooperating witnesses, who were subpoenaed witnesses, some with immunity, whatever.  They described to you what that camp was which frankly was somewhat pathetic and laughable.  Obviously, Ujamma had lied about a lot of what was there.  But for our purposes they described what Haroon did, indeed, what his role was.  There was no dispute about that.  Kasir, yes, Kasir is the military one.  He is going to teach them how to behead people, how to shoot AK 447s, how to fight and how to presumably, yes, engage in the type of jihad as we understand it now.

Haroon's role as told to you under oath by government witnesses was to teach Islam, to teach the Quran, to teach Arabic.  He's a Hafiz, as his brother and as his father before him.  That is someone who has memorized the Quran.  In their culture that is an essence of pride and that's what he was supposed to do there.  And that's what witnesses, government

1    witness haves told you he did.  He is there for, approximately,

2    I think all together six weeks part of it in Glide and part of

3    it in Seattle.

4         They described to you during that trial how he usually

5    was just there walking with Kasir.  Kasir is the one who brings

6    him there.  He leaves I believe shortly after Kasir leaves.

7    All together it's approximately six weeks but what did he do

8    there?  Trust, I don't need to go through the actual testimony

9    that came out at the trial but it was minimal.  And I don't

10   raise the term minimal in terms of guideline reduction.  I

11   raise it in just the little word.  With this conspiracy or the

12   substantive count is evaluated terms of his actual conduct, I

13   submit to you, your Honor, at least in terms of Glide, there is

14   no other description in terms of mental at least as it applies

15   to his other co-conspirators, if you will.

16        When viewed in terms of what the world was at that

17   time that is pre-9/11 and what his motivation was, yes, he pled

18   guilty to this crime.  He understood we explained what these

19   elements were, what the proof would be, how there was no

20   necessity for him to know that it was al-Qaeda or that it was

21   on a designated list as a terrorist organization.  If he

22   understood as he explained to us that Abu Hanza and Kasir --

23   I'll use the term "associated" or at least were part or had

24   some connection -- to what he just considered some kind of an

25   Arab group that apparently had done things that would probably

1    be sufficient to convict him.  And the reality is, yes, it was

2    also explained to him of what would happen if just all of that

3    was proved at a trial which he understood based on what had

4    happened probably would be proved at a trial if nothing else

5    maybe because of the association with Hamza and Kasir and some

6    of the circumstantial aspects that the government has outlined

7    for you and he would now be facing not a 20 year maximum, your

8    Honor.  He'd be facing, essentially, the potential of, if not

9    the equivalent of a life sentence, certainly that.

10           So please in any of the comments I've made today let

11   me stress one thing.  At no time are we suggesting or is he

12   suggesting he is not guilty of what he has been convicted of by

13   his on plea.  He fully accepts responsibilities for that.  He

14   fully accepts and has stated and will state through me in a few

15   moments even more his conduct and what it was.  And he

16   understands under our system, under these elements he is guilty

17   of these charges.  But that conduct does not warrant a 20-year

18   sentence.  It's not a slap on the wrist for what he did which I

19   would describe as total minimal.  And in a few moments I'm

20   going to get the post Glide which I would take the position

21   actually is some of the strongest support as to why he does not

22   have a long-term connection to jihadist violence as the

23   government would have you believe.  If anything, it cuts

24   completely against in the opposite of that.

25           But he has spent now a quarter of his life in prison

1    or in confinement.  Obviously, we believe that's more than

2    sufficient to do more of a sentence based on what he did.  And

3    as I said -- I'll get to post Glide in a moment -- is simply

4    not just not warranted.  It would be wrong, your Honor.

5             THE COURT:  I know you are going to get to would he

6    did and I think it's important because the sentencing

7    guidelines and the sentencing statute require a Court not only

8    to look at the crime of conviction but also to evaluate social

9    responsibility going forward and likelihood of recidivism etc.,

10   and there are many theories of sentencing only one which is

11   just desserts.

12            MR. QUIJANO:  Of course.  We, obviously, were aware of

13   that from the moment we pled guilty.  We have addressed that as

14   early as the objections to the presentence report in all our

15   submissions and now I gladly address it also because I still

16   believe what we have at the end of that after a fair and

17   accurate examination of what takes place after Glide, if

18   anything, underscores the fact that a sentence of 20 years

19   would be beyond excessive.

