UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

UNITED STATES OF AMERICA,

     -v-                                  04 Cr. 356 (AT)

HAROON ASWAT,

               Defendant.

------------------------------------------------------- X


**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR COMPASSIONATE RELEASE**


Peter Quijano
Anna Sideris
Quijano, Ennis & Sideris P.C.
40 Fulton Street, 23rd Floor
New York, NY 10038
(212) 686-0666

Megan Wall-Wolff
Wall-Wolff LLC
90 Broad Street, 22nd Floor
New York, NY 10004
(212) 920-0257

*Attorneys for Haroon Aswat*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES…………………………………………………………………...ii

PRELIMINARY STATEMENT…………………………………………………………….....1

FACTUAL BACKGROUND………………………………………………………………...5

 A. Background and procedural history……………………………….………….5

 B. Mr. Aswat's mental health condition makes him particularly vulnerable to the impact of COVID-19……………….………………….....................................8

ARGUMENT…………………………………………………………………………11

 A. Legal standard…………………………………………………………………11

 B. Extraordinary and compelling circumstances warrant compassionate release…………….……….……………………………………………………12

 C. The § 3553(a) factors favor a reduction in sentence……………………...…19

CONCLUSION…………………………………………………………………………..22

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*United States v Amaro*,
  No. 16 Cr. 848 (KPF), 2020 WL 3975486
  (S.D.N.Y. July 14, 2020)..........................................................................................15

*United States v. Arango*,
  No. 15 Cr. 104 (JMF), 2020 WL 3488909
  (S.D.N.Y. June 26, 2020)………………………………………………………13

*United States v. Avery*,
  No. 14 Cr. 810 (JMF), ECF No. 539
  (S.D.N.Y. Nov. 16, 2020)………………………………………………….……...13

*United States v. Barajas*,
  No. 18 Cr. 0736 (NSR), 2020 WL 3976991
  (S.D.N.Y. July 13, 2020)..........................................................................................16

*United States v Bary*,
  No. 98 Cr. 1023 (LAK), 2020 WL 5946985
  (S.D.N.Y. Oct. 7, 2020)..........................................................................................17

*United States v. Brooker*,
  976 F.3d 228 (2d Cir. 2020)………………………………………………...12, 17

*United States v. Ebbers*,
  No. 02 Cr. 1144 (VEC), 432 F. Supp. 3d 421
  (S.D.N.Y. 2020)…………………………………………..…………………………12

*United States v. Ferizi*,
  No. 16 Cr. 42 (LMB), ECF No. 105
  (E.D.Va. Dec. 3, 2020)..........................................................................................18

*United States v. Lizardi*,
  No. 11 Cr. 1032 (PAE), ECF No. 2523
  (S.D.N.Y. Oct. 9, 2020)…………………………………………………......12, 20

*United States v. Mongelli*,
  No. 02 Cr. 0307 (NGG), 2020 WL 6449237
  (E.D.N.Y. Nov. 3, 2020)..........................................................................................16

*United States v. Pacheco*,
  No. 12 Cr. 408 (JMF), 2020 WL 4350257
  (S.D.N.Y. July 29, 2020)………………………………………………...13, 20

*United States v. Pena*,
  No. 15 Cr. 551 (AJN), 459 F. Supp. 3d 544
  (S.D.N.Y. May 8, 2020)………………………………………………………….......13

*United States v Pina*,
  No. 18 Cr. 179 (JSR), 2020 WL 3545514
  (S.D.N.Y. June 29, 2020)...........................................................................14, 15

*United States v. Rojas*,
  No. 01 Cr. 257 (AT), ECF No. 304
  (S.D.N.Y. Dec. 18, 2020)...........................................................................12, 17

*United States v. Staats*,
  No. 17 Cr. 0461 (AB), 2020 WL 6888224
  (E.D. Pa. Nov. 24, 2020)...........................................................................16

*United States v. Vega*,
  No. 89 Cr. 229 (JS), ECF No. 788
  (E.D.N.Y. Dec. 02, 2020)...........................................................................16

**Statutes**

18 U.S.C. § 2339B…………………………………………………………….......2, 6

18 U.S.C. § 3553(a)………………………………………………………..……..passim

18 U.S.C. § 3582(c)(1)(A)…………………………………………..……….passim

U.S.S.G. § 1B1.13……………………………………………………………12, 17

## PRELIMINARY STATEMENT

Haroon Aswat respectfully moves the Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to modify his 240 month sentence – 90% of which he has already served with good time credit – and reduce his sentence to time served. As a citizen of the United Kingdom, Mr. Aswat will be immediately deported following his release, where he will live with his family and be subject to extensive post-sentence monitoring and supervision by U.K. authorities.

