# EXHIBIT A



**U.S. Department of Justice**

Criminal Division

---

*Washington, D.C. 20530*

May 8, 2012

Mr. Alexander Fraser
Home Office
5th Floor, Fry Building
2 Marsham Street
London, England SW1P 4DF

> Re:   Extradition of Haroon Aswat
>       **(Application no. 17299/12, Aswat v. the United Kingdom)**

Dear Mr. Fraser:

This is in response to the letter from the Registrar of the European Court of Human Rights dated 10 April 2012, requesting additional information in support of the request for the extradition of Haroon Aswat. In response to the request, officials from the Department of Justice and the Federal Bureau of Prisons (Bureau or BOP) provided the information set forth below.

**1.    What relevance is there, if any, of Mr. Aswat's transfer from HMP Long Lartin to Broadmoor Hospital on account of his mental health?**

Upon his arrival in the United States to face prosecution, Mr. Aswat would have a full opportunity to argue that he lacks mental competency to stand trial in the United States. Any challenge to his competency would be resolved by the trial judge pursuant to firmly established legal standards and procedures.

The Constitution of the United States mandates that a defendant may not face criminal prosecution unless he is competent to stand trial. *See United States* v. *Quintieri*, 306 F.3d 1217, 1232 (2d Cir. 2002) (quoting *Medina* v. *California*, 505 U.S. 437, 439 (1992)). As the United States Supreme Court has explained, "[c]ompetence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so." *Cooper* v. *Oklahoma*, 517 U.S. 348, 354 (1996) (citations omitted). Accordingly, were Mr. Aswat to raise his competency to face criminal prosecution in the United States, the court would need to assess Mr. Aswat's competency before permitting any trial to proceed.

This pretrial competency determination would be made pursuant to Title 18, United States Code, Section 4241. Section 4241 is a statute of general application that provides, in pertinent part:

> At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant . . . the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a).

In determining whether a competency hearing is warranted under Section 4241(a), trial judges may – and routinely do – rely on the reports of medical professionals, including reports provided by defense counsel, as well as the defendant's full medical records. *See, e.g.*, *Quintieri*, 306 F.3d at 1233; *United States* v. *Nichols*, 56 F.3d 403, 414 (2d Cir. 1995); *United States* v. *Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995); *United States* v. *Oliver*, 626 F.2d 254, 258-59 (2d Cir. 1980). These records would presumably include information on all of Mr. Aswat's medical history, including recording relating to his transfer from HMP Long Lartin to Broadmoor Hospital. If the court concludes that there is reasonable cause to believe that the defendant may be incompetent, there is "an affirmative obligation on the part of the trial court to order a competency hearing when warranted by the evidence." *Nicks* v. *United States*, 955 F.2d 161, 168 (2d Cir. 1992). Prior to such a competency hearing, and to prepare for it, "the court may order that a psychiatric or psychological examination of the defendant be conducted." 18 U.S.C. § 4241(b).

Following any competency hearing, which typically involves testimony from various medical experts who have examined the defendant, the trial judge determines whether the defendant is competent to stand trial. "The defendant must have (1) 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' and (2) 'a rational as well as factual understanding of the proceedings against him.'" *Nichols*, 56 F.3d at 410 (quoting *Dusky* v. *United States*, 362 U.S. 402 (1960) (per curiam)); *see also Godinez* v. *Moran*, 509 U.S. 389, 396 (1993); *United States* v. *Morrison*, 153 F.3d 34, 46 (2d Cir. 1998); *United States* v. *Hemsi*, 901 F.2d 293, 295 (2d Cir. 1990). In determining whether the defendant meets these standards, the trial court may properly rely on a number of factors, including medical opinions and the district court's observation of the defendant's comportment. *Nichols*, 56 F.3d at 411; *Hemsi*, 901 F.2d at 295-96; *Oliver*, 626 F.2d at 258-59.

A competency evaluation may be appealed under the collateral order doctrine. *See United States* v. *Gold*, 790 F.2d 235, 238-39 (2d Cir. 1986). In other words, if the trial judge were to find Mr. Aswat competent to stand trial and Mr. Aswat wished to challenge that competency

determination, Mr. Aswat would be able immediately to appeal the court's determination to the United States Court of Appeals for the Second Circuit. The Second Circuit would need to affirm the district court's competency determination before Mr. Aswat's trial could proceed.