20            What happens after Glide?  This is no lieutenant

21   devotee of Abu Hanza, let alone Kasir.  He returns to London

22   and frankly, is disgusted.  Shortly after he returns Ujaama,

23   the government's witness, the government mastermind at Glide

24   who still hasn't been sentenced and presumably will end up with

25   something -- well.  Ujamma comes to London to meet with Abu

FAGAASWS                    Sentence

Hanza and Kasir and the talk is of total violence.  He left

that day.  He has never been back.  He has not seen Abu Hanza

other than at the MCC, apparently, and Kasir of course.  He

completely disassociated from them because what he now saw and

he tells me, I realize at the very least I guess I was naive

then to think the people, especially Abu Hanza, the people at

that mosque, they seem like such a finding a home for me, that

those people would have the same morals and views.  And, your

Honor, the view of Islam that he has is the opposite of a

jihadist.  The view of Islam that he has is portrayed by -- is

the letter from the sister in the spider story.  He really

believes that all of God's creatures, all of people God's

people regardless of nationality, religion or anything have to

be treated kindly and well.  He is abhorred at the idea of

violence on innocence.  But he also believes that he had an

obligation to train.  As I referred to you before because of

the Quran, because of what happened in Bosnia, because of all

of that, because of the discrimination he could still see in

his native England --

                THE COURT:  Now I thought he went to Abu Hanza

starting in 19 --

                MR. QUIJANO:  99, I believe.

                THE COURT:  No.  He was with Abu Hanza prior to that.

                MR. QUIJANO:  OK.  I am told absolutely right.  But

what he basically did, he'd drive him around, take him shopping

1    and get literally stuff off the shelves for him.  He cooked for

2    him.  He took care of his living quarters.  That was his role.

3          THE COURT:  But he also sat with him at the table in

4    conferences.  I saw the videos.  I'm sure you have too, where

5    Abu Hanza as spewing hatred and venom and he was sitting right

6    next to him on dias.

7          MR. QUIJANO:  Yes.

8          THE COURT:  So he wasn't just getting a cup of tea.

9          MR. QUIJANO:  Your Honor, no, and that's exactly why

10   he was able to plead guilty.  He was aware of Hanza's

11   connection at that point.  He did not fully accept it or

12   realize it until he came back from Glide and the Glide

13   experience and the final blow was then having Ujamma speaking

14   to them, to Hamza in the way he was.

15          I've had the honor and pleasure of now knowing him for

16   a year.  I've spent a lot of time with him as has my partner,

17   Ms. Sideris.  He has almost child-like sense of wonder and

18   curiosity about life.  He wants often to see for himself.  He

19   leaves Finsbury Mosque and first goes to Saudi Arabia.  He

20   wanted to see what life in an Islamic land was like.  And there

21   there is more talk about these training camps.  So, yes, he

22   travels to where the training camps were.  It is now 2000.  If

23   I have my timing correctly it's approximately five or six

24   months after he's left Glide, the stop at Saudi Arabia and then

25   he goes -- and again, your Honor, at the time many young Muslim

1    men were going.  They were not going to join al-Qaeda.  He

2    didn't even know the name.  Many didn't.  Most didn't.  But

3    many were not going to join any particular type of

4    organization.  They wanted this training.  They wanted this

5    kind of organized training because of there tenant and because

6    of this concern of protecting Muslim people.  Again, I keep

7    going back to Bosnia because he goes back to them so often and

8    he describes the horror of watching these things.

9           So he goes through what apparently is the protocol

10    that takes place there, to get to these camps, at least

11    especially before 9/11.  And again, not to start lecturing the

12    Court on history.  At the time the Taliban -- unless I'm

13    mistake -- is not even one of these designated terrorist

14    organizations.  The Taliban -- and I don't think most people

15    even knew the name at that time -- are involved in the civil

16    war with northern alliance.  It's all the remnants of when

17    Mujahideen had pushed the Soviets out of Afghanistan, the

18    Mujahideen who of course this country backed.

19           Haroon and many young men went there really viewed

20    those people would be the trainers.  These people from

21    Afghanistan, these Mujahideen or Arabs or whatever they were

22    that were the trainers, he was not going there to link up with,

23    as the government has suggested to this Court, to link up with

24    al-Qaeda, didn't know they existed.  There was a protocol.  You

25    had to be vetted and this took place at a guest house, not in

FAGAASWS                    Sentence

1    Pakistan, not in Karachi.  The one he went to was in Kandahar.

2              And there apparently is part after the protocol of

3    these young men had to surrender their goods as well as their

4    passport.  I don't believe anyone can tell this Court exactly

5    what Government Exhibit 1111 is.  We certainly, I would submit,

6    can infer that it appears to be a ledger that appears to be

7    memorializing things like passports that are surrendered from a

8    lot of individuals.  His name appears on that or at least a

9    variation of his name, I'm not going to quibble about that.  I

10   think it's Haroon Aswat or something like that.  And two United

11   Kingdom passports even though he insists he only had one.

12   Regardless, the passport is surrendered.  He then goes to a

13   camp which he just knew as a camp.  It apparently now is the

14   notorious Al Farouq camp where thousands upon thousands of

15   people get trained or were trained.  But, again, it's before

16   9/11.  He's still not aware of al-Qaeda or anything like that.