In June 2005, Mr. Aswat was charged with providing material support to a foreign terrorist organization. ECF No. 1. He was arrested in Zambia and transferred to the U.K., where he was incarcerated until his extradition to the United States several years later. PSR at 2; ECF No. 497 at 33. Because Mr. Aswat suffers from schizophrenia and schizoaffective disorder, he requires continuous medical treatment and spent most of his detention in the U.K. in a specialized hospital structured to provide care for those with severe mental health conditions.[1] Mr. Aswat received good mental health care in the U.K. and was able to achieve a stable mental state, due in large part to a consistent, specialized medication regimen and sustained access to a therapeutic environment, including participation in various programs, group activities, education, recreation, and therapeutic access to the hospital grounds. ECF No. 504-2 at 3-5; Ex. A at 5.[2] Extradition negotiations between the governments of the United Kingdom and the United States took almost a decade – the U.K. was extremely hesitant to extradite Mr. Aswat because of his acute mental health needs and concern about the lack of such resources in U.S. prisons. The U.S. government eventually provided assurances that Mr. Aswat would receive the same level of

---

[1] A copy of Mr. Aswat's BOP medical records have been provided to the government and have been submitted to the Court separately. Due to the sensitive information contained in those records, counsel requests that the Court allow those documents to be filed under seal.

[2] A letter written by Gareth Pierce, Mr. Aswat's former counsel in the U.K., is attached hereto as Exhibit A.

mental health care and program access if he were incarcerated in the U.S., specifically assuring that he would be detained in a specialized medical facility, would not be placed in solitary confinement, and would have continuous access to the same medical treatment, programming, and care that he received while incarcerated in his home country. *See, e.g*., ECF No. 523, Tr. 29:22-32:23. The U.K. finally accepted the U.S. government's representations regarding Mr. Aswat's conditions of potential confinement and on October 21, 2014 he was extradited to the United States. ECF No. 510.

On March 30, 2015, Mr. Aswat pleaded guilty to two counts of conspiracy to provide and providing material support and resources to a foreign terrorist organization in violation of 18 U.S.C. § 2339B. ECF No. 485. While awaiting trial, Mr. Aswat was held at MCC and then MDC, where, contrary to the government's assurances, he was placed in solitary confinement on multiple occasions and was deprived of his medications for multiple days. ECF No. 523, Tr. 29:22-32:23. On October 16, 2015, Judge Katherine B. Forrest held a sentencing hearing during which she expressed alarm at Mr. Aswat's treatment during pretrial detention and sought reassurances from the government that he would be held in humane conditions going forward. *Id*., Tr. 22:24-23:16. The government assured Judge Forrest that BOP was more than capable of providing Mr. Aswat with all necessary medical care and mental health treatment while in custody, and that his well-being would not be harmed. *Id*., Tr. 23:17-26:18.

Judge Forrest ultimately accepted the government's representations and sentenced Mr. Aswat to two 120-month sentences of incarceration, to run consecutively, for a total of 240 months. ECF No. 523, Tr. 64:15-16. However, she recognized Mr. Aswat's significant mental health needs and took the extraordinary step of recommending that he be housed only in a facility that provided specialized psychiatric care, and encouraged him to apply to BOP for

permission to serve his sentence in the U.K. rather than the U.S. *Id.*, Tr. 64:17-65:11. She also signed an order of judicial removal ordering that Mr. Aswat be immediately deported upon his release. ECF No. 510; ECF. No. 523, Tr. 65:9-11. Mr. Aswat's projected release date is October 13, 2022. Ex. B.[3] With good time credit, he has already served over 90% of his sentence. *See id.*

Following sentencing, Mr. Aswat was initially incarcerated at FMC Fort Worth. He was then transferred to FCI Butner, and transferred again to FMC Devens. Although he initially adjusted well, he did not have a consistent treating physician to calibrate his medications and he quickly began to decompensate. BOP responded by placing him in solitary confinement, where he was held for over a year. During this time Mr. Aswat experienced disruptions to his medications and was cut off from all contact with his family and loved ones, causing him to endure repeated acute psychotic episodes, and eventually experience suicidal ideation.[4] *See* Aswat 2017 BOP Medical records; Aswat 2018 BOP Medical Records; Aswat 2019 BOP Medical Records. Despite enduring such conditions, Mr. Aswat had recently achieved mental stability and relief from acute psychosis when his medications were restored and he once again had access to programs and family contact. He was able to regain what is by all accounts his typical mild-mannered, respectful, trusting, and soft-spoken demeanor, and experienced a period of relative adjustment while serving his sentence. ECF No. 504-2 at 4-7. Then in Spring 2020 the COVID-19 pandemic hit.

As the Court is well aware, COVID-19 has wrought an unprecedented change in the conditions of Mr. Aswat's confinement that could not have been foreseen at the time of sentencing. The pandemic poses an extraordinary risk to Mr. Aswat's physical and mental health.

---

[3] BOP's sentence computation is attached hereto as Exhibit B.
[4] Mr. Aswat's subjection to solitary confinement and the disastrous mental health consequences resulting therefrom is extensively documented in his BOP medical records.

That risk is particularly acute in prisons like FMC Devens, which have poor ventilation, unsanitary conditions, and limited access to medical care or protective equipment. Public health experts agree that conditions in jails and prisons make it extremely easy for a respiratory virus to spread nearly unchecked, and inmates have little to no ability to follow the protective guidance issued by the CDC, including rigorous handwashing, avoiding crowded areas, and staying isolated from other people as much as possible.

In an effort to mitigate the deadly spread of the virus, BOP has instituted unprecedented lockdowns within its facilities for nearly a year, drastically restricting inmate movement, prohibiting visits with family and counsel, and suspending all programs. The risk posed by COVID-19 is particularly high for inmates like Mr. Aswat who suffer from severe mental illness and are extraordinarily vulnerable to the devastating effects of the isolation and lockdowns necessitated by this public health emergency.