**2.**     **Prior to Mr. Aswat's surrender to the USA, would details of his mental health condition be provided to the U.S.'s authorities?**

Because this question asks about what information the authorities in the United Kingdom would share with us, this question seems directed to the United Kingdom authorities. While normally we would not review such psychiatric records given privacy concerns, if the defendant were to waive any such privacy rights, U.S. authorities would be willing to review them prior to Mr. Aswat's transfer.

**3.**     **After surrender, what steps would be taken by the United States ' authorities:**
        **(i) to assess whether Mr Aswat would be fit to stand trial; and ,**
        **(ii) to ensure that, in the event of his conviction, his mental health condition would properly be taken into account in determining where he would be detained?**

Please see the response to Question 1 above, which sets forth the procedure by which a defendant's mental competency to stand trial is assessed under U.S. law. With regard to the second part of the question, see below.

        a.     Where will Mr. Aswat be housed before and after conviction and sentencing

Prior to and pending trial, Mr. Aswat will not be housed at the United States Penitentiary, Administrative Maximum Facility (ADX) in Florence, Colorado since the ADX does not have the mission of housing inmates who are un-sentenced and pending trial.

The process for the recommendation, review, and designation, if appropriate, of an inmate to the ADX has been provided on several occasions in these matters. The designation of an inmate to the ADX is a classification decision premised on recommendations that a particular inmate needs additional controls to ensure the safe and secure operation of correctional facilities and to promote public safety. Medical, psychological, and psychiatric concerns are considered by the designation team and information regarding those matters is required to be provided. Depending upon the level of medical, psychological, and psychiatric care the inmate needs, a determination of housing is made. Thus, if Mr. Aswat were considered for designation to the ADX, and the Designations and Sentence Computation Center determined that a hearing was warranted, the inmate may present documentary evidence and make oral statements as to why he should not be designated to ADX in light of his mental health. However, Mr. Aswat will not be able to present evidence against his designation to ADX until after sentencing, since, allowing him to present evidence prior to sentencing is equivalent to a request for a pre-sentence designation of a criminal defendant.

The statutory authority to designate an inmate is vested exclusively with the BOP, in accordance with Title 18 U.S.C. § 3621(b). The impediment to any type of pre-designation is set forth in subsection (a) wherein it states that, "A person *who has been sentenced* to a term of imprisonment . . . shall be committed to the custody of the Bureau of Prisons." (Emphasis

added).  Subsection (b) provides that, "The Bureau of Prisons shall designate the place of a prisoner's imprisonment."  *Id.*  Thus, two events must transpire before the Bureau can properly designate an individual.  First, the individual has to be found guilty and sentenced to a term of imprisonment.  Second, the individual has to be committed to the custody of the Bureau via the Judgment in a Criminal Case.  Without these two preconditions being satisfied, subsection (b) is not made effective, thus depriving the Bureau of statutory authority to perform an initial designation.

Because Mr. Aswat has not been convicted, sentenced or committed to the custody of the Bureau, the statutory authority enumerated in 18 U.S.C. § 3621(a)-(b) does not pertain to him at this time and, therefore, giving him permission to state where he would be housed is not possible.  *United States v. Miller,* 594 F.3d 1240, 1242 (10th Cir. 2010) ("BOP cannot designate a place of confinement until Mr. Miller is in federal custody"); (citing *Hernandez v. United States,* 689 F.2d 915, 919 (10th Cir. 1982) (without custody of the defendant, "the Attorney General was in no position to designate a place of confinement"); *see also United States v. Pungitore,* 910 F.2d 1084, 1119 (3d Cir. 1990) (the Attorney General "simply will not be called upon to [designate the place of confinement] until the state sentence is completed and the defendant is delivered to federal custody").

    b.    Facilities for managing his schizophrenia

The Bureau offers a stratified approach to the delivery of mental health services which is comparable in many ways to the system of mental health care found in the community.  Mental health services range from inpatient psychiatric treatment, to residential treatment programs, to outpatient psychological and psychiatric services.  As in the community, the vast majority of mental health care in the Bureau is provided on an outpatient basis at the local institution level by the Psychology Services Department working in collaboration with either a full-time or consultant psychiatrist.