17   He is in Afghanistan though undergoing this training when 9/11

18   finally happens.  And about a month later, of course, the

19   bombing starts and he runs out of Afghanistan back into

20   Pakistan.  He then did you not linger -- if I recall the

21   language used by the government -- in Pakistan.  He spent the

22   next several months trying to find the passport to get the

23   passport back.  One can only imagine the chaos that was

24   happening during that period of time, what was happening in

25   Afghanistan and the war.  It took him a period of time.  He

 1    doesn't join up with al-Qaeda.  He didn't go to Bora Bora and

 2    start fighting.  He is looking for a passport.  He finally gets

 3    it and he leaves when he finally could leave and enter into

 4    another country.  At his family's suggestion he goes to South

 5    Africa where he had family there.

 6            And then four years go by, your Honor, four years.

 7    And I would suggest respectfully to the Court that those four

 8    years should answer concerns the Court may have about, as the

 9    Court posed earlier, Who is this young man?

10            Is he someone who only because of a matter of timing

11    didn't engage in my real violent terrorist acts?  Or is this a

12    young man who was misled and got himself led astray?  I would

13    suggest to you he is not even the latter.  He wasn't so much

14    misled because he never tried to be a part of al-Qaeda.  He

15    wasn't misled because he never had any intention of committing

16    any terrorist act, any violence against anyone, let alone in

17    the name of Islam.  But it should.  These four years, your

18    Honor, should answer the question of, Who is this young man,

19    because nothing happened.  He quickly adapted himself to an

20    almost hippie-like lifestyle, if you will, where he discovered

21    if he made copies of CDs, originally, it was Islamic prayers

22    and music, some videos, he was able to eke out a living first

23    by just setting up a little stall, if you will, outside of a

24    mosque, then a marketplace and then as he started to make a

25    little bit more money, he essentially became an itinerant of a

1   salesman going not just to South Africa but to Zambia, I

2   believe in another neighboring country to mosques and outdoor

3   food markets where he would sell inventory group.  He

4   eventually was able to buy a little car.

5          So he now is trying to download as much as he can to

6   create these CDs.  When the government during plea negotiations

7   referred to I believe what they referred to at the time as

8   problematic files or material on his computer, obviously, we

9   addressed it immediately.  It took us a while to get some of

10  these files.  It's just difficult to open them.  And certainly,

11  of the ones that were outlined this morning by the government

12  and the ones referred to in its submissions I believe if I

13  recall correctly, the only one he vaguely recalls was the --

14  one or to the others.  He has described doing that.

15         And again, I stress to, your Honor, a few things.

16  One, there were apparently thousands of files on this computer

17  and external hard drive.  They ran the gamut from TV shows

18  Islamic, a lot of Islamic, the original ones, the music, the

19  prayers the chants, videos to apparently these kinds of

20  documents which in our review of the problematic material are

21  all readily available on the internet.  What isn't?

22         Most of them, your Honor, yes, I did I suppose make

23  fun but most of them are absolutely pathetic but he does not

24  remember seeing any, except one of those.  He would in an

25  effort to increase his inventory used two people who were

1   apparently much more computer savvy where he would routinely

2   just give them the hard drive and they would download all sorts

3   of material and then he would see what he could use and make

4   his CDs.  But it's so much more than that because it's four

5   years.  Nothing happens.

6          If I recall correctly I believe in one of the

7   government's submissions in an effort to find support for the

8   20 year sentence it asked this Court to impose it refers to

9   when he is arrested he has wires.  He was an electrical

10  engineering student and a couple years he went to college.  His

11  family has described to us as he has that since he was a child

12  we take everything apart and put things together.  Having wires

13  did not justify a 20-year sentence.  He did not join anything.

14  He certainly did not do anything.  He was perfectly content for

15  probably the first time in his life that admittedly before

16  there was psychotropic medication he was taking, yes, we like

17  self-medicate with marijuana but he was at peace and happy with

18  his religion, happy with his life and then he was arrested and

19  now he's here.

20         The court referenced some of letters that he's

21  received.  Let me just spend a few moments on what Ms -- was

22  able to provide the Court.  I think it is extremely important

23  and I believe enlightening for this Court.

24         THE COURT:  I'm going to ask you just to hold on for a

25  moment.  I think what we're going to do right now is since it

FAGAASWS                 Sentence

 1   sounds like you going to move to a new topic, just take a short

 2   break and we have been going for about an hour now and we'll

 3   come back and then we'll continue with that point.

 4           I also it would be helpful since we paused for moment

 5   to know whether the government if going to want to respond at

 6   all or whether or not we'll just head on and do the next part

 7   right after this.  Normally there is no response.

 8           MR. STANSBURY:  So far, no.  If we do I'll be very

 9   brief.

10           THE COURT:  That's fine.  Thank you.  If I have

11   questions or I have anything I think you need to respond to

12   I'll let you know.

13           Let's just take a short break.  Thank you.

14           (Recess)

15           THE COURT:  Be seated.

16           All right.  Mr. Quijano, you may proceed, sir.

17           MR. QUIJANO:  Thank you, your Honor.  I'm sorry for

18   being a little long but I went completely off script after the

19   Court posed all these questions.

20           THE COURT:  No, don't worry about taking up time.  You

21   certainly should say whatever you would like to say.