Moreover, the balance of the 18 U.S.C. § 3553(a) factors has materially changed since Mr. Aswat was sentenced. Despite everything he has endured, Mr. Aswat has nonetheless taken numerous steps toward rehabilitation while serving his time. Prior to the suspension of all activities early last year, and despite the fact that he was held in solitary confinement for more than a year of his sentence, he had managed to complete over 73 hours of programs with BOP and countless hours of programming, education, and work while he was incarcerated in the U.K.[5] He is eager to return home to his family, reenter society, and build a productive life. He has done everything he can in the sixteen years he has been incarcerated to work toward those goals, despite the enormous obstacles he has faced. Because Mr. Aswat has already served most of his sentence, the retributive and deterrent objectives of sentencing have been accomplished. Nor will

---

[5] A copy of Mr. Aswat's BOP program record is attached hereto as Exhibit C.

4

he pose any danger to the community – upon release he will be immediately deported to the U.K., where he will live with his close-knit family and be subject to extensive supervision by U.K. authorities. Ex. A at 1-3; Ex. A-1. Mr. Aswat has acknowledged the seriousness of his crime, accepted responsibility for his actions, and expressed remorse. Keeping him in prison for the brief remainder of his sentence under such harrowing and unprecedented conditions is a punishment that Judge Forrest never could have anticipated when she first determined the appropriate sentence for him. The 3553(a) factors now favor release, and the Court should reduce Mr. Aswat's sentence to time served.

## FACTUAL BACKGROUND

### A.  Background and procedural history

Mr. Aswat was charged with conspiring to provide material support to a foreign terrorist organization between October 1999 and early 2000. PSR at 3-4. In June 2005 he was arrested in Zambia and transferred to his home country of the United Kingdom, where he remained incarcerated until his eventual extradition to the United States nearly a decade later. PSR at 2; ECF No. 497 at 33.

Although Mr. Aswat was initially placed in a prison in the U.K, he began to experience acute psychotic episodes as a result of the prison environment and was transferred to Broadmoor Hospital, where he was diagnosed with schizophrenia. ECF No. 504-2 at 3-5; Ex. A at 5. Broadmoor is a specialized medical facility structured to provide care for inmates like Mr. Aswat who suffer from severe mental health conditions that require continuous medication and treatment. *Id*. Mr. Aswat benefited enormously from the therapeutic environment at Broadmoor and was able to recover his cognitive coherence, stability, and typically gentle and soft-spoken demeanor. *Id*. As a result of Mr. Aswat's success in a specialized medical facility and grave

5

concerns about the availability of comparable resources in U.S. prisons, the U.K. government was extremely hesitant to extradite Mr. Aswat to the United States. Extradition negotiations between the two governments took almost ten years, and were only resolved when the U.S. government provided assurances to the U.K. that Mr. Aswat would receive the same level of mental health care and program access that he experienced at Broadmoor, specifically assuring that he would be detained in a specialized medical facility, would not be placed in solitary confinement, and would have continuous access to the same medical treatment, programming, and care. *See, e.g.*, ECF No. 523, Tr. 29:22-32:23; ECF No. 504-2 at 5-6; Ex. A at 5-6. The U.K. finally accepted the U.S. government's assurances and on October 21, 2014 he was extradited to the United States. ECF No. 510. Unfortunately, those assurances were almost immediately undermined: while awaiting trial in New York, Mr. Aswat was held at MCC and then MDC, during which time he was placed in solitary confinement on multiple occasions and was deprived of his medications for multiple days. ECF No. 523, Tr. 29:22-32:23.

On March 30, 2015, Mr. Aswat pleaded guilty to one count of conspiracy and one count of providing material support and resources to a foreign terrorist organization in violation of 18 U.S.C. § 2339B. ECF No. 485. Judge Forrest held a sentencing hearing on October 16, 2015. ECF No. 523. At sentencing, Judge Forrest expressed alarm at the fact that Mr. Aswat had been held in solitary confinement during pretrial detention and emphasized his need for consistent mental health treatment if she were to impose the maximum sentence of 240 months, seeking assurances from the government that Mr. Aswat would not be confined in conditions that would cause his mental health to deteriorate. *Id.*, Tr. 22:24-23:16. The government assured Judge Forrest that BOP was more than capable of providing Mr. Aswat with all necessary medical care and mental health treatment while in custody, and that his well-being would not be harmed. *Id.*,

Tr. 23:17-26:18. The government also specifically argued in its sentencing memorandum that BOP policy would prohibit Mr. Aswat from being placed in solitary confinement, and therefore the maximum sentence was warranted. ECF No. 503 at 23-25, 25 n.8. Defense counsel reminded the Court of the enormous hesitance of the United Kingdom to extradite Mr. Aswat to the United States because it was so concerned about the impact of U.S. prison conditions on Mr. Aswat's mental health, and noted that the government's assurances had already been undermined by BOP almost immediately following extradition. *Id*.