Mental health services in the Bureau are delivered by psychiatrists and doctoral-level psychologists.  This hiring standard ensures mental health providers in the Bureau have a minimum of four years of graduate level, supervised training in the treatment of mental illnesses.  This standard meets, or exceeds, the community standard for mental health providers in the United States.  All Bureau facilities are equipped to manage mentally ill inmates, including those with schizophrenia, as each institution employs doctoral-level psychologists and has access to psychiatric services.  Many inmates with mental illnesses, including schizophrenia, are managed successfully in mainline institutions through the treatments of choice which include medication, clinical case management, and cognitive-behavioral interventions.  While a diagnosis of schizophrenia would not preclude a designation to a maximum security facility, most inmates with this diagnosis are managed and treated in other facilities.  Conditions of confinement are largely determined by security needs and would be modified based on mental illness only if the inmate's mental status warranted such a change (e.g., if his mental status deteriorated).

The Bureau provides a structured living environment for inmates with significant staff oversight.  This environment allows for prompt identification of mental health concerns, provides immediate access to mental health professionals, and facilitates compliance with mental health treatment.  All inmates confined in the Bureau are evaluated by Health Services staff

within 24 hours of arrival. At that time, their medication regimens are reviewed and continued, as appropriate. Thus, any mental health medications the inmate may be taking would be noted and continued as appropriate, upon admission. Additionally, an inmate's mental health status is evaluated to determine whether there is any imminent risk of self-harm or suicide and whether he or she is stable and appropriate for placement in the designated setting. If Health Services staff has any concerns at the time of admission, a doctoral level psychologist will be called to consult.

In all cases, regardless of the outcome of the initial evaluation performed by Health Services staff, all new designees are seen within 14 days for evaluation by a doctoral level psychologist. This evaluation focuses on collecting a mental health history, as well as identifying any current symptoms and determining treatment needs. All inmates are classified based on their mental health treatment needs to ensure appropriate placement, treatment, and follow-up services to be provided.

Psychologists are a visible presence in the institution — in the cafeteria, on the compound, and in the housing units. In addition, a psychologist is on-call 24 hours a day, 7 days a week, with a prompt response to the institution in the event of a mental health crisis. All inmates have direct access to psychological services from doctoral level psychologists. Ordinarily, these services include: crisis intervention, ongoing clinical case management of mental illnesses, brief counseling focused on a specific issue or problem, individual psycho-therapy, and psycho-educational and/or therapeutic groups. Inmates may access these services through self-referral or may be referred by institution staff. In addition, all inmates who need psychotropic medication are seen regularly by a psychiatrist.

On occasion, despite best efforts to work with mentally ill inmates at the local institution level, more intensive mental health services are required. In these cases, an acutely mentally ill inmate is typically referred to one of the Bureau's Psychiatric Referral Centers for acute psychiatric care. Under Bureau policy, acute psychiatric care is defined as care, including but not limited to, crisis intervention for inmates who are persistently suicidal, homicidal, or unable to function in the institution without creating a dangerous situation due to their mental illness. These inpatient services are generally brief, with the goal of returning the inmate to a level of functioning that would allow him or her to return to the designated institution.

Alternatively, seriously, but not acutely, mentally ill inmates may be placed in one of the Bureau's residential mental health treatment programs, which provide long-term, intensive mental health care. The Bureau is committed to providing high-quality, evidence-based residential treatment programs to all inmates in need of these services. The BOP's Psychology Treatment Programs (PTPs) are designed using the most recent research- and evidence-based practices. These practices lead to a reduction in inmate misconduct, mental illness and behavioral disorders; substance abuse, relapse, and recidivism; and criminal activity. These practices also lead to an increase in the level of the inmate's stake in societal norms and in standardized community transition treatment programs. Transition treatment increases the likelihood of treatment success and increases the public's health and safety. Inmates are referred to these programs based on need and appropriateness of the program to the inmate's security level.

Decisions concerning the appropriateness of transfer to a Psychiatric Referral Center are based on the best judgment of the treating clinicians (i.e., psychologist, staff psychiatrist, or consulting psychiatrist) and are typically dependent upon such factors as the severity of the mental illness, the specific characteristics and resources of the institution, and relevant patient variables. Inmates who are disruptive to the orderly running of the institution, but who are not mentally ill, are not generally appropriate referrals to a Psychiatric Referral Center.