22           MR. QUIJANO:  Thank you, your Honor.

23           Your Honor, I'd like to address Ms. Pierce's comments

24   and observations of Haroon Aswat.  As your Honor knows, in her

25   letter she describes what she was able to observe when Haroon

1    was first incarcerated and in particular, his interactions with

2    the people who he was incarcerated with.  As the Court may

3    recall Ms. Pierce has a career that stretches now almost 40

4    years and, apparently, she's represented numerous individuals

5    charged with terrorist acts and crimes.  And at the time

6    apparently Haroon was being housed in an area at a particular

7    prison which was populated, if you will, primarily with people

8    charged with similar types of crimes and types of backgrounds

9    certainly the government has tried to attribute to Haroon.  And

10   yet when she observed -- I certainly for one found not just

11   interesting but I think relevant -- she saw that they, these

12   other men accused of terrorism found Haroon to be puzzled and

13   he was equally puzzled by them.  It was clear that they did not

14   share the came common ground in terms of politics mindsets and

15   placements on any religious political spectrum.  Indeed, a

16   small close unit where they were where close contact should

17   have led to easy bonding, she found the reverse to happen.

18   That it appeared to be the case that Mr. Aswat simply didn't,

19   to use her term, March to the same tune.  Instead, he followed

20   his own course.  She in fact believes it may have exacerbated

21   his eventual mental breakdown.

22          As to what we can expect in the future however, your

23   Honor, quite simply, this is not a man of violence.  He has

24   never wished to harm anyone.  He still doesn't.  Indeed, he

25   realizes almost ironically that what happened that led him to

FAGAASWS                    Sentence

plead guilty, the conduct that led him to plead guilty, his

association, if you will, with Abu Hanza and the hole Glide

incident in terms of these charges, the irony is not lost on

him.  He repeatedly goes back to this about how all those

beliefs, those principles that kind of conduct that these other

people clearly believed in and have fostered on so many

innocents in this country, in this world were completely at

odds with his view of his own religion, their religion.  He

thinks they have bastardized it.  He is offended.  But again,

he would constantly going back to how could I let this happen?

How could I have been so naive?  He's frequently expressed to

Garret that he wishes to return to school, as he has to us.

        But there's something in Ms. Pierce's letter which I

think is very important in terms of the question that the Court

is raising to what happened.  She points out that upon his

return to the United Kingdom when he's either finished his

sentence here or if he is granted the treaty program and is

allowed to serve his sentence in England, when he is finally

released there are certain notifications provisions within

United Kingdom's code apparently.  And these are mandatory

conditions imposed on individuals released from prison who have

been convicted even abroad of terrorism offenses.  This

involves close monitoring for a substantial part of the

remainder of their lives.  This is not a supervised lease I

think as you and I understand it to be.  This is more of a

FAGAASWS                    Sentence

combination of super supervised release and, perhaps, the child

pornography types of sex offender protocols that take place

upon conviction.  Apparently, these people were monitored and

under supervision for essentially the entire time that they

remained in England, their lives.

The policy allows for close monitoring of individuals

by the police in the Home Office Department.  And since his

diagnosis and treatment of schizophrenia exists what's key here

is Haroon has developed a full appreciation for that and how

that can affect him.  He knows he needs to constantly receive

treatment, not for fear that he is going to link up with

al-Qaeda or ISIS or commit violence for his own piece of peace

of mind, for his own ability to live life and to live life

under the tenants of Islam as he believes it is and as he

interprets it.

Your Honor, I mentioned earlier and I'll state again,

in terms of specific deterrence, I would submit that under an

analysis of 3553 a quarter of his life detained to point, I

believe it's 11 years now which is still I believe less than

150 months that we request, is more than enough in terms of any

need for specific deterrence as to him.

In terms of general deterrence however, your Honor, I

at least suggest the following thought.  I believe I have

accurately depicted his conduct for these two crimes.  And if

that is his true conduct, what kind of message is sent to the

world if for conduct which again, I would submit is minimal?

Someone receives still the maximum available sentence in this

case 20 years for this conduct, and isn't possible that the

interpretation will be by so much of this world that what he's

being punished for is his religious belief, specifically, his

belief that there is a tenant in the Quran which requires

training?  I understand there's other aspects to this conduct

but I do raise this because I believe it's a valid question

and, obviously, it takes me back to my position that what is a

reasonable sentence in this case and not in any way more than

necessary would be 150 months.

          And yet the government eloquently with great care have

outlined to this Court what it believes is its justification

under 3553 for the guideline sentence of 20 years to be the

sentence imposed.  Even though it is ten years after Booker and

we know the guidance of how sentencing is supposed to take

place and what the guidelines are supposed to be, I still fear

that it seems like it's almost a policy from that office that

regardless of the crime and certainly in a terrorism crime, the

only possible sentence has to be the guideline sentence which

here, of course, is the statutory maximum.  But I fear that

what it then forces the government to do and has done here is

in an effort to justify that conclusion, in an effort to

justify a 20-year sentence a guidelines sentence what is

warranted under 3553, there is a mischaracterization of the

FAGAASWS                    Sentence

conduct and again a total disregard of context and motivation

to the point that it leaves the Court with the question imposed

initially this morning, Who is this young man?