 Judge Forrest ultimately accepted the government's assurances and sentenced Mr. Aswat to two 120-month sentences of incarceration, to run consecutively, for a total of 240 months. ECF No. 523, Tr. 64:15-16. However, she specifically recognized Mr. Aswat's significant mental health needs and recommended that he be housed only in a facility that provided specialized psychiatric care, and encouraged him to apply for permission to serve his sentence in the U.K. rather than the U.S. *Id*., Tr. 64:17-65:11. She also signed an order of judicial removal ordering that Mr. Aswat be immediately deported upon his release. ECF No. 510; ECF. No. 523, Tr. 65:9-11. Mr. Aswat's projected release date is October 13, 2022. Ex. B. With good time credit, he has already served over 90% of his sentence. *Id*.

On July17, 2020, Mr. Aswat made a request to the Warden of FMC Devens that he be released pursuant to the compassionate release statute due to the risk posed to him by COVID-19 and the impact of the lockdowns on his mental health. On August 24, 2020, BOP denied his request. Ex. D.[6] On September 15, 2020, Mr. Aswat again requested compassionate release from the Warden of FMC Devens due to the increasing impact of the lockdowns and total isolation on

---

[6] A copy of BOP's August 24, 2020 letter to Mr. Aswat is attached hereto as Exhibit D.

his mental health. Ex. E.[7] BOP denied his request again on September 30, 2020. Ex. F.[8] Because

more than 30 days have elapsed since Mr. Aswat made his requests to BOP, his petition is ripe

for review pursuant to 18 U.S.C. § 3582(c)(1)(A).

### B. Mr. Aswat's mental health condition makes him particularly vulnerable to the impact of COVID-19

As this Court is well aware, COVID-19 has been ravaging the country since early 2020

and is now in its third wave. There have been over 27.8 million cases and 490,326 deaths in the

United States alone since the pandemic began. *See* N.Y. Times, *Coronavirus in the U.S.: Latest

Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html

(last visited Feb. 18, 2021). The spread of new and more contagious variants in recent weeks has

made efforts to control the pandemic even more precarious. *Id.* The impact has been particularly

severe in jails and prisons, where inmates have little to no ability to follow the protective

guidance issued by the CDC, including avoiding crowded areas and practicing social distancing.

Those life-saving measures are impossible to implement in a correctional institution like FMC

Devens, which has limited access to personal hygiene and medical care, poor ventilation, and no

possibility of staying at a safe distance from other people.

As a result, nearly 377,497 prisoners have been infected with COVID-19 nationwide

since the pandemic began, and over 2,400 have died. *See* The Marshall Project, *A State-By-State

Look at Coronavirus in Prisons*, https://www.themarshallproject.org/2020/05/01/a-state-by-state-

look-at-coronavirus-in-prisons (last updated Feb. 12, 2021). As case rates have risen over the last

few months, BOP has seen an explosion of cases among both inmates and staff, including over

47,000 inmate cases total and 222 inmate deaths. BOP, *COVID-19 Update*,

---

[7] A copy of Mr. Aswat's September 16, 2020 letter to BOP is attached hereto as Exhibit E.
[8] A copy of BOP's September 30, 2020 letter to Mr. Aswat is attached hereto as Exhibit F.

https://www.bop.gov/coronavirus/ (last updated Feb. 16, 2021). Although FMC Devens had previously not seen as many cases as some other institutions, there has recently been a sharp uptick in case rates and the facility reinstituted a complete lockdown for four weeks, during which time Mr. Aswat was confined to his cell 24 hours per day and denied any contact with family or counsel. According to current BOP data, 7 inmates and 9 staff members have currently tested positive at FMC Devens. *Id*. 10 inmates have died. *Id*. As BOP has acknowledged, prison staff are not immune from contracting the virus or spreading it to others. As of today over 6,300 staff members have been infected, and that number is rising. *Id*. Those staff members live in their communities and move freely between their homes and the facilities in which they work. Given the rising case rates and the grim outlook for the coming months, the threat posed to the people incarcerated there is grave.

That threat is uniquely acute for Mr. Aswat, who suffers from schizophrenia and schizoaffective disorder and is extraordinarily vulnerable to isolation and lockdowns. When Mr. Aswat was first incarcerated in the U.K., it became clear that a regular prison environment triggered episodes of acute psychosis and he was transferred to Broadmoor Hospital, which is structured to provide care for those with severe mental health conditions. He remained at Broadmoor until he was extradited, and was able to achieve a stable mental state, due in large part to a consistent, specialized medication regimen, sustained relationships with doctors who were familiar with his case, and continuous access to a therapeutic environment, including participation in various programs, group activities, education, recreation, and therapeutic access to the hospital grounds. ECF No. 504-2 at 3-5; Ex. A at 5. The U.S. government was only able to secure his extradition after almost ten years of negotiations and after providing assurances that Mr. Aswat would receive the same level of mental health care and program access as he had at

9

Broadmoor. *See, e.g.*, ECF No. 523, Tr. 29:22-32:23; ECF No. 504-2 at 5-6; Ex. A at 5.