In the case of schizophrenia, the treatment of choice is medication, clinical case management, and cognitive behavioral interventions, with inpatient admissions only as necessary to manage brief psychiatric emergencies, should they arise. The Bureau attempts to manage and treat the mental illnesses of all offenders in the least restrictive environment appropriate to their mental health and security needs. Therefore, an inmate's security level would only be adjusted due to schizophrenia should behavioral issues or a psychiatric emergency warrant such an adjustment. The Bureau currently incarcerates many inmates diagnosed with schizophrenia, the majority of whom is managed and treated successfully in general population settings.

    c.    Review of detention decision

If Mr. Aswat were to be detained in the ADX, his detention would be subject to review. Generally, the status of inmates is reviewed in three ways: Classification, Program Review, and a Progress Report. Classification and Program Review refer to the procedure whereby an inmate's case is formally reviewed by the Unit Team. These meetings are generally referred to as "team" and the inmate is present. Team meetings are intended to give staff and inmates the opportunity to discuss issues in an open format. This is the inmate's opportunity for individual attention and he or she should be encouraged to ask questions and discuss concerns.

Classification is the initial team meeting whereby a careful review of the case and inmate's history are discussed and relevant programs are recommended. The purpose of the meeting is to define clearly for the inmate: (1) sentence information, including financial obligations; (2) educational programs; (3) security/custody levels; (4) release plans; and (5) work assignments. These programs reflect the needs of the inmate and are stated in measurable terms. Generally, initial classification occurs within four weeks of an inmate's arrival at his designated institution.

Subsequent team meetings are referred to as Program Reviews. These meetings are held at least once every six months (every three months for inmates with less than one year remaining to serve) and are conducted to monitor and evaluate the inmate's progress in all program areas. Program participation is discussed in relation to the schedule developed at initial classification. New and/or revised goals are developed as necessary. A progress report is the principal document used by the Unit Team to evaluate the behavior and activities of inmates. The progress report is a detailed, comprehensive account of an inmate's case history, prepared by the Case Manager at prescribed intervals during the inmate's confinement. Generally, the Case Manager composes the progress report with input from other unit staff, work detail supervisors, and education instructors. The progress report reflects the inmate's past status, assesses his current status, and offers an indication of anticipated accomplishments. This could include the inmate's continued participation in a program, and what he plans to do at the completion of the

program, or if he plans to use what he has learned upon his release. Information is also provided on the inmate's relationship with others (both staff and inmates), particularly with respect to attitude, punctuality, etc. A progress report is required, at a minimum, once every three years. At the ADX, the inmates are provided with a copy of the most current progress report. Upon request, an inmate may read and receive a copy of any progress report retained in the inmate's central file.

An ADX inmate's status is also reviewed under Institution Supplement FLM 5321.0J(1), General Population and Step-Down Unit Operations. In addition, Mr. Aswat would have access to the Bureau's Administrative Remedy Program, which is set forth in Program Statement 1330.16, Administrative Remedy Program, and, as with any inmate of the ADX, he would be able to seek review of any issue relating to their confinement before the United States District Courts. All of these procedures have been described in detail before and are not repeated here.

d.     Review of mental condition

As mentioned above, if designated to the ADX, Mr. Aswat's mental condition will be subject to regular review. Inmates designated to the ADX undergo a psychological intake evaluation upon arrival. At that time, an inmate may be referred to the mental health chronic care clinic, which is an outpatient clinic with services provided by a psychiatrist. Such an inmate would be seen, at least, every six months by the psychiatrist. However, the inmate may always request to be seen more frequently.

As noted above, inmates are classified based upon their mental health care needs. Inmates may receive psychological services monthly, weekly, or daily (inpatient), based upon their classification, and more frequently should a crisis situation arise. Inmates who are receiving psychiatric medications are seen periodically by Health Services staff based on clinical need, as well as if they request to be seen. An inmate also may request psychiatric or psychology services orally or in writing from ADX staff.

In addition, psychological services are available to all inmates at the ADX, through the Psychology Services department. The Psychology Services department provides a full range of services, as noted above, including evaluation, clinical case management, psychotherapy, and

other treatment interventions, such as smoking cessation, stress and anger management, and interventions providing alternatives to a criminal lifestyle, within the context of the structure of the ADX.

If you have any further questions, please do not hesitate to contact us.

Sincerely,

Mary Ellen Warlow
Director

By:

Lystra G. Blake
Associate Director