    I submit to your Honor this young man is not who the

government has described.  This young man is a man who did the

conduct that we've outlined, that you you've heard from other

individuals including doctors.  We could have brought in people

from the BOP who would also tell you about him.  He sits before

this Court in braids because he makes friends with a brother

from Harlem, Dominicans from the South Bronx, everyone.  It is

almost like this child-like wide-eyed curiosity of just wanting

to see for himself about so much people, cultures, everything.

But one thing that is not present in this man, your Honor, I

submit to you, is violence in any form especially in the name

of a religion that he holds so dearly.  Thank you, your Honor.

          THE COURT:  Thank you, Mr. Quijano.

          Mr. Stansbury, you're looking at me.

          MR. STANSBURY:  I'm because I made a promise to you

and I just want to respond extremely briefly.

          THE COURT:  All right.  Then, Mr. Quijano, if you want

that respond to Mr. Stansbury that will be fine.  Just let me

know.

          MR. QUIJANO:  Thank you, your Honor.

          MR. STANSBURY:  And I really will keep this brief.  I

wasn't going to respond until I heard a couple of things by Mr.

FAGAASWS                    Sentence

1    Quijano that I feel that obligated to respond to.  And this is

2    the idea particularly that he's being punished for his

3    religious beliefs.  Mr. Quijano is doing a fantastic job.  I

4    know on behalf of his client but to paint this man as a

5    passivist is I think a complete distortion of truth.  The

6    idea -- and I don't have the exact quote in front of me -- but

7    the idea that he was not a man of violence is completely and

8    utterly contradicted by his actions.  If you not a man of

9    violence you don't go to set up a training camp where that's

10   the specific purpose.  If you not a man of violence you don't

11   go to one of the most notorious training camps on the planet

12   for one of the most violent and destructive organizations on

13   the planet, al-Qaeda.  So if anyone is stretching the facts,

14   respectfully, and I believe it's Mr. Quijano.

15            The defendant's -- and I could go into more details

16   about some of the things on his computer and so forth but I

17   just, we strongly disagree with that characterization.

18            THE COURT:  All right.  Thank you.

19            I understand, Mr. Quijano, that you will not agree

20   with the government, but is there anything else that you wanted

21   to add?

22            MR. QUIJANO:  No, your Honor.  Thank you very much.

23            THE COURT:  All right.  Thank you.

24            Mr. Aswat, would you like to address the Court before

25   sentence is imposed?  I'm going to ask you to speak into the

1    mic.  So I'm going to have you sit there and not stand so that

2    we can get a clear sound through the microphone.

3              THE DEFENDANT:  Peaceful greetings to everyone.  I

4    would like to start by apologizing to the government and this

5    Court for breaking the law of this country.  I will also like

6    to apologize to my family and friends for the distress I have

7    caused them.  During the past ten years I have had a lot of

8    time to ponder and think over the reasons that have led me to

9    be incarcerated.  Initially, anger drove me to near insanity

10   and depression.  Then in 2008 I was admitted into Broadmoor

11   Hospital.  Here I began a positive phase in my life.  I owe a

12   lot of gratitude and thanks to Broadmoor for the treatment,

13   care and activities they provided me.  It was a road to

14   recovery.

15             Overall, the experience of the last ten years has

16   humbled me and prepared me to face the future.  I have studied

17   deeply holy books and have arrived to this conclusion.  I have

18   chosen patience over retaliation, forgiveness over enmity and

19   peace over violence.

20             I am and always have been totally against harming

21   innocent people and those who promote peace.  There is a prayer

22   I learned many years ago from the teachings of Prophet

23   Muhammad, peace and blessings be upon him.

24             Oh, merciful Lord, I seek refuge with you for

25   misguiding or being misguided, from humiliating or being

FAGAASWS                        Sentence

humiliated, from oppressing or being opposed and from acting

ignorantly or being treated ignorantly.

      This prayer I used to cite regularly when I was young

and it has a lot more meaning to me now than every.  I've come

to realize that crime does not pay.  I look forward to a future

where I can be with my family and hopefully find a wife and

settle down.  I hope to live a peaceful crime free life and

promote nonviolence, reconciliation and peace.  I hope to carry

on with my studies and obtain a degree.  I also hope to

continue with my treatment for schizophrenia.

      I pray to the supreme Lord to make me a person that

establishes peace and safety for others and I seek refuge from

making mischief, oppression and chaos.  Amen.  Thank you.

      MR. QUIJANO:  Your Honor, if I may, I neglected to

make one request and I certainly understand the Court's usual

view to any kind of recommendation to the BOP.  However, we

would ask for a recommendation that it be a facility at least

on the east coast of the United States ideally close to the

international airport where the family would be able to visit a

little bit easier.

      THE COURT:  Thank you, Mr. Quijano.