Sadly, those assurances were almost immediately undermined following extradition. As described above, Mr. Aswat was put in solitary confinement on multiple occasions during pretrial detention and was deprived of access to his medication for periods of days. ECF No. 523, Tr. 29:22-32:23. After sentencing, Mr. Aswat was incarcerated at FMC Fort Worth. Although he initially adjusted well, because he did not have a consistent treating physician to calibrate his medications, he began to decompensate and experience acute psychotic episodes. BOP responded by placing him in solitary confinement, where he was held for over a year across multiple institutions. During this time Mr. Aswat experienced repeated disruptions to his medication and was cut off from all contact with his family and loved ones, causing him intense distress, multiple episodes of psychosis, and eventually suicidal ideation. *See* Aswat 2017 BOP Medical records; Aswat 2018 BOP Medical Records; Aswat 2019 BOP Medical Records. He was transferred to FCI Butner, and transferred again to FMC Devens, during which time he remained in solitary confinement. Despite all the odds, Mr. Aswat eventually achieved mental stability when he was allowed to return to regular housing, his medications were restored, and he once again had access to programs and family contact. He was able to regain what is by all accounts his typical mild-mannered, respectful, trusting, and soft-spoken demeanor and experienced a period of relative adjustment while serving his sentence. ECF No. 504-2 at 4-7. Then the pandemic hit.

Since early 2020, BOP has been compelled to institute stringent lockdowns to attempt to control the deadly spread of the virus. All programs have been suspended across BOP facilities and FMC Devens has been subject to varying degrees of lockdown over the past year. Most recently, the facility instituted a complete lockdown starting in mid-December and lasting four

weeks. Mr. Aswat was confined to his cell 24 hours per day and was allowed out only a few times per week to shower. During this time he was again refused any contact with his family, and the prison also refused him contact with counsel, despite counsel's repeated requests and the pendency of this motion. Those conditions have been absolutely grueling for Mr. Aswat, whose heartbreaking history of incarceration shows that he is exceedingly vulnerable to isolation.

Despite all of those debilitating restrictive measures, Mr. Aswat nonetheless learned that he tested positive for COVID-19 during the most recent lockdown. While this certainly does not exclude him from reinfection, as will be discussed in detail below, it does reduce the likelihood that his physical health is at immediate risk from the virus. However, as the Court is well aware, the end of the pandemic is nowhere in sight. Mr. Aswat's mental health is extraordinarily precarious, and every day that he spends in the current conditions at a facility like FMC Devens – let alone the conditions during inevitable future lockdowns – increases the risk to his mental health and forces him to endure conditions of incarceration that Judge Forrest never could have imagined at the time of sentencing.

## ARGUMENT

### A.  Legal standard

A court may reduce a term of imprisonment under 18 U.S.C. § 3582 if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Once the Court has determined that such circumstances exist, it must also consider the factors set forth in 18 U.S.C. § 3553(a). *Id.* § 3582(c)(1)(A).

While § 3582(c)(1)(A) originally did not permit prisoners to initiate compassionate release proceedings, the First Step Act now allows defendants to file compassionate release motions directly with the courts once they have exhausted their administrative remedies with

BOP. *See United States v. Ebbers*, No. 02 Cr. 1144 (VEC), 432 F. Supp. 3d 421, 422–23, 427 (S.D.N.Y. 2020). Because it has been at least 30 days since Mr. Aswat filed his request with the Warden of FMC Devens, the exhaustion requirement has been satisfied.

As the Second Circuit recently clarified, the First Step Act freed district courts to exercise their discretion in determining what qualifies as "extraordinary circumstances" when considering a compassionate release motion. *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020). While courts had previously treated the Sentencing Commission's guidance as applicable to all compassionate release motions, the Second Circuit made clear that, where a compassionate release motion is brought directly by the defendant, U.S.S.G. § 1B1.13 "is not applicable" and "cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling." *Id.* at 236; *see also United States v. Rojas*, No. 01 Cr. 257 (AT), ECF No. 304, at *4 (S.D.N.Y. Dec. 18, 2020).

Moreover, "in assessing a § 3582(c) motion brought directly by a defendant, the Court is not constrained by either § 1B1.13's enumeration of extraordinary and compelling reasons, or its freestanding requirement that the defendant seeking release not pose any danger to the community." *United States v. Lizardi*, No. 11 Cr. 1032 (PAE), ECF No. 2523, at *5 (S.D.N.Y. Oct. 9, 2020) (citing *Brooker*, 976 F3d at 237). Rather, the Court may "consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before [it] in motions for compassionate release" along with any applicable § 3553(a) factors. *Brooker*, 976 F.3d at 237.

**B. Extraordinary and compelling circumstances warrant compassionate release**

Mr. Aswat has demonstrated that "extraordinary and compelling reasons warrant" a reduction in his sentence. 18 U.S.C. § 3582(c)(1)(A). As courts in this district have

acknowledged, "'the threat of COVID-19 to those in prison,' by itself, 'constitutes an extraordinary and compelling reason for compassionate release.'" *United States v. Avery*, No. 14 Cr. 810 (JMF), ECF No. 539, at *1 (S.D.N.Y. Nov. 16, 2020) (citing *United States v. Pacheco*, No. 12 Cr. 408 (JMF), 2020 WL 4350257, at *1 (S.D.N.Y. July 29, 2020); *United States v. Arango*, No. 15 Cr. 104 (JMF), 2020 WL 3488909, at *2 (S.D.N.Y. June 26, 2020); *United States v. Pena*, No. 15 Cr. 551 (AJN), 459 F. Supp. 3d 544, 552 (S.D.N.Y. May 8, 2020)). Because Mr. Aswat suffers from serious mental illness, he continues to face extraordinary risk from COVID-19 each day that he remains incarcerated.