      Mr. Aswat, let me tell you how the Court arrives at

its sentence.  It's a very difficult task that a Court is faced

with and I sit here as a representative of our society and have

been appointed to fill this role and I'm guided in my decision

1   by certain laws that we have relating to sentencing.  They are

2   the sentencing statute which your lawyer referred to as 3553(A)

3   as the provision of it that relates to certain factors so the

4   Court must take into consideration in sentencing a defendant.

5          And I also have to consult the guidelines.  We've

6   talked I think quite a lot about the guidelines and I have

7   taken those into consideration but I'm not to assume that the

8   guidelines are necessarily reasonable.  I want to assure that

9   your lawyer since he made the comment about the government's

10  view being a guidelines view very frequently that the Court

11  makes its own determination as to what the appropriate sentence

12  is.  And I have varied from the guidelines.  I have gone up and

13  I have gone down and I have certainly not followed the

14  government's recommendation simply because it was a government

15  recommendation.  Nor have I followed a probation recommendation

16  simply because it was a probation recommendation.  Nor have I

17  followed a defense recommendation simply because it's a defense

18  recommendation.  I'm tasked with evaluating myself a particular

19  defendant in the context of a particular crime and in the

20  context of who the Court deems that defendant to be based upon

21  its best judgment at the time and also based on the Court's

22  view as to how this case does impact potentially what your

23  lawyer referred to as "general deterrence" sort of the bigger

24  picture as to how similar crimes should be treated.  So it's a

25  very complex picture.

FAGAASWS                    Sentence

1          At the heart that have picture, Mr. Aswat, is you and

2    it's the Court's attempt to try to figure out for you what the

3    right sentence is and what for our society the right sentence

4    is.  And it's a very difficult exercise, particularly, when --

5    and it's not always the case -- there is so much of a

6    difference between the picture that is drawn as to a particular

7    defendant.  Here, there are obviously very different views and

8    I'll and do my very best to balance all of the interests which

9    the Court is required to balance in coming up with a sentence.

10         I want to assure you that in no sense are you being

11   sentenced by this Court for any religious beliefs.  That would

12   be wrong and that is not the basis of any sentence.  It is

13   based upon the crime that you committed and based upon the

14   impact of that crime on our society and our views as to that

15   crime and judgments about you with regard to that crime.

16         So I have to ask, how serious was the offense?  I have

17   to ask because of the factors under 3553(A), I have to ask what

18   are your personal history and characteristics?  That's what

19   kind of person are you now and going forward and what kind of

20   person were you at the time?  And with that I have to come up

21   with what is a sufficient but not greater than necessary

22   sentence for you taking into consideration the guidelines and

23   here taking into consideration the congressional intent that is

24   spoken through the terrorism enhancement and spoken through the

25   base offense level that has been placed upon the crime.  I've

1   already noted the tension between that and the statutory

2   maximum but I need to take into consideration the congressional

3   view.  Our Congress is our people's view as to this crime.  So

4   in doing that I'm looking for what's just punishment for this

5   offense, what is going to protect our society, what kind of

6   sentence will promote respect for the rule of law.

7           But how have I done that for you?  Well, it's

8   certainly true that the offense is was quite a serious offense.

9   It was not simply that you went to Glide as someone who would

10  provide religious instruction because I think that if you used

11  only those words, doesn't convey to our society what was going

12  on, which is that there was a man who you, Mr. Aswat, who had

13  spent three years -- your sentencing submission at page ten

14  says 1997 you started with Abu Hanza -- three years with Abu

15  Hanza, by his side doing whatever tasks you may have been doing

16  however menial -- and I will accept that they were menial

17  tasks -- but you were by his side and by his side you could not

18  but have helped to have heard his statements to have heard his

19  mission, to have heard what he was attempting to inspire others

20  to do.  I saw the videos of you in the connection with that

21  trial where you were sitting with him on the dais.  You weren't

22  in the audience.  You weren't behind the scenes.  So while I

23  don't know what was in your head at the time, I know to the

24  degree that I need to know that you understood precisely who he

25  was before you ever went to Glide.  I'm not suggesting that you

were him.  You're not obviously him.  You are Haroon Aswat.
But you are under no mistaken impression as to who he was.

          And in going to Glide you accompanied Mr. Kasir and
you knew who he was.  He told you he was there.  He told the
group -- this is part of what the trial record demonstrated,
that he was there to martyr himself, that he was there to bring
destruction and he was certainly there to train others in
violent jihad.  And he displayed his frustration with being
unable to do that in his words when Glide didn't work out and
he went to Seattle.

          So you were part of a group with Mr. Kasir and Mr. Abu
Hanza that was a group that was not intent on peacefully
discussing a religious view.  It was a perversion of a
religious view into something that could be used through
addition to that of violence to achieve a particular end.  And
your role in connection to that I have to take very, very
seriously because you were there to try to support
psychologically and inspire psychologically through whatever
channels you could the individuals who were going to conduct
violent jihad or be trained in violent jihad.