First, Mr. Aswat is uniquely vulnerable to the harrowing conditions of confinement that have been necessitated by the pandemic. Solitary confinement has long been shown to have a devastating impact on those with mental illness, as it has had on him. *See, e.g.*, Metzner & Fellner, Journal of the American Academy of Psychiatry and the Law, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics* (March 2010), http://jaapl.org/content/38/1/104. As researchers have repeatedly found, when an inmate is subjected to isolation "the stress, lack of meaningful social contact, and unstructured days can exacerbate symptoms of illness or provoke recurrence. Suicides occur disproportionately more often in segregation units than elsewhere in prison. All too frequently, mentally ill prisoners decompensate in isolation, requiring crisis care or psychiatric hospitalization. Many simply will not get better as long as they are isolated." *Id*. at 105 (citations omitted). The extended lockdowns imposed by BOP, including at FMC Devens, have increasingly taken on an alarming resemblance to the typical conditions of solitary confinement: confinement to a small cell for close to 24 hours per day, complete lack of access to social activities, movement, or recreation, lack of programming, highly restricted access to medical care or interaction with psychiatrists,

13

lack of access to social contact, suspension of all visits, and prohibition of contact with family

and counsel. *See id*. at 104. Such conditions have been implemented to varying degrees by BOP

for almost a year now, with FMC Devens instituting a total lockdown for four weeks straight as

recently as December. Those restrictions have caused alarm to researchers since the pandemic

began, and are being shown to have a deleterious effect on vulnerable prisoners. *See, e.g.,* The

Marshall Project, *What Happens When More Than 300,000 Prisoners Are Locked Down?* (Apr.

15, 2020), https://www.themarshallproject.org/2020/04/15/what-happens-when-more-than-

300-000-prisoners-are-locked-down? While Mr. Aswat has so far endured the most recent round

of lockdowns without decompensating, the risk of such an outcome is enormous given his

medical history. His particular vulnerability to the harrowing conditions of the last year

constitutes an extraordinary and compelling reason justifying release, and courts in this district

and others have granted compassionate release where a defendant's mental health has been

impacted by the restrictions necessitated by COVID-19. As Judge Rakoff recently opined:

> It is likewise not surprising that [the defendant's] efforts to cope with his PTSD
> have been seriously undermined by the conditions imposed on prisoners because of
> the pandemic. The very steps being taken to prevent [the defendant] from
> contracting the virus have aggravated his mental condition. [The doctor] opined
> that the present lockdown has led to "a worsening of [the defendant's] chronic
> symptoms" . . . . [concluding] that under present circumstances, fear for [the
> defendant's] well-being is justified, and the possibility of suicide cannot be
> dismissed . . . . This danger constitutes an "extraordinary and compelling reason"
> warranting a reduction in the term of imprisonment.

*United States v Pina*, No. 18 Cr. 179 (JSR), 2020 WL 3545514, at *2 (S.D.N.Y. June 29, 2020).

Judge Rakoff also found that defendants suffering from mental illness experience substantial

obstacles to their ability to practice self-care during the pandemic:

> [The defendant's] efforts to practice self-care in terms of his PTSD while in prison
> have relied upon activities – e.g., exercise – that have been substantially curtailed
> to prevent the spread of COVID-19. More generally, his confinement to his cell for
> 22 hours a day cannot help but exacerbate his depression and anxiety. With the

14

spread of COVID-19 continuing to accelerate nationwide, the Court has no reason to believe that [the prison] will lift its present precautions in the foreseeable future. Accordingly, and based upon the doctors' reports, the Court concludes that this combination of circumstances "substantially diminish[ ] the ability of the defendant to provide self-care within the environment of" [the prison] and that he "is not expected to recover" from those symptoms while incarcerated.

*Id.*; *see also United States v Amaro*, No. 16 Cr. 848 (KPF), 2020 WL 3975486, at *3 (S.D.N.Y. July 14, 2020) (finding extraordinary and compelling reasons warranting compassionate release due to combination of risk posed to defendant by COVID-19, comorbidities, and inadequacy of mental health care within BOP facility). Mr. Aswat is experiencing exactly those same conditions, and his risk of decompensation increases every day that he remains incarcerated.

Moreover, preliminary research has shown that patients who suffer from schizophrenia have an increased risk of mortality and adverse health care outcomes than those without such a diagnosis. *See, e.g.*, Fond et al., Oxford Academic, Schizophrenia Bulletin: The Journal of Psychoses and Related Disorders, *Disparities in Intensive Care Unit Admission and Mortality Among Patients With Schizophrenia and COVID-19: A National Cohort Study* (Oct. 22, 2020), https://academic.oup.com/schizophreniabulletin/advance-article/doi/10.1093/schbul/sbaa158/5935036. Although the CDC does not currently include mental health conditions on its list of illnesses that might put patients at higher risk for severe illness from COVID-19, there are many factors that would contribute to such adverse outcomes, particularly those who suffer from schizophrenia.