          So I do agree certainly with your lawyer who has done
a stupendous job in bringing all of the various factors to bear
hear for you, that the Court does need to sentence you with the
mindset both of who you are today and who you might become but
also understanding that the crime that was committed was a

FAGAASWS                    Sentence

pre-9/11 crime.  That's a crime of conviction.  Of course there

were events that were post-9/11 and that's important so that he

thank we don't confuse today our views on certainly things with

at the time.  But we do know that pre-9/11 and at the time that

these events occurred there had been the embassy bombings.  We

do know that at the time there was an attempt to have

individuals engaged in violent jihad with the specific and

directed intention of harming the west.  So it's not as if 9/11

was simply just the first moment when those views became clear.

They were certainly clear in Mr. Abu Hanza's speech.  That's

certainly predated 9/11.  There were just dozens of them in

that regard during the period of time and directly the period

of time that the events here had happened.

        So I ask myself then what do we do with this series of

events?  And I then look at what happened after you left Glide,

after you left Seattle, after you then separated yourself

seemingly from Mr. Abu Hanza.  And I tried to figure out what

reasonable inferences to draw and Mr. Quijano has offered

reasonable inferences on the one hand that you when you went to

Afghanistan were simply being trained because that was an

obligation to be trained and it was simply the fulfillment of a

religious on obligation and no more and that even if -- let's

put that aside -- by the time you went to South Africa you were

engaged in a different life altogether.  That is one series of

inferences.

FAGAASWS                    Sentence

1          There's another series of inferences that I must take

2     seriously because I have to try to make a judgment for our

3     society about you.  And that series of inference is that you

4     new exactly what you were doing when you went to Afghanistan,

5     that you were attempting to be trained and others were

6     attempting to be trained in Afghanistan.  Whether you call it

7     "al-Qaeda", whether you call it "the base" in Arabic, whether

8     you call it by a different name, whatever you all it, whether

9     you call it at that time confusion with the Taliban, you went

10    to the Al Farouq camp which was not simply about physical

11    training or even hand-to-hand combat.  It was also about

12    explosive devices and about a very particular message.  And

13    then you left from there to South Africa.  And by the way,

14    there it is important to me that you did go through and

15    interview with the Taliban to go to Al Farouq which is

16    important because it indicates that you knew exactly where you

17    were going I think as well.  That's a reasonable inference that

18    the Court needs to draw or can draw.

19          So I'm confronted with these reasonable inferences and

20    I then ask myself, well, what were you doing in South Africa?

21    Because if I truly knew what you were doing it might well put

22    things in one direction or another.  But there are only

23    reasonable inferences that we can draw, ones of the reasonable

24    inferences, ones that your lawyer has put forward.  Those are

25    supported, if you will, by the impression of Ms. Pierce in

FAGAASWS                    Sentence

terms of a disassociation, if you will, from what she viewed as

some sort of the typical behavior of others accused of crimes

of terrorism.

        But then there's the potential that you were sent on

assignment, if you will.  Is there any evidence of that?  Zero.

But we do know that your -- and so you not being sentenced for

that but your computer we know continued to carry a variety of

material.  I don't know what to do with that period of four

years.  The computers back then to download all this

information on, you would think you'd have to upgrade your

computer at this time and you wouldn't have had the same

computer in 2004 that you had in 1999.  But do I know that?  I

don't know that.  Why is that important to me?  Because if you

downloaded the stuff later on that's more important to me than

if you downloaded it in 1999.

        To the extent that there was any kind of inference

that you were not the one who download files and they may have

been downloaded by others I, specifically, do reject that as a

reasonable inference.  I think that the only reasonable

inference is however that material got there it got there from

you.

        I don't disagree with Mr. Quijano that the material is

available all over the Internet and I don't disagree with that

at all or that some of it is not particularly earth shattering.

But I also believe collectively it paints a picture of a very

1   dangerous situation and somebody trying to get a ahold of a

2   variety of explosive devices that lead to a very dangerous

3   mindset.

4           So I put all this together and I'm laying it out for

5   you, Mr. Aswat, since at the end of the day you have to

6   understand why and how I get here because it's your life.  You

7   are going to be the person who has to carry out the Court's

8   sentence and to live with the Court's sentence.

9           So I then go to the picture of your mental illness.

10  It's very important to the Court.  It's a critical point for me

11  because as I've expressed at the outset, I can't be sure who

12  you -- in fact, none of us in this room except for you know who

13  you are.  And so we're making our judgments, our best judgments

14  about you and if I'm wrong people could die.  And that's a very

15  heavy responsibility and very different when I have to make

16  judgments for people where it may tend one way or the other and

17  the result of a wrong judgment may mean one thing.  I have

18  inferences here that could pain you as a very dangerous man,

19  although, I don't disagree that your primary impetus is based

20  in a view of religion but so was Abu Hanza's.  But if I knew

21  for sure that it was in a purity of Islamic faith it would be

22  different than a perversion of that.

23          So I with all of this go to your mental illness and

24  think I do not want to have you released in our society more

25  dangerous than you may be today.  Let's assume today you're a

FAGAASWS                    Sentence

dangerous man.  That's still less dangerous than a dangerous

man released after having had poor treatment for schizophrenia

over the course of the next four or five years, right?