Second, the fact that Mr. Aswat recently tested positive for COVID-19 does not necessarily exclude him from reinfection, nor does it make him ineligible for compassionate release. Although rare, as scientists learn more about the virus they are finding that reinfection is possible, and that such cases are on the rise. *See* Science Magazine, *More people are getting COVID-19 twice, suggesting immunity wanes quickly in some* (Nov. 18, 2020),

https://www.sciencemag.org/news/2020/11/more-people-are-getting-covid-19-twice-suggesting-immunity-wanes-quickly-some. Courts in this district and others have granted compassionate release to inmates following recovery from COVID-19, both to avoid the possibility of reinfection and to ensure that they can be provided with adequate medical care. *See, e.g., United States v. Barajas*, No. 18 Cr. 0736 (NSR), 2020 WL 3976991, at *10-11 (S.D.N.Y. July 13, 2020) (granting compassionate release to defendant who had been infected with COVID-19 because of possibility of reinfection and demonstrated inability of the prison to stem the spread of the virus, raising the "very real risk that re-exposure to the virus could spell disaster for [the defendant]") (collecting cases where courts granted compassionate release owing to the danger of long-term complications even in "asymptomatic" cases and the possibility of reinfection after recovering from COVID-19); *United States v. Staats*, No. 17 Cr. 0461 (AB), 2020 WL 6888224, at *5-6 (E.D. Pa. Nov. 24, 2020) (granting compassionate release to defendant who tested positive for COVID-19 because of potential for reinfection and failure of prison to protect inmates from the virus); *United States v. Mongelli*, No. 02 Cr. 0307 (NGG), 2020 WL 6449237, at *3 (E.D.N.Y. Nov. 3, 2020) (granting compassionate release to defendant who tested positive for COVID-19 on the basis of his diminished access to medical care in prison); *United States v. Vega*, No. 89 Cr. 229 (JS), ECF No. 788, at *10 (E.D.N.Y. Dec. 02, 2020) (granting compassionate release to defendant who tested positive for COVID-19 given diminished capacity to provide self-care while incarcerated). The Court should do the same here.[9]

Finally, although the Court is no longer required to consider U.S.S.G. § 1B1.13(2) in its

---

[9] The fact that BOP has begun preliminary vaccination efforts at certain facilities should not change the Court's analysis. Even if Mr. Aswat were able to receive a vaccine in the near future – an unlikely outcome – BOP has issued a guidance statement recommending that, even after vaccination, all restrictive measures should remain in place. *See* BOP, *COVID-19 Vaccine Guidance* at 3 (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. This would do nothing to ameliorate the impact on Mr. Aswat's mental health.

analysis after *Brooker*, it is worth noting that Mr. Aswat does not pose "a danger to the safety of any other person or to the community." Mr. Aswat committed his crime in the late 1990s and has served 16 years in prison. Upon release he will be immediately deported to the United Kingdom and will not be able to pose a danger to anyone in the community. This Court has recently held that a defendant's deportation upon release does not militate against a sentence reduction, noting that courts in this district routinely grant compassionate release to defendants subject to deportation. *See United States v. Rojas*, No. 01 Cr. 257 (AT), ECF No. 304, at *7 (granting compassionate release to defendant who had served more than 75% of his lengthy sentence and would be deported to Columbia) (collecting cases).

Moreover, Mr. Aswat will be subject to extensive post-sentence supervision in the United Kingdom for at least 30 years after he is released. Ex. A at 3. That supervisory regime will require Mr. Aswat to keep the U.K. government apprised of his whereabouts, personal information, addresses, phone numbers, financial information, passport information, and any travel. Ex. A-1. He will essentially be subject to the equivalent of supervised release for the rest of his life, including having a dedicated case officer, 24-hour monitoring of his movements, a curfew, home visits, and interventions as necessary. *Id*. Even if he were inclined to re-offend – which he is not – it would be nearly impossible to do so without immediately alerting the U.K. authorities. Courts in this district and others have granted compassionate release to defendants convicted of even more serious crimes and who will be subject to deportation and supervisory restrictions upon release, especially in the U.K. *See, e.g, United States v Bary*, No. 98 Cr. 1023 (LAK), 2020 WL 5946985, at *4 (S.D.N.Y. Oct. 7, 2020) (granting compassionate release to terrorism defendant who only had a few weeks left on his sentence and would be immediately deported to the U.K.); *United States v. Ferizi*, No. 16 Cr. 42 (LMB), ECF No. 105, at *7-8

17

(E.D.Va. Dec. 3, 2020) (granting compassionate release to terrorism defendant who would be deported to Kosovo, had expressed remorse, had no criminal history prior to the offense, and who had strong family support).

Importantly, Mr. Aswat has maintained close ties with his parents, nine siblings, twenty-seven nieces and nephews, and other extended family, with whom he ordinarily speaks multiple times per week. His long separation from his family during his many years of incarceration – particularly in the last year of constant lockdowns – has been particularly painful for him. He wants nothing more than to reunite with them as soon as possible. Any concern that the Court may have that Mr. Aswat will recidivate if he is released before serving the remaining months of his sentence should be resolved by the fact that he will be deported immediately back to the U.K., where he will live with his parents, and where his entire extended family lives within a one-mile radius. Ex. A at 3. Mr. Aswat will be able to work in either of the two family businesses that his parents and siblings operate in town, using skills he has acquired while serving his sentence. *Id*. at 3. Not only will Mr. Aswat benefit enormously from his close-knit family's ongoing presence and support as he readjusts to post-incarceratory life, he will be subject to rigorous supervision by the U.K. government. Ex. A-1.

Mr. Aswat has used his term of incarceration to work toward significant rehabilitation and to prepare himself for a productive life when he is released. Although inmate programs have been suspended since the pandemic began in the spring, and despite spending a significant portion of his sentence in solitary confinement, Mr. Aswat had previously completed almost 73 hours of programs with BOP, worked at any inmate jobs that were available, and completed countless hours of programs while incarcerated in the U.K., including courses in math, science, engineering, sociology, social living, music, carpentry, sewing, electrical repair, mental health

awareness, and anger management. *See* Ex. C; ECF No. 504-2 at 5-6. He has done everything possible to better himself while serving his sentence, and is eager to reunite with his family and start rebuilding his life.

Mr. Aswat is simply not the same young man he was more than twenty years ago. He has finally received a mental health diagnosis that has allowed him to access the significant medical and therapeutic interventions that are necessary for him to function in society. He does not pose a danger to his community either here or in the U.K., and will benefit from the utmost support from his family and community once he returns home.

**C.  The § 3553(a) factors favor a reduction in sentence**

Once the Court has established that extraordinary and compelling reasons exist, as they do here, it must consider whether the § 3553(a) factors weigh in favor of a sentence reduction. 18 U.S.C. § 3582(c)(1)(A)(i). The balance of those factors has changed considerably since October 2015. When Judge Forrest first imposed the maximum sentence of 240 months, she did so only because the government assured her that Mr. Aswat would not be confined in conditions of isolation that would cause his mental health to deteriorate again. ECF No. 523, Tr. 22:24-26:18. Heartbreakingly, Mr. Aswat nonetheless spent a considerable portion of his sentence in just such harrowing conditions, made all the worse by the COVID-19 pandemic, which has significantly altered the sentencing analysis.

First, the pandemic has changed the analysis of the "history and characteristics of the defendant" and the "need . . . to provide the defendant with needed . . . medical care," 18 U.S.C. § 3553(a). As discussed above, Mr. Aswat's continued incarceration poses an immediate threat to his mental and physical health because his severe schizophrenia makes him uniquely vulnerable to isolation and lockdowns – a risk that is rising by the day while he remains

incarcerated.

Second, Mr. Aswat's term of confinement has been more harrowing than Judge Forrest could possibly have imagined at the time of sentencing. For the last year, Mr. Aswat has been subject to severe restrictions on his movements as BOP has imposed near constant lockdowns in an effort to arrest the spread of the infection among inmates. Mr. Aswat has only been able to leave his cell for a brief period of time each day, if at all, has had no access to programs or recreation, and has been unable to see any of his family members or even speak to them on the phone for extended periods of time. On top of this, he has been living in constant fear and anxiety of becoming infected himself. Courts have consistently recognized that such harsh conditions of confinement should be factored into motions for compassionate release. As Judge Engelmayer recently explained, "[a] day spent in prison under extreme lockdown and in legitimate fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing." *Lizardi*, ECF No. 2523, at *7-8 (collecting cases) (releasing defendant with no underlying health issues, concluding that the combination of COVID, jail conditions, the short period left on his sentence, and other 3553(a) factors constituted extraordinary and compelling circumstances). *See also Pacheco*, 2020 WL 4350257, at *2 ("the conditions of [the defendant's] confinement — which have included any number of serious restrictions designed to stem the spread of the virus, [] — have been far harsher than the Court had reason to believe they would be when imposing an eight-month sentence") (internal citations omitted).

Third, Mr. Aswat has already served over 90% of his sentence with good time credit. The goals of both specific and general deterrence, retribution, and incapacitation have all been

20

achieved, and he will never put himself in such a position again. Mr. Aswat had no criminal history prior to the instant offense. As detailed above, he has demonstrated significant rehabilitation in the nearly two decades he has been incarcerated, and has been working diligently toward preparing himself for a successful reentry to society. He has maintained close ties with his parents, siblings, and extended family, benefits greatly from their love and support, and is looking forward to reuniting with them as soon as he can. He has received a life-changing mental health diagnosis and now has the tools to seek the medical and therapeutic care that will allow him to function in society. He does not present a danger to the community. Each day by which Mr. Aswat can reduce his term of imprisonment and begin his term of supervision in the U.K. will spare him exposure to a deadly infection without undermining the goals of sentencing.

Because the goals of sentencing have been largely achieved, and because Mr. Aswat's continued detention now poses imminent danger of acute psychosis and all its attendant risks, not to mention severe illness or death – a situation that Judge Forrest could not have anticipated when imposing sentence – the § 3553(a) factors now weigh heavily in favor of granting Mr. Aswat compassionate release.

## CONCLUSION

For the foregoing reasons, Mr. Aswat respectfully requests that the Court grant his request for compassionate release and reduce his sentence to time served.


Dated: February 26, 2021                              Respectfully submitted,
      New York, New York


                                               /s/ Peter Quijano
                                             Peter Quijano
Anna Sideris
Quijano, Ennis & Sideris P.C.
40 Fulton Street, 23rd Floor
New York, NY 10038
(212) 686-0666
peter@qandelaw.com

Megan Wall-Wolff
Wall-Wolff LLC
90 Broad Street, 22nd Floor
New York, NY10004
(212) 920-0257
mwallwolff@wallwolff.com

*Attorneys for Haroon Aswat*