Whatever you are today, that treatment must be maintained.  And

if you are not a dangerous man, I worry about treatment not

going well for you and you becoming dangerous.  Not because of

who you might be right now but because have you become that by

virtue of a spiral downwards.  Even good people can become

dangerous with untreated mental health issue, people who

otherwise would not be violent if their mind was not in a

unhealthy place.

          So I do take into consideration your mental condition

and I have certain facts on your mental condition that I know

which is based upon the very extensive report.  I have two

reports.  I've got a report from a U.S. Bureau of Prisons

Analysis and review Of your condition and actually by seeing

you and having you engage with them, as well as a much more

extensive one from London.  And I then put that all together

and I think to myself the schizophrenia is real.  It's

something that is precarious.  I don't say that because I think

that you right now are in any way incompetent.  Your words are

quite clear.  You're clearly competent.  You're looking at the

Court very clearly today.  I have a high degree, in fact I have

complete confidence that you entirely competent as you sit here

right now.

FAGAASWS                    Sentence

1        So the question for me is, what do I do with this

2   whole picture?  And it's something that I have struggled with

3   because I also am mindful of your mother and father and their

4   health conditions and I'm mindful of their age and I'm mindful

5   that you've got a strong family who is back and who is there

6   for you in England.  And I'm also mindful that if you are

7   incarcerated for a further period of time you will be getting

8   out at approximately, well, anywhere between now and the age of

9   47.  So you would not in under any events be somebody who would

10  have to spend their lifetime behind bars.

11       So on balance and having considered very carefully the

12  other sentences and other terrorism cases and having evaluated

13  what I could from those cases and from what I know about a few

14  of those cases firsthand, it is my judgment that I am going to

15  sentence you to 240 months total which is 120 months for Count

16  Five and 120 months for Count Six.

17       I'm going to make a recommendation and in fact a

18  requirement to the Bureau of Prisons which will be the first

19  time I've ever ordered the Bureau of Prisons to do something

20  like this which is that you be housed in a facility that has

21  specialty psychiatric care.  It is of the greatest importance

22  to this Court that you receive the best psychiatric care that

23  you can receive while you are here.

24       Now, if you can be housed in England, the Court would

25  certainly support that.  If there's going to be a treaty

FAGAASWS                  Sentence

application to have you serve your time over there, I would not

order that.  But this transcript can be used to show that the

Court is supportive of that.  If you believe and I think there

is good evidence to demonstrate that the treatment over there

is something that has worked for you in the past, then that

would be a very good reason for both the U.S. and the UK to

consider that in connection with an ultimate housing

recommendation.

There will be no supervised release because you are

going to be deported.  The Court has signed an order of

judicial removal.

There is a $200 mandatory special assessment which the

Court does impose.  And there will not be any financial

penalty.  The Court is not going to impose a fine.  It is not

going to impose forfeiture and there is no order of

restitution.

I will say, Mr. Aswat, that I understand this is not

the sentence that you would want today.  It is the sentence

that I believe I must impose for our society to try to balance

the possibility that you might, in fact, be the person who went

to Al Farouq knowing exactly what you were doing and who could

do it again against the possibility that you could get out

worse than you are now with your mental health and I have tried

very hard to balance this and I do believe this is the right

sentence under 3553(A).

FAGAASWS                       Sentence

1          While it happens to be a guideline sentence the Court

2    should note that if the guidelines were different the Court

3    would still impose the same sentence.

4          Is there any legal or other reason why sentence should

5    not be imposed as stated?

6          MR. STANSBURY:  No, your Honor.

7          MR. QUIJANO:  No, your Honor.

8          THE COURT:  I do order sentence to be imposed as

9    stated.

10          Mr. Aswat, you waived certain rights of appeal when

11    you made your plea.  However, you may have rights to appeal

12    that remain.  It is up to you and your lawyer to determine

13    whether or not you have any basis for appeal.  If you have a

14    basis for appeal you should file and must file any notice of

15    appeal within 14 days of your filing of the judgment of

16    conviction.  If you can't afford the cost of appeal you can

17    apply to have those costs waived.  That's called proceeding in

18    forma pauperis.  You have a right to do that.

19          The Court will make the recommendation it has made

20    with respect to the psychiatric treatment.  The Court does

21    believe that that recommendation should outweigh any

22    recommendation as to location.  However, to the extent that

23    there is an ability to have the psychiatric treatment occur

24    either in the New York City area, metropolitan area or in a

25    metropolitan area with direct access to Europe through a close

FAGAASWS                        Sentence

1   by airport, I also recommend that that be done as well to

2   facilitate family visits which would be an important part of

3   the defendant's overall treatment.

4              Thank you.  We are adjourned.

5              MR. STANSBURY:  Your Honor, just one remaining issue.

6   There are open counts in an underlying indictment, so we move

7   to dismiss those.

8              THE COURT:  The Court does dismiss the underlying

9   count and the underlying indictment.

10                        (